# United States District Court
# For the District of Columbia

<table>
<tr><td>

_____

**HAWAI`I ORCHID<br>GROWERS ASSOCIATION**,<br>C/O Donald Eberly, President<br>14-4865 Iliani Road<br>Post Office Box 2069<br>Pahoa, Hawai`i 96778

    **Plaintiffs**,

    **v.**

**UNITED STATES DEPARTMENT<br>OF AGRICULTURE**,

SERVE:   Kenneth L. Wainstein<br>          Interim United States Attorney<br>          for the District of Columbia<br>          Judiciary Center<br>          555 Fourth Street, N.W.<br>          Washington, D.C. 20530-0001

          Alberto R. Gonzales<br>          Attorney General<br>          Room 5111<br>          Tenth Street and<br>          Constitution Avenue, N.W.<br>          Washington, D.C. 20530-0001

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

Civil Action No. 05-1182 (RCL)

</td></tr>
</table>

```
              and                        )
                                         )
Mike Johanns,                            )
                                         )
SERVE:    Mike Johanns                   )
          Secretary of Agriculture       )
          U.S. Department of Agriculture )
          Jamie L. Whitten Federal Building)
          Room 200-A                     )
          1400 Independence Avenue, S.W. )
          Washington, D.C. 20250-0002    )
                                         )
              and                        )
                                         )
W. Ron DeHaven,                          )
                                         )
SERVE:    W. Ron DeHaven, D.V.M.         )
          Administrator                  )
          Animal and Plant Health        )
           Inspection Service            )
          U.S. Department of Agriculture )
          Jamie L. Whitten Federal Building)
          Room 312-E                     )
          1400 Independence Avenue, S.W. )
          Washington, D.C. 20250-0312    )
                                         )
              and                        )
                                         )
UNITED STATES DEPARTMENT                 )
OF THE INTERIOR,                         )
                                         )
              and                        )
                                         )
```

- 2 -

**Gale Norton**,                                )
                                                )
SERVE:   Gale Norton                            )
         Secretary of the Interior              )
         U.S. Department of the Interior        )
         1849 C Street, N.W.                     )
         Washington, D.C. 20240-0001            )
                                                )
         and                                    )
                                                )
**Matthew J. Hogan**,                           )
                                                )
SERVE:   Matthew J. Hogan                       )
         Acting Director                        )
         U.S. Fish and Wildlife Service         )
         1849 C Street, N.W.,                    )
          Mailstop 3256 MIB                     )
         Washington, D.C. 20250-0002            )
                                                )
         **Defendants**.                        )
_____

AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

NATURE OF THE ACTION

1.  Plaintiffs file this Amended Complaint in accordance with FEDERAL RULE OF
CIVIL PROCEDURE 15(a), and Plaintiffs seek herein declaratory and injunctive relief
under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 and under the Endan-
gered Species Act, 16 U.S.C. § 1531 *et seq*. Plaintiffs challenge the Biological Opinion

- 3 -

and a Final Rule of the Animal and Plant Health Inspection Service, United States Department of Agriculture, which allows importation of an additional taxon of plants, epiphytic orchids of the genus *Phalaenopsis* (moth orchids) from Taiwan established in a growing medium. As of Friday, June 4th, 2004 such importation is allowed subject to the growing, inspection, and certification requirements of 7 C.F.R. § 319.37-8(e) (a part of that which is referred to generally as the "Quarantine 37" regulations). "Importation of Orchids of the Genus *Phalaenopsis* From Taiwan in Growing Media," 69 Fed. Reg. 24916-36 (2004) (to be codified at 7 C.F.R. § 319.37-8(e)). Plaintiffs assert that the Biological Opinion by Defendant Animal and Plant Health Inspection Service, after Endangered Species Act consultations with the Fish and Wildlife Service, United States Department of the Interior, the Biological Opinion that the Final Rule will not adversely affect Federally-listed or proposed Endangered or Threatened Species or their habitats, 69 Fed. Reg. 24916 (2004), is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. Plaintiffs assert that Defendant's Fish and Wildlife Service, United States Department of the Interior concurrence with the Biological Opinion effects an unlawful "Taking." Plaintiffs assert that Defendant's Fish and Wildlife Service, United States Department of the Interior concur-

- 4 -

rence with the Biological Opinion by Animal and Plant Health Inspection Service that the Final Rule will not adversely affect Federally-listed or proposed Endangered or Threatened Species is itself arbitrary, capricious, an abuse of discretion, and not in accordance with law because it disregards the risk of invasion of alien species from Taiwan through introduction of suitable breeding habitats. Plaintiffs assert that Defendant United States Department of Agriculture and Defendant United States Department of the Interior are both in unlawful breach of their obligations under a Memorandum of Understanding concerning a project at Kahului Airport on the island of Maui, State of Hawai`i to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet.

Parties

2.  Hawai`i Orchid Growers Association is an unincorporated non-profit association established in 1995 in Hawai`i County, State of Hawai`i that promotes coordinated efforts among breeders, propagators, and growers of orchids in Hawai`i and supports marketing, research, and educational projects. Hawai`i Orchid Growers Association here asserts claims for declaratory and injunctive relief in its name on behalf of its members. Hawai`i Revised Statutes § 429-7(b). One or more members of the

Hawai`i Orchid Growers Association are growers of potted *Phalaenopsis* spp. orchids; one or more members of the Hawai`i Orchid Growers Association are growers of orchids other than *Phalaenopsis* spp. orchids. One or more members of the Hawai`i Orchid Growers Association are producers of plants other than *Phalaenopsis* spp. orchids. One or more members of the Hawai`i Orchid Growers Association will suffer immediate, irreparable injury as a result of the Biological Opinion and the subsequent Final Rule allowing the importation of finished, flowering *Phalaenopsis* spp. potted orchid plants, this from invasive alien species and from threats to Endangered or Threatened Species that occur in California, in south Florida, in Hawai`i, and in the tropical Territories and Commonwealths associated with the United States. Defendant United States Department of Agriculture is an Agency and entity of the United States. Defendant United States Department of Agriculture has its principal place of business in the District of Columbia. Mike Johanns is the Secretary of Agriculture. Secretary Johanns is sued in his official capacity only. W. Ron DeHaven, D.V.M., is the Administrator, Animal and Plant Health Inspection Service, United States Department of Agriculture. It was the Animal and Plant Health Inspection Service, United States Department of Agriculture which, on April 7th, 2003 gained the concurrence of the Fish

and Wildlife Service, United States Department of the Interior in a Biological Opinion that the proposed Final Rule would not adversely affect Federally-listed or proposed Endangered or Threatened Species, and then in a Final Rule published Wednesday, May 5th, 2004 added orchids of the genus *Phalaenopsis* from Taiwan to the list of plants that may be imported in an approved growing medium subject to specified growing, inspection, and certification requirements. Dr. DeHaven is sued in his official capacity only. Defendant United States Department of the Interior is an Agency and entity of the United States. Defendant United States Department of the Interior has its principal place of business in the District of Columbia. Defendant Fish and Wildlife Service, United States Department of the Interior concurred with the Biological Opinion by Animal and Plant Health Inspection Service that the Final Rule will not adversely affect Federally-listed or proposed Endangered or Threatened Species. Gale Norton is the Secretary of the Interior. Secretary Norton is sued in her official capacity only. Matthew J. Hogan is the Acting Director, United States Fish and Wildlife Service. Acting Director Hogan is sued in his official capacity only. Secretary Johanns, Dr. DeHaven, Secretary Norton, Acting Director Hogan, the United States Depart-

ment of Agriculture, and the United States Department of the Interior are hereinafter referred to, collectively, as "the Defendants."

JURISDICTION AND VENUE

3.   This Court has jurisdiction under 5 U.S.C. § 702, 16 U.S.C. § 1540(g)(1), and 28 U.S.C. § 1331. This Civil Action arises from the Final Rule published Wednesday, May 5th, 2004 which is now final, 5 U.S.C. § 704, and from the Biological Opinion of the Animal and Plant Health Inspection Service which preceded it. This Court previously considered this Final Rule in *Hawai`i Orchid Growers Assoc. v. U.S. Department of Agriculture, et al.*, 2005 U.S. Dist. LEXIS 4548 (D.D.C. 2005). This Court there dismissed for want of jurisdiction the Endangered Species Act claims that are the subject of this Civil Action. *Id.*, 2005 U.S. Dist. LEXIS 4548 *8.

4.   Venue is proper in this Court under 5 U.S.C. § 703, 16 U.S.C. § 1540(g)(3)(A), and 28 U.S.C. § 1391(e).

5.   The requested relief is proper under 5 U.S.C. § 706; under 16 U.S.C. § 1540(g)-(1); and under 28 U.S.C. §§ 1361, 2201, 2202.

6.   In compliance with 16 U.S.C. § 1540(g)(2)(A)(i), and more than sixty days prior to the filing of this Civil Action, Plaintiffs gave Notice to Defendants of Plaintiffs'

intent to file suit under the citizen suit provision of the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(A), for Defendants' violations of: (a) Section 2(c)(1) of the Endangered Species Act, 16 U.S.C. § 1531(c)(1), by failing to ensure that Agency actions, specifically, Agency actions under the Final Rule entitled "Importation of Orchids of the Genus *Phalaenopsis* From Taiwan in Growing Media," 69 Fed. Reg. 24916-36 (2004) (to be codified at 7 C.F.R. § 319.37-8(e)), conserve Federally-listed Endangered Species and Threatened Species and do not jeopardize the continued existence of Endangered Species and Threatened Species or critical habitat; (b) Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), by failing to ensure that this Final Rule is not likely to jeopardize the continued existence of any Federally-listed Endangered Species or Threatened Species, or is not likely to result in the destruction or adverse modification of critical habitat of such Species, and by failing to use the best scientific and commercial data available in the consultations over the Biological Opinion that preceded this Final Rule; and (c) Section 9 of the Endangered Species Act, 16 U.S.C. § 1538(a), through past, present, and planned future actions which have resulted in, and imminently threaten to continue, unlawful "Take" of Federally-listed Endangered Species and Threatened Species with-

- 9 -

in the meaning of said Section and implementing regulations. The violations complained of in the Notice are continuing and have not been remedied.

AVERMENTS

<u>Kahului Airport.</u>

7.   In connection with a project at Kahului Airport on the island of Maui, State of Hawai`i to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet, the Hawai`i Department of Transportation and the Federal Aviation Administration, United States Department of Transportation conducted a Biological Assessment and, as required by 16 U.S.C. § 1536(a)(2) initiated Endangered Species Act consultations with the Fish and Wildlife Service, United States Department of the Interior to assess the potential effects of the project on Federally-listed or proposed Endangered or Threatened Species or their habitats.

8.   A part of the Biological Assessment was a paper entitled "Effectiveness of Potential Mitigation Measures for Selected Invasive Alien Taxa" prepared and published by Dr. Francis Howarth of the Department of Natural Sciences, Bishop Museum, Honolulu, Hawai`i on February 3rd, 1997. A copy of this paper is Attachment 1 to this Complaint. The paper was later published as Appendix H of the "Alien Species Bio-

logical Assessment" prepared under contract with the Federal Aviation Administration, United States Department of Transportation and published on March 10th, 1997. Dr. Howarth has particular concern for invasion by biting midges, and he focuses on the risk on invasion by the *Culicoides* species through introduction of suitable breeding habitats, not on the risk of invasion that might be imposed through entry of specific hosts:

**Immature Midges in Breeding Habitats:**

**Pre Entry:**

• Damp absorbent material (such as sphagnum, other mosses, and wood chips) used to transport cut flowers and other fresh plant and animal material can harbor immatures of biting midges as well as many other pests. Some *Culicoides* aestivate as dry immatures and can rehydrate and emerge when moistened. This strategy allows for efficient long-distance dispersal in untreated material. Larvae or other immature stages are likely to be found in breeding substrates at any time of the year, even in the temperate region. *Culicoides obsoletus* is thought to over winter as larvae. Therefore, the risk may not be seasonal, unless the shipment is treated or other precautions are taken.
• Treatment of this packing material before use is recommended. Treatments could include heat, dipping or washing with soap solution, or fumigation. Certification that organic packing material is free of pests would further reduce the risk.

**Port of Entry:**

• Suspected substrates should be looked for during inspections and treated if necessary.

• High risk material also may include fresh cut flowers and other living plant material, particularly from high risk areas. Larval biting midges have been intercepted in Hawaii in bromeliad leaf axils, a known habitat for some *Culicoides* species. The recent arrival of the mosquito, *Wyeomyia mitchellii*, is suspected of having been introduced with bromeliads from southeastern North America. A number of plant-feeding insects remain closely associated with their host; some are sessile like the scale and white fly on the stems, flowers, leaves, and fruits of plants.

• Other measures are listed in Table H2 and similar to the descriptions given for the ants.

**Post Entry**

• Organic packing material from high risk areas should be treated before disposal on Maui. This can be accomplished by heat, submersion in insecticidal or soap solution, or by fumigation. Heat (hot water dip) would probably be the cheapest and safest.

• Given the tiny size, cryptic behavior and high mobility, Culicoides are probably very difficult to control or eradicate once they become well established. Therefore, greater reliance must be placed on prevention.

*Effectiveness of Potential Mitigation Measures for Selected Invasive Alien Taxa*, Hawai`i Biological Survey Technical Report Number 3, February 3rd, 1997, at 9.

9. The Biological Assessment was completed on March 10th, 1997 under a contract with the Federal Aviation Administration, United States Department of Transporta-

tion. Two sections of the Biological Assessment, Section 5 "Determination of Alien Species" and Section 6 "Impact of Alien Species," deal with the toll taken on Hawai`i by the invasion of alien species. The Biological Assessment summarized in Section 5 the threat to Hawai`i posed by the invasion of alien species:

> At present, there are over 2,500 alien arthropod species of insects and about 75+ alien non-marine mollusks established in the wild in Hawaii (Howarth 1985). It is estimated (CGAPS 1996) that, each year, approximately 20 to 30 new alien insects make their way to Hawaii and become established. Annually, about three of these species turn out to be economic pests (OTA 1993). . . .
> . . . .
> The introduction of alien species is the greatest single threat to the conservation of native species and to the integrity of Haleakala National Park and other natural areas on Maui. (Brockie *et al.* 1988). The impacts caused by alien species are the most important factor in population declines, endangerment, and extinctions of native organisms in Hawaii. (CGAPS 1996; Holt 1996). Furthermore, alien species can undo all other conservation programs. Alien species are also a major impediment to agriculture and economic development (including tourism) in Hawaii, causing hundreds of millions of dollars of damage to the economy each year (CGAPS 1996). . . .

*Alien Species Biological Assessment for Kahului Airport Improvements, Kahului, Maui, Hawai`i*, March 10th, 1997, at 5-1.

10. Just as in Dr. Howarth's paper, Section 5 of the Biological Assessment likewise focuses on the risk on invasion by alien species through introduction of suitable

breeding habitats, not on the risk of invasion by alien species that might be imposed

through entry of specific hosts:

> About 2,000 alien species established in Hawaii arrived inadvertently. Many insects are masters at dispersal. They are common stowaways on aircraft hiding within the plane as well as in cargo. Most of the inadvertent species arrived associated with their host or the substrate used for diapause (*e.g.*, as eggs in soil, plant material, or on their vertebrate hosts). Species arriving on their hosts can be removed during inspection or quarantine, but many cryptic species escape this process. The invisibility of insects is emphasized by the convergent accumulation of the same pests on the same crops in different parts of the world. Over 400 insect species were purposefully introduced, mostly as biological control agents, but a few as pollinators or for other purposes. Many of these purposeful introductions have also had negative environmental impacts (Howarth 1985a; 1991).

*Alien Species Biological Assessment for Kahului Airport Improvements, Kahului, Maui,*

*Hawai`i*, March 10th, 1997, at 5-1.

11. Upon receipt of the Biological Assessment, on March 11th, 1997 the Federal

Aviation Administration, United States Department of Transportation provided it to

the Fish and Wildlife Service, United States Department of the Interior for Endan-

gered Species Act consultations as required by 16 U.S.C. § 1536(a)(2). The Fish and

Wildlife Service, United States Department of the Interior issued its Biological

Opinion on July 23rd, 1997. A copy of this Biological Opinion is Attachment 2 to

this Complaint. In its Biological Opinion, the Fish and Wildlife Service, United States Department of the Interior concludes, as to the effects of the project at Kahului Airport to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet, that:

> The most serious potential effects involve introduction of alien species. The effects of alien species have been cited as causes of past decline, and potential further decline, of all T&E [Federally-listed or proposed Endangered or Threatened Species] species in Hawaii (Asquith 1997, NMFS 1992, NMFS & USFWS 1996, USFWS 1983b, 1984, 1990, 1992b, 1996a, 1997, in prep. a, b). The Service believes that all presently listed species on Maui could be adversely affected by alien species not yet on Maui. . . .

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i*, July 23rd, 1997, at 7.

Almost all alien species introductions in Hawaii are the result of human actions, either governmental or private. For example, a total of 2275 alien invertebrates were intercepted by Federal inspectors in 1994. Out of this total, 89% were found in either air cargo or passenger baggage (Noda and Associates 1997). It is estimated that over 4373 alien species have become established in the wild in the Hawaiian Islands. This includes 956 plants, 46 birds, 19 mammals, 23 reptiles, 4 amphibians, 73 fish, and more than 3247 invertebrates (Eldridge and Miller 1997). In addition to the total number of alien species, the rate at which alien species are entering Hawaii is increasing. The average number of invertebrate introductions per year has gone from 16 during the years between 1937 and 1961, to 20 in the 1970s (TNCH 1992). The current estimated rate of invertebrate introduction to Hawaii is between 20-30 species per year (Noda and Associates 1997).

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i*, July 23rd, 1997, at 23.

The primary concern of the Service is the potential indirect effect of this project on listed and proposed species and critical habitat due to the potential introduction of alien species to the island of Maui (the indirect action area). The continuing influx of alien species poses a grave threat to all native species in Hawaii, including those on Maui. These species are introduced by accidental or deliberate transport on aircraft and ships. The proportion of these species that arrive by air is probably large (BA [the Biological Assessment of March 10th, 1997] table 1-5), especially for those species purposely transported by humans. Because of extensive interisland transport, even native species on other Hawaiian Islands could eventually be affected by alien organisms that become established on Maui.

There is little question that a large number of alien organisms which could be transported purposefully or inadvertently by air could, if established on Maui, cause or contribute to the eventual extinction of listed taxa. Examples include weaver ants, high-altitude mosquitoes, biting midges, snakes and predatory lizards (BA pp. 6-1 to 6-10). Alien plants and animals that colonize native ecosystems can affect listed and proposed species and critical habitat through a variety of means documented in scientific literature. In addition to the direct effects such as predation and herbivory (Cole *et al.* 1992, Sohmer 1996), parasitism (van Riper and van Riper 1985), and competition (Smith 1985), non-native species can interfere with pollination (Cole *et al.* 1992), promote disturbance such as fire (Smith 1985), change nutrient regimes (Vitousek *et al.* 1987), or favor the spread of other alien species (Wester and Wood 1997). . . .

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i*, July 23rd, 1997, at 24-25. In this Biolo-

gical Opinion, the Fish and Wildlife Service, United States Department of the Interior expressly precludes, because of the irreversible and catastrophic consequences of an invasion by an alien species, even the incidental "Take" of Endangered Species and of Threatened Species:

> Introduction of alien species as a result of this project, although unlikely, *would be practically irreversible and could have catastrophic consequences for one or more listed species* included in this biological opinion. Therefore, any incidental taking that results from such an introduction is not authorized. . . .

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i*, July 23rd, 1997, at 30 (emphasis added).

12. The Fish and Wildlife Service, United States Department of the Interior ultimately issued a "No Jeopardy" Biological Opinion, but doing so the Fish and Wildlife Service, United States Department of Interior required explicit measures to preclude the invasion of alien species at Kahului Airport:

> it is the Service's biological opinion that the Kahului Airport Improvements, including its "state of the art" alien species interdiction features, are not likely to jeopardize the continued existence of any endangered, threatened, or proposed endangered species on Maui. . . .

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i*, July 23rd, 1997, at 29. The alien species interdiction features required by the Fish and Wildlife Service, United States Department of the Interior include, *inter alia*:

- Pre-treatment of aircraft cargo holds to "greatly reduce the risk of biting midges, mosquitoes and other passively carried insects being introduced to Maui," this to be by "[n]on-chemical pesticidal measures such as sticky traps or light traps."

- new Agriculture Arrival Inspection Facilities including a data link between arrival gates and baggage claim; an X-ray machine to inspect arriving baggage (including carry-on baggage); and office space, kennels, and inter-terminal golf carts.

- additional Arrival Inspectors, an anticipated staffing level of two detector dogs and eleven human inspectors.

- a new Air Cargo Building, including an industrial air curtain barrier to prevent escape of any insects during inspection of air cargo containers; offices and facilities; lab space, freezer and sterilization/incineration facilities; space for X-ray equipment; and computer equipment and facilities for the Hawai`i Department of Agriculture's alien species database system.

- a Quality Control Program including yearly reports with "summaries of all alien species interceptions from airport-based operations, their origin and mode of arrival, to the extent possible, and estimates of the efficiency of the inspection system for various taxonomic groups of concern."

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i*, July 23rd, 1997, at 26-28.

13. On August 24th, 1998 the United States Department of Transportation, Defendant United States Department of the Interior, Defendant United States Department of Agriculture, the Hawai`i Department of Agriculture, the Hawai`i Department of Transportation, the Hawai`i Department of Land and Natural Resources, and the Hawai`i Department of Health entered into a Memorandum of Understanding concerning the project at Kahului Airport to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet. A true and complete copy of this Memorandum of Understanding is Attachment 3 to this Complaint. The Memorandum of Understanding is effective through August 24th, 2008. The Memorandum of Understanding commits all of the signatories "to work together to deter the introduction of alien species through the airport so as to benefit Maui's environment." Attached to the Memorandum of

Understanding is the "Federal-State Alien Species Action Plan for the Kahului Airport, Maui." The Memorandum of Understanding recognizes that the Federal-State Alien Species Action Plan is a dynamic document, subject to change as conditions warrant. The Federal-State Alien Species Action Plan itself requires "additional specific risk assessments as warranted to evaluate potential alien species introductions from particular points of origin." Neither Defendant United States Department of Agriculture nor Defendant United States Department of the Interior consulted with the Hawai`i parties about the impact and effect of the Final Rule here in issue on potential alien species introductions at Kahului Airport. No specific risk assessments for potential alien species introductions at Kahului Airport as a result of the Final Rule here in issue have been conducted.

Informal Rulemaking Proceedings.

14. Importation of plants and plant products is restricted or prohibited to prevent the introduction or dissemination of plant pests and noxious weeds. Subpart 37 of Section 319, Title 37, Code of Federal Regulations (known generally as "the "Quarantine 37" regulations) sets out prohibitions and restrictions on the importation of nursery stock, plants, roots, bulbs, seeds, and other plant products. Generally, this Subpart

requires that imported plants "shall be free of sand, soil, earth, and other growing me-

dia." 7 C.F.R. § 319.37-8(a). Now, certain greenhouse-grown plants from eleven listed

taxa may be imported in an approved growing medium. 7 C.F.R. § 319.37-8(e). This

Quarantine 37 provision specifies attributes for the greenhouses in which plants from

these eleven listed taxa are to be cultivated, including requirements that these green-

houses must have screening with openings of not more than 0.6 mm on all vents and

openings except entryways; that entryways must be equipped with automatic closing

doors, 7 C.F.R. § 319.37-8(e)(2)(ii); and that plants in these greenhouses must be root-

ed and grown in approved growing media on benches supported by legs and raised at

least 46 cm above the floor, 7 C.F.R. § 319.37-8(e)(2)(vi). These general program re-

quirements are supplemented for *Rhododendron* spp., 7 C.F.R. § 319.37-8(e)(2)(ii), -8-

(e)(2)(ix), -8(e)(2)(x), and for *Hyacinthus* spp., 7 C.F.R. § 319.37-8(f).

15. As required by 5 U.S.C. § 553(b), on September 1st, 1998 Animal and Plant

Health Inspection Service issued notice of a proposed Rule in the FEDERAL REGISTER.

63 Fed. Reg. 46403-46406 (1998). In 1997 the Government of Taiwan had requested

that Animal and Plant Health Inspection Service consider amending 7 C.F.R. §

319.37-8(e) to allow importation of *Phalaenopsis* spp. orchid plants established in

- 21 -

sphagnum moss as a growing medium. By April 1997 Animal and Plant Health In-
spection Service had concluded in a Risk Assessment that "the importation of *Phala-
enopsis* spp. orchids from any country—not just Taiwan—under the conditions re-
quired by § 319.37-8(e) would pose no greater pest risk than is posed by the importa-
tion of epiphytic orchid material currently allowed entry from any country as bare-
rooted plants under § 319.37-8(a) or established on other epiphytic growing media
(tree fern slabs, coconut husks, or coconut fiber) under § 319.37-8(d)." Thus Animal
and Plant Health Inspection Service proposed a Rule which would "allow *Phalaenop-
sis* spp. orchids to be imported into the United States established in approved growing
media from any country provided the orchids were produced, handled, and imported
in accordance with the requirements of § 319.37-8(e) . . . ." 63 Fed. Reg. 46404 (1998).

16.  Included also with the notice of the proposed Rule, in accordance with 5 U.S.C.
§ 603, was an Initial Regulatory Flexibility Analysis which announced Animal and
Plant Health Inspection Service's preliminary view, based on admittedly limited infor-
mation, that "there is no basis to conclude that the impact of this proposed Rule
would result in any significant impact on a substantial number of small entities." 63
Fed. Reg. 46406 (1998). Animal and Plant Health Inspection Service then offered no

specific phytosanitary measures beyond the general program requirements contained in 7 C.F.R. § 319.37-8(e). *Id.*

17. The Hawai`i Orchid Growers Association provided Comments on November 30th, 1998 as later did the Society of American Florists, the American Nursery and Landscape Association, the Hawai`i Department of Land and Natural Resources, the Hawai`i Department of Agriculture, the United States Fish and Wildlife Service, the United States Department of the Interior, the United States Geological Survey, the University of Hawai`i, and Hawai`i's Congressional Delegation. The Office of the Chief Counsel for Advocacy of the United States Small Business Administration explicitly responded to the Initial Regulatory Flexibility Analysis, and, as well, the Hawai`i Orchid Growers Association explicitly responded to the Initial Regulatory Flexibility Analysis.

18. In October 2002, as required by 16 U.S.C. § 1536(a)(2), Animal and Plant Health Inspection Service initiated Endangered Species Act consultations with the Fish and Wildlife Service, United States Department of the Interior to assess the potential effects of the proposed Rule on Federally-listed or proposed Endangered or Threatened Species or their habitats. On April 7th, 2003 the Fish and Wildlife Service,

United States Department of the Interior concurred with the Biological Opinion of the Animal and Plant Health Inspection Service that the proposed Rule would not adversely affect Federally-listed or proposed Endangered or Threatened Species or their habitats, this a "No Jeopardy" opinion. The Fish and Wildlife Service, United States Department of the Interior considered no alien species interdiction features such as those it had imposed to preclude the invasion of hitchhiking alien species at Kahului Airport, alien species interdiction features that were a condition of the "No Jeopardy" Biological Opinion earlier issued by the Fish and Wildlife Service, United States Department of the Interior. Neither did the Fish and Wildlife Service, United States Department of the Interior consider the difference between an assessment of risk of alien species invasion through entry of specific hosts, *viz.*, *Phalaenopsis* spp. orchid plants, and an assessment of risk of alien species invasion through introduction of suitable breeding habitats for alien species, i.e., the pots in which mature *Phalaenopsis* spp. orchid plants will enter from Taiwan.

19. In response to the Comments that had been submitted on the proposed Rule, on May 9th, 2003 Animal and Plant Health Inspection Service narrowed the application of the proposed Rule to *Phalaenopsis* spp. orchids from Taiwan only, published

an Environmental Assessment, and revised and reissued the Risk Assessment of 1997 as the Risk Analysis of 2003. 69 Fed. Reg. 24916-24917 (2004). Animal and Plant Health Inspection Service did not then revise its Initial Regulatory Flexibility Analysis nor review the Comments that had been received on that Initial Regulatory Flexibility Analysis. 68 Fed. Reg. 24915 (2003).

20. Animal and Plant Health Inspection Service's 1997 Risk Assessment and 2003 Risk Analysis are supposedly premised on available scientific literature and Animal and Plant Health Inspection Service's pest inspection records for imported seedlings of the genus *Phalaenopsis* and the plant family *Orchidaceae*. 69 Fed. Reg. 24920 (2004). In fact, the 1997 Risk Assessment and the 2003 Risk Analysis are limited to "quarantine pests" "specifically linked in scientific literature or APHIS interception records with orchids of the genus *Phalaenopsis*." 69 Fed. Reg. 24922 (2004). This focus on the risk of invasion of alien species through entry of specific hosts, orchids of the genus *Phalaenopsis*, rather than the risk of invasion of alien species through introduction of suitable breeding habitats, is entirely inconsistent with the Biological Assessment of March 10th, 1997 prepared for the Federal Aviation Administration, United States Department of Transportation and entirely inconsistent with the Biological

Opinion of July 23rd, 1997 by the Fish and Wildlife Service, United States Department of the Interior, both assessing the effects of the project at Kahului Airport to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet. This Biological Assessment and the Biological Opinion focus not on the risk of invasion of alien species through entry of specific hosts, but rather on the risk of invasion by alien species through introduction of suitable breeding habitats. Animal and Plant Health Inspection Service's 1997 Risk Assessment and the 2003 Risk Analysis expressly do not consider "accidental hitchhikers." Contrariwise, the alien species interdiction features imposed in the Biological Opinion by the Fish and Wildlife Service, United States Department of the Interior as a condition of the "No Jeopardy" finding for the project at Kahului Airport to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet are focused on accidental hitchhikers.

21. The 1997 Risk Assessment and the 2003 Risk Analysis consider only the climate of the Mainland United States, and there only of south Florida, whose climate is akin to the tropical climate of Taiwan, and was thought to be at risk. The Animal and Plant Health Inspection Service does not regard Hawai`i's unique ecology. Hawai`i's

unique ecology has been recognized by the well-respected but now defunct Congressional Office of Technology Assessment:

> Hawaii has a unique indigenous biota, the result of its remote location, topography, and climate. Many of its species, however, are already lost, and at least one-half of the wild species in Hawaii today are non-indigenous. New species have played a significant role in the extinction of indigenous species in the past and continue to do so. Hawaii, the Nation, and the world lose something valuable as the indigenous flora and fauna decline. . . .
>
> By many measures, the Hawaiian Islands represent the worst-case example of the Nation's NIS [non-indigenous species] problem. No other area in the United States receives as many new species annually, nor has as great a proportion of NIS established in the wild. At the same time, Hawaii, the Nation's so-called extinction capital, has the greatest concentration of threatened and endangered species in the United States and the greatest number of extinct species as well. While habitat destruction has been and continues to be a main factor in the demise of the indigenous biota, NIS[1] have been identified as an important, if not the most important, current threat (27,85,86,128).
>
> In addition, Hawaii may be the State most visibly transformed by NIS. Most of the coastal areas and lowlands of the mountainous islands appear to be the proverbial paradise-green, often lush, replete with birds and flowers. But except in a few pockets, most of the trees, foliage, flowers, and birds are non-indigenous. Only at higher elevations can one find any appreciable expanse of the globally unique flora and fauna.

U.S. Congress, Office of Technology Assessment, *Harmful Non-Indigenous Species in the United States, OTA-F-565*, at 234.

22. The approved organic growing media, 7 C.F.R. § 319.37-8(e)(1), in which greenhouse-grown plants may be imported under the Quarantine 37 provision (peat, sphagnum moss, and volcanic rock) and other damp absorbent material that is also authorized under the Quarantine 37 provision are well able to harbor biting midges, larvae, and other immature alien pests as noted in the Biological Assessment prepared for the Federal Aviation Administration, United States Department of Transportation and in the Biological Opinion by the Fish and Wildlife Service, United States Department of the Interior, both conducted for Kahului Airport. These alien pests are tiny, exhibit cryptic behavior, and are highly mobile, thereby making detection at ports-of-entry extremely difficult, at best.

23. Animal and Plant Health Inspection Service concludes, for the greenhouses in which potted *Phalaenopsis* spp. orchid plants are to be grown to maturity in Taiwan over a period of fifteen months, that the "screen mesh size required under the regulations in § 319.37-8(e) is sufficient to exclude all life stages of all quarantine pests of *Phalaenopsis* spp. orchids identified in our risk analysis, except for the crawler stage of *Planococcus minor.*" 69 Fed. Reg. 24928 (2004). But there is sound scientific evidence, this from Rutgers Cooperative Extension, the State University of New Jersey,

- 28 -

that greenhouse screening with a hole size not larger than 0.1905 mm is required to exclude flower thrips. http://www.rce.rutgers.edu/pubs/pdfs/fs640.pdf.

24. It is clear from the Administrative Record before Animal and Plant Health Inspection Service that identified *Thripidae* quarantine pests of *Phalaenopsis* spp. orchids in Taiwan, including *Dichromothrips* sp., *Frankliniella intonsa* (Trybom), *Frankliniella schultzei* (Trybom), and *Thrips palmi* Karny, will not be excluded from the supposed "pest-exclusionary" greenhouse by screening (the requirement is that the pest-exclusionary greenhouse must have screens on all vents and openings with hole sizes not more than 0.6 mm) even with hole sizes as small as 0.073 mm. Indeed, neither will the required 0.6 mm screen hole size exclude the mealy-bug, *Planococcus minor*, a quarantine pest, and one of the only two of thirty-five identified alien arthropod pests of *Phalaenopsis* spp. orchids in Taiwan that was deemed of significance by the Animal and Plant Health Inspection Service because *Planococcus minor* will spread along the pathway initiated by importation from Taiwan of finished, flowering *Phalaenopsis* spp. orchid plants in pots.

25. The Government of Taiwan has requested, and received, approval of the use of sphagnum moss as a growing medium. 63 Fed. Reg. 46403 (1998). Use of sphagnum

moss as a growing medium in greenhouses in Taiwan will vector a hitchhiker, a blood-sucking midge, *Forcipomyia taiwana*. This blood-sucking pest is very small (a very narrow body, and some 1.4 mm in length), and is distributed island-wide. A recent article in the JOURNAL OF MEDICAL ENTOMOLOGY, Volume 37, Number 2 (2000), "Distribution and Seasonal Occurrence of *Forcipomyia taiwana* (Diptera: Ceratopogonidae) in the Nantou Area in Taiwan," at pages 205-09, teaches that populations of *Forcipomyia taiwana* have increased rapidly, that *Forcipomyia taiwana* females deposit eggs on moist substrate, and that *Forcipomyia taiwana* adults aggregate in hedgerows and agricultural fields. Just as the required 0.6 mm screen opening for the supposed "pest exclusionary" greenhouse will exclude neither identified *Thripidae* quarantine pests of *Phalaenopsis* spp. orchids in Taiwan, nor the mealybug, *Planococcus minor*, so also will this required 0.6 mm screen opening not exclude *Forcipomyia taiwana* adult females, and these *Forcipomyia taiwana* adult females will find the treated sphagnum moss growing medium, kept moist to support ideal orchid culture in the greenhouses, an inviting place to deposit their eggs. *Forcipomyia taiwana* is just one species of blood-sucking midge endemic to Taiwan, and to China. This particular blood-sucking midge, known in Taiwan as "little

King Kong," has become a serious environmental problem in Taiwan. http://www.-taipeitimes.com/News/taiwan/archives/2003/10/08/2003070855. The larger genus is *Culicoides*, with 30 species in Taiwan, and another 80 species in China. Of the 1,400 *Culicoides* species known worldwide, 96 percent are obligate blood suckers. Only a screen opening smaller than 0.203 mm will prevent entry of *Culicoides*. Chemical control is usually futile. These blood-sucking midges are known to transmit both human pathogens and pathogens of domesticated and non-domesticated animals. *Culicoides* species are vectors of arboviruses, such as the West Nile virus. There are no *Culicoides* in Hawai`i. Biting midges are a serious economic impact on tourism in coastal resort areas and in mountain areas. The bites cause itching and, in sensitive people, welts and lesions that last for several days.

26. Again, the Hawai`i Orchid Growers Association provided Comments, this time on July 9th, 2003. Comments were also submitted by the Society of American Florists, the Florida Nurserymen & Growers Association, the American Nursery & Landscape Association, the Hawai`i Department of Agriculture, and Hawai`i's Congressional Delegation.

- 31 -

27. On May 5th, 2004 Animal and Plant Health Inspection Service issued its Final Rule amending 7 C.F.R. § 319.37-8(e) to allow importation of *Phalaenopsis* spp. orchid plants from Taiwan established in an approved growing medium. 69 Fed. Reg. 24916-24936 (2004).

28. And Animal and Plant Health Inspection Service published, in accordance with 5 U.S.C. § 604(a), its Final Regulatory Flexibility Analysis. Animal and Plant Health Inspection Service concludes that the Final Rule "will likely have a significant adverse economic impact on many U.S. growers of potted *Phalaenopsis* plants, many of whom are probably small entities," 69 Fed. Reg. 24932 (2004); that this Final Rule will possibly have an adverse economic impact "on U.S. growers of orchids other than *Phalaenopsis* spp. orchids, many of whom are also probably small in size," *Id.*; and that this Final Rule "may have adverse economic impacts on producers of other plants besides *Phalaenopsis* spp. orchids." 69 Fed. Reg. 24934 (2004). Ultimately, Animal and Plant Health Inspection Service says that "we do not believe continuing to prohibit the importation of *Phalaenopsis* from Taiwan is justified, since we have determined that *Phalaenopsis* from Taiwan can be imported in growing media without introducing plant pests or noxious weeds into the Unit-

ed States." 69 Fed. Reg. 24933 (2004). Animal and Plant Health Inspection Service considers only one specific host, *Phalaenopsis* spp. orchid plants, not the pots filled with damp sphagnum moss in which these *Phalaenopsis* spp. orchid plants enter the United States, pots that are a highly suitable habitat for invasive alien species. Neither is Animal and Plant Health Inspection Service concerned with a possible infestation in Hawai`i of *Forcipomyia taiwana*, one species of many blood-sucking midges endemic to Taiwan, and to China: "We do not believe that this action will have an impact on Hawaii's tourism industry because there is no evidence to suggest that the pests . . . will enter the United States in association with *Phalaenopsis* spp. plants imported in approved growing media from Taiwan." 69 Fed. Reg. 24934 (2004).

29. This Final Rule is effective June 4th, 2004. 69 Fed. Reg. 24916 (2004).

30. The Final Rule allows entry into the United States of finished, flowering *Phalaenopsis* spp. orchid plants from Taiwan established in pots containing approved growing media. 69 Fed. Reg. 24936 (2004). Finished, flowering *Phalaenopsis* spp. orchid plants in pots have put out flower spikes. Scientific literature teaches that orchid flower spikes increase pest risk because they provide a habitat for mites, mealybugs, blos-

som midges, thrips, and other blossom-infesting organisms. Hara, A. H. and Hata, T. Y., "Pests and Pest Management," pages 34 through 36, and 40, in K. Leonhardt and K. Sewake, *Growing Dendrobium Orchids in Hawai`i*, Production and Management Guide, College of Tropical Agriculture and Human Resources, University of Hawai`i at Manoa (1999).

The Hawai`i Growers.

31. There are about 150 active growers in Hawai`i depending on epiphytic orchids for economic existence, and another 100 active growers that rely on epiphytic orchids to supplement their income. All are small businesses, and a typical grower has some 10 employees, involving about 3,000 people in this industry. Hawaiian orchid growers import many of the orchid seedlings that they use to establish potted epiphytic orchid plants. Most epiphytic orchid seedlings are imported bare-root, having been previously transferred out of sterile flasks and grown in-vivo for three to nine months, else they are imported growing in agar or other transparent or translucent tissue culture medium and still contained in sterile flasks. 7 C.F.R. § 319.37-8(c). Prior to June 4, 2004 international trade in *Phalaenopsis* spp. orchid plants was limited to such bare-root seedlings, ergo non-flowering orchid plants. 63 Fed. Reg. 46405 (1998).

32. It takes some fifteen months on a nursery bench to establish an epiphytic or-
chid seedling in a pot as an orchid plant. Over and above the cost of the orchid seed-
ling, it costs between $0.12 and $0.15 per month to raise the plant domestically. The
process requires considerable hand labor, and it does not lend itself to automation.
Finished potted epiphytic orchid plants are sold to other Hawaiian growers/shippers
at wholesale prices, direct to Mainland retailers with freight paid by the retailers, or to
Mainland nurseries or distributors, again with freight paid by the Mainland nursery or
distributor. Shipments are typically by overnight express carrier. Wholesale prices for
potted epiphytic orchid plants range between $4.00 and $8.50. Potted epiphytic orchid
plants are sold at retail for prices ranging $12.00 and $30.00.

33. While overall the State of Hawai`i is experiencing a booming trade in tourism,
East Hawai`i, the area around the city of Hilo on the moist, windward side of the Big
Island, Hawai`i, has been especially hard-hit economically by sugar plantation clos-
ures, and has always lacked a tourism base due to its heavy rainfall and dearth of
beaches. And it is East Hawai`i in which the domestic orchid industry has shown its
most explosive growth, more than tripling in acreage in orchid cultivation in the last

10 years—due to low land costs, a favorable tropical climate, and an abundant supply of pure water.

34. The point of domestic re-growing of imported *Phalaenopsis* spp. seedlings is to allow the orchid plants to put out flower spikes—orchid seedlings or orchid plants without flower spikes have little or no retail value. The domestic trade in all species of potted epiphytic orchids focuses on flowering plants. Orchids are the pacesetter in Hawai`i's sales of flower and nursery products, last valued (in 2001) by the Hawai`i Department of Agriculture at $87,976,000. In calendar year 2002, domestic wholesale orchid sales were approximately $106,000,000, and the only flowering potted plant crop with a higher value was poinsettia. The American Orchid Society estimates that seventy-five percent of all potted orchid plants produced in the domestic trade are of the genus *Phalaenopsis*. Orchid growing is an international business: large-scale production of finished, flowering *Phalaenopsis* spp. orchid plants is occurring in China, Germany, Japan, the Netherlands, the United States, and Taiwan. Unlike all other ornamental crops, orchid sales have increased during the last five years. In 2002 three States—California, Florida, and Hawai`i—together accounted for 58 percent of all

large United States growers and 91 percent of all the potted orchids sold by those growers.

35. Plaintiffs are residents of the State of Hawai`i, and Hawai`i is in a tropical climate. Residents of a tropical climate, i.e., Hawai`i, south Florida, and the tropical Territories and Commonwealths associated with the United States, are frequently lightly dressed, and not often well-protected from the environment, or from pests in that environment. There are three species of native Hawaiian orchids, one of which, *Platanthera holochila*, is listed as an Endangered Species, and the others, *Anoectochilus sandvicensis* and *Liparis hawaiiensis*, are both Species of concern. The Fish and Wildlife Service, United States Department of the Interior has made it clear in Endangered Species Act consultations that the Final Rule may be detrimental to these native Hawaiian orchids by altering critical conditions required for their successful germination, growth, and reproduction, and has made it clear in Endangered Species Act consultations that possible infestations in Hawai`i of *Thripidae* pests of *Phalaenopsis* spp. orchids from Taiwan (also in a tropical climate) are an "area" of "residual concern." Each day, Plaintiffs have the opportunity to observe the native Hawaiian orchids. Indeed, because of their avocational interest in *Orchidaceae*, Plaintiffs are more likely

- 37 -

than other people to make such observations. Defendant Animal and Plant Health In-spection Service's representations in response to the "residual concern" of the Fish and Wildlife Service, United States Department of the Interior, representations that are the basis for one of Plaintiffs' claims here for relief under the Endangered Species Act, have increased the risk that the native Hawaiian orchids may be infested by inva-sive *Thripidae* pests of *Phalaenopsis* spp. orchids brought to Hawai`i in pots from Tai-wan, pots from Taiwan that are just as likely to enter Hawai`i at Kahului Airport as they are to enter Hawai`i at Honolulu International Airport or another port-of-entry.

36. The blood-sucking midge *Forcipoymia taiwana*, known in Taiwan as "little King Kong," and a serious environmental problem there, will invade Hawai`i through eggs laid in the sphagnum moss in which maturing *Phalaenopsis* spp. orchids are cul-tivated in greenhouses in Taiwan, sphagnum moss that will be introduced into Ha-wai`i at Honolulu International Airport and at Kahului Airport along with the entry of mature potted *Phalaenopsis* spp. orchid plants. Once in tropical Hawai`i, *Forcipoy-mia taiwana* will become no less of a pest than it is in tropical Taiwan, biting those lightly-clothed folk who work about greenhouses cultivating orchids no less frequent-ly than those tourists who seek to enjoy a day on the beach are bitten.

37. It is also certainly true that beyond their claims of personal injury as residents in the human environment of Hawai`i (which is not now infested with blood-sucking midges), residents who have daily opportunities to observe native Hawaiian orchids, Plaintiffs have claims of economic injury that arise from their avocation. Plaintiffs have heretofore enjoyed a business advantage from domestic sales of mature potted *Phalaenopsis* spp. orchid plants, a business advantage which Defendant Animal and Plant Inspection Service admits, in its Economic Analysis, is disappearing under the Final Rule with the importation from Taiwan of mature potted *Phalaenopsis* spp. orchid plants. But this is not the only economic injury of Plaintiffs that is at issue here. Plaintiffs would also have an economic injury if they could not produce nursery products in a domestic environment free from invasive alien plant pests.

38. Plaintiffs' avocation, growing out immature imported bare-rooted *Phalaenopsis* spp. orchid seedlings in pots of sphagnum moss and then selling mature potted *Phalaenopsis* spp. orchid plants in the domestic trade is an object of the Final Rule and the Biological Opinion which preceded it, just as Defendant Animal and Plant Health Service has confirmed in its representations to the Fish and Wildlife Service, United States Department of the Interior: "*Phalaenopsis* has been imported bare root into the

- 39 -

United States for at least 20 years. During that time no problems with pests on *Phala-enopsis* have arisen. The importation has amounted to a long-term uncontrolled experiment." Plaintiffs will be economically devastated from the need to invest in the expensive, and labor-intensive, sanitary and phytosanitary treatments of existing greenhouse orchid stocks needed to combat invasive alien pests introduced with mature potted *Phalaenopsis* spp. orchid plants from Taiwan that will spread along the importation pathway into California, into south Florida, into Hawai`i, and into the tropical Territories and Commonwealths associated with the United States. Plaintiffs' avocation is an object of the Final Rule and the Biological Opinion which preceded it—thus there can be no question of Plaintiffs' standing to challenge the Final Rule and the Biological Opinion which preceded it.

39. Plaintiffs' challenges to the Final Rule and the Biological Opinion which preceded it will be redressed by a favorable decision in this Civil Action. It is not just that Defendants have performed procedural steps in an incorrect or inaccurate manner—Defendants have overlooked the creation of demonstrable risk to Plaintiffs' particularized personal and economic interests, and it is likely that a second, proper review of Taiwan's importation request, and a second Endangered Species Act consultation to

assess, in a proper Biological Opinion, the potential effects of any newly-proposed Rule on Federally-listed or proposed Endangered or Threatened Species or their habitats, will correct these errors and will impose additional phytosanitary measures such that Plaintiffs' economic interests are protected from invasive alien plant species, Plaintiffs are protected from invasive alien pests of the human environment, and the native Federally-listed Endangered Hawaiian orchids are secure.

40. Plaintiffs have already been held to have standing to challenge the Final Rule, *Hawai`i Orchid Growers Assoc.,* 2005 U.S. Dist. LEXIS 4548, at *8 - *16, and this ruling should control here in this challenge to the Final Rule and the Biological Opinion which preceded it.

41. Plaintiffs have third-party standing to assert a breach of the Memorandum of Understanding for Kahului Airport. The certain economic devastation of Plaintiffs' orchid industry by invasive alien pests arriving in Hawai`i at Kahului Airport and other ports-of-entry is the requisite distinct and palpable injury, and this economic devastation will be the direct and immediate result of the Final Rule and the Biological Opinion which preceded it. The harm which Plaintiffs seek to prevent with this Civil Action is more than just a generalized grievance, and this harm will be redressed by

the relief requested here. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72-81 (1978).

Endangered Species.

42. Section 7(a) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), requires interagency consultations, for terrestrial species, with the Fish and Wildlife Service, United States Department of the Interior so at to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." Regulations implementing this substantive legal requirement that Agencies ensure that proposed Agency action will not likely jeopardize Federally-listed or proposed Endangered or Threatened Species or their habitats require:

> The Federal agency requesting formal consultation shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat. This information may include the results of studies or surveys conducted by the Federal agency or the designated non-Federal representative. The Federal agency shall provide any applicant with the opportunity to submit information for consideration during the consultation.

- 42 -

50 C.F.R. § 402.14(d). Likewise, these regulations impose duties on the Fish and Wildlife Service, United States Department of the Interior, *viz*:

> Service responsibilities during formal consultation are as follows:
> (1) Review all relevant information provided by the Federal agency *or otherwise available.* . . .

50 C.F.R. § 402.14(g) (emphasis added).

43. After Animal and Plant Health Inspection Service initiated interagency Endangered Species Act consultations with the Fish and Wildlife Service, United States Department of the Interior in October 2002, the Fish and Wildlife Service "identified two areas of residual concern," one of which was as follows:

> It is not clear why the several species of quarantine pest thrips were eliminated from consideration as pests that are likely to follow the importation pathway. The phytosanitary measures do not appear to adequately address the potential for infestation of thrips, resulting in a substantial risk of the organisms entering greenhouse units, openings, and vent coverings. Specifically, the prescribed screening mesh size does not appear fine enough to exclude thrips from growing areas. Please provide an explanation why these species of thrips were dropped from the list of quarantine pests, and the rationale for the prescribed screening mesh size.

44. At a conference convened on April 2nd and 3rd, 2003 Animal and Plant Health Inspection Service responded to this "residual concern" as follows:

Thrips is a pest of Orchidaceae in Taiwan; however, there is no evidence in either the scientific literature or from the interceptions at APHIS plant inspection stations that thrips is a pest on *Phalaenopsis*. PPQ ran a search on their database for thrips interceptions on *Phalaenopsis* from Taiwan. No interceptions turned up. . . . *Phalaenopsis* has been imported bare root into the United States for at least 20 years. During that time no problems with pests on Phalaenopsis have arisen. The importation has amounted to a long-term uncontrolled experiment.

45. On April 3rd, 2003 Animal and Plant Health Inspection Service, responding to this "residual concern," wrote the Fish and Wildlife Service, United States Department of the Interior, as follows:

The thrips identified in the pest risk assessment (PRA) were not considered for several reasons. The extensive literature searches APHIS conducted revealed that none of the thrips identified in the PRA have ever been reported on Phalaenopsis. Furthermore, a review of pest interceptions made over the past eight years on bare-rooted Phalaenopsis plants from Taiwan show that thrips have not been intercepted. . . .

46. These representations by Animal and Plant Inspection Service were not the "best science" required by 50 C.F.R. § 402.14(d). These representations by Animal and Plant Health Inspection Service to the Fish and Wildlife Service, United States Department of the Interior were wrong and untruthful.

47. The Risk Assessment prepared by Animal and Plant Health Inspection Service in April 1997 had already reported, from a literature search, and from review of Ani-

mal and Plant Health Inspection Service interception records, that the following alien pests were "associated" with *Phalaenopsis* spp. from Taiwan: *Dichromothrips* sp., *Frankliniella intonsa*, *Frankliniella schultzei*, Phlaeothripidae sp., Thripidae, sp., *Thrips hawaiiensis*, and *Thrips palmi*. The Hawai`i Orchid Growers Association's Comments submitted on November 30th, 1998 had carefully explained that the required 0.6 mm screen hole size would not exclude the *Thripidae* quarantine pests of *Phalaenopsis* spp. orchids in Taiwan that had been identified in the Risk Assessment. And in Comments from the Hawai`i Department of Agriculture submitted on November 25th, 1998 Hawai`i Department of Agriculture had reported that in 1993 it had allowed an importation of 50,000 bare root *Phalaenopsis* spp. orchids into Hawai`i under a special permit whereby the mature plants were grown in greenhouses in Taiwan enclosed by screen and doors, and Hawai`i Department of Agriculture inspectors had traveled to Taiwan and there inspected and approved "each and every Phalaenopsis plant for packing." Nonetheless, several pests were intercepted by Animal and Plant Health Inspection Service when the bare root mature plants were presented for entry into the United States, and even more pests were found after these plants were thereafter placed in a quarantine house in Hawai`i for the then-required period of six-

ty days post-entry quarantine. One of these later-emerging alien pests was an Asian ti-
ger mosquito, *Aedes albopictus*, family *Culicidae*.

48. These wrong and untruthful representations by Animal and Plant Health In-
spection Service to the Fish and Wildlife Service, United States Department of the In-
terior were not the "best science" required by 50 C.F.R. § 402.14(d). Lacking the "best
science" required by 50 C.F.R. § 402.14(d), the Biological Opinion issued by the Ani-
mal and Plant Health Inspection Service, after Endangered Species Act consultations
with the Fish and Wildlife Service, United States Department of the Interior, that the
Final Rule will not adversely affect Federally-listed or proposed Endangered or
Threatened Species or their habitats is unlawful, as is the Final Rule which followed it.
*Hawai`i Longline Association v. National Marine Fisheries Service*, 281 F. Supp. 2d 1,
26 (D.D.C. 2003).

Ants.

49. On October 25th, 2001 the Hawai`i Ant Group, a comprehensive cooperative
Federal/State committee responsible for developing a strategy to protect the State of
Hawai`i from exotic ant introductions, presented to Animal and Plant Health Inspec-
tion Service its analysis and a request to change Animal and Plant Health Inspection

Service's policy for ants moving into, or through, the State of Hawai`i. The Hawai`i Ant Group is compromised of representatives from the Hawai`i Department of Agriculture, the Hawai`i Department of Natural Resources, the Bishop Museum, the Entomological Society of America's Social Insect Specialist Group, the National Invasive Species Council, the Department of the Interior's National Park Service, the Biological Resources Division of the United States Geological Survey, the Department of the Interior's Fish and Wildlife Service, and United States Department of Agriculture's Forest Service.

50. The Hawai`i Ant Group presented its work to Animal and Plant Health Inspection Service in a paper entitled *Request and Analysis to Change the Quarantine Policy for Ants Moving Into, or Through, the State of Hawaii*. A copy of this paper is Attachment 4 to this Complaint.

51. It had been the policy of Animal and Plant Health Inspection Service that ants found in plants or plant material presented for entry would not require a report, or quarantine action, except for non-native species of ants in eight genera (e.g., red imported fire ants, *Solenopsis invicta*), and that no action would be taken on shipments found to be infested with native continental United States ant species, or established

- 47 -

non-native continental ant species (genera which have established within the continental United States and are not under domestic quarantine control). This policy of the Animal and Plant Health Inspection Service applied without regard to the status of ant species in Hawai`i, even if the destination of the infested shipment was Hawai`i. This policy was premised on the conclusion of Animal and Plant Health Inspection Service that "on balance, it seems that ants prey both on plant pests and predators of plant pests and can be considered environmentally neutral in terms of plant pest impact." *Request and Analysis to Change the Quarantine Policy for Ants Moving Into, or Through, the State of Hawaii,* Hawai`i Ant Group, October 25th, 2001, at 4-5.

52. Hawai`i Ant Group proposed a new policy that all species of ants intercepted at ports-of-entry and destined to, or through, the State of Hawai`i would require quarantine action and would be considered reportable if (1) they are not already established and widespread in Hawai`i and (2) the life stages found in a given shipment indicate the ability to reproduce. In addition, shipments found to be infested with ants already established and widespread in Hawai`i would be required to be reported to the Hawai`i Department of Agriculture. *Id.,* at 3-4.

53. Hawai`i Ant Group argued that a new policy was required because:

- 48 -

• The existing policy is directed towards protecting the continental United States where a diverse array of native species of ants are present. The State of Hawaii is a collection of isolated insular environments that have no native ant species. This intensifies the potential for damage from introduced ants because Hawaii's native fauna and flora never developed evolutionary strategies against social insects. Introduced ants in Hawaii are not environmentally neutral as stated in the current PPQ ant policy.

• The Animal and Plant Health Inspection Service's mandate for protecting agricultural crops has been expanded to protection of native plant species and plant pollinators since the original ant policy was established. The protection of threatened and endangered species from introduced non-native invasive species is also identified as current policy by the USDA Secretary's office (USDA, 2001). Hawaii is particularly high on the priority list because it has the highest percentage of endemic plants and animals of any location within the United States and possibly the world. Many of these plants and animals are Federally listed and protected. Ants are a major threat to many of these listed species not only because of direct damage to plants, but also because of secondary effects such as removing native insect pollinators.

*Id.*, at 3-4.

54. Hawai`i Ant Group explained:

Introduced ants are notorious for causing economic and environmental damage to the ecosystems in which they have been established. Most susceptible are those ecosystems that have no native ant species.

Hawaii lacks native ant species. If any single taxa of invasive species belongs to the top of the list of organisms to be concerned about in Hawaii, ants should be it. On the continental land masses ants are often the dominant ecological force in a natural community. Their biomass and energy consumption usually exceeds those of all the vertebrate species combined. They

- 49 -

are the principal predators (Holldobler and Wilson, 1990) and prime movers of soil within most terrestrial ecosystems (Lyford, 1963; Wilson, 1973). In addition, leaf cutter ants are, species for species, the major herbivores in South and Central America (Weber, 1972). Ants shape, and often maintain, the plant and animal communities in which they live (Wilson, 1973; Jeanne, 1979; Levieux, 1982; Sorensen and Schmidt, 1987; Holldobler and Wilson, 1990).

The scientific literature is full of examples where introduced ants have resulted in native species extinctions covering a wide range of taxa in Hawaii and elsewhere (Zimmerman, 1948, Solem 1976, Gagne and Howarth, 1982; Lubin, 1984; Howarth, 1985; Howarth and Medeiros, 1988; Howarth and Ramsay, 1991 ; Cole et al., 1992; Gillespie and Reimer, 1993; Reimer, 1994; Wilson, 1996; Loope, 1998; LaPolla et al., 2000).

To understand why Hawaii's plants and animals are particularly vulnerable to ants, an understanding of the geological and evolutionary history of the islands is necessary. The Hawaiian archipelago comprises a southeast-trending chain of eight major and 124 smaller islands, reefs and shoals stretching 1600 miles across a highly isolated area of the northeast Pacific Ocean. The substantial age of the island chain (over 40 million years), its isolation (over 2000 miles from the nearest continent), and the variety of habitats created by Hawaii's relatively high mountains has created a special biota of plants and animals, different from any other on earth (Medeiros and Loope, 1994).

Hawaii is a prime example of oceanic island ecosystems that are highly susceptible to damage from newly established non-native organisms. Much of the existing endemic biota is believed to have evolved from approximately 1,000 original colonists (Mueller-Dombois, et al., 1981). It is estimated that before man came to the islands a new group successfully colonized Hawaii about once every 50,000 years on average. Hawaii's relative isolation from

the biological forces that shape continental organisms has resulted in eco-systems that are unique and very vulnerable to invasion.

As a result, Hawaii has one of the highest levels of endemism in the world, with over 99% for terrestrial arthropods (Zimmerman, 1948) and 89% for the flora (Wagner et al., 1990). Approximately one-third of all Federally-listed threatened and endangered species occur in Hawaii (Stein et al., 2000).

Unfortunately, Hawaii also has the distinction of having the highest extinction rate of native species of any State in the Union even though the total number of plant and animal species in Hawaii are among the lowest for any State (Stein et al., 2000). It is well documented that non-native species are currently the predominant cause of biodiversity loss in Hawaii, even more than habitat destruction (Howarth and Ramsay, 1991; Medeiros and Loope, 1994; Stein et al, 2000).

Ants are not native to Hawaii. Unfortunately, close to 40 species of non-native ants have already established in Hawaii because of man's activity. Fortunately, many habitats (including large sections of pristine upland preserves on the larger islands and many of the outlying islands) are still ant-free. In addition, there are numerous other (not yet introduced) ant species that could invade new habitats and/or attack different plants or animals if they become established in Hawaii (Loope et al., 2001). Even in the case where one ant species would replace another, the results are not a simple one-for-one substitution but more often a radical restructuring of the entire arthropod community (Porter et al., 1988). Currently, the National Park Service, US Fish and Wildlife Service and the State of Hawaii are actively protecting natural areas from ant introductions in an effort to protect native plant and animal communities.

. . . .

[T]he impact of ants on the environment is impossible to categorize as either just plant pests (a PPQ responsibility) or just animal pests. For example,

at Haleakala National Park on Maui, there is an active control program against the recently introduced Argentine ant because of its potential to eliminate the endemic rare native ground nesting bees *Nesoprosopis volcanicus* and *N. nivalis*. The reason for concern is not only for the protection of these rare insects, but also because these bees are the primary pollinators of the famous endangered Haleakala Silversword (*Argyroxiphium sanwicense macrocephalum*) (Medeiros and Loope, 1994). Elimination of the bees may likely mean elimination of the plant. Additional Hawaiian introductions of primarily predatory ant species into areas where ants are not currently present will likely impact other endemic native arthropods that share symbiotic relationships with threatened or rare endemic plant species.

*Id.*, at 6-8.

55. On April 10th, 2002 Animal and Plant Health Inspection Service's National Identification Services adopted the proposed new policy. It is the mission of Animal and Plant Health Inspection Service's National Identification Services to "determine which organisms are quarantine pests using pest risk analysis models." A copy of this Policy Change is Attachment 5 to this Complaint.

56. With this Policy Change, Animal and Plant Health Inspection Service's National Identification Services likewise recognized Hawai`i's unique ecology, just as the Congressional Office of Technology Assessment had earlier recognized Hawai`i's unique ecology:

To address the proposed policy, NIS considered the potential impact of exotic ants on the Islands and the impact on trade that a more restrictive policy would impose.

NIS accepts the proposal that exotic ant species not present or widely distributed on the Hawaiian Islands should be excluded from Hawaii. The proposal explains that ants could not have co-evolved with native flora and fauna in Hawaii because the State has no native ant species. Consequently, plants and animals on the Islands are particularly susceptible to herbivory predation and competition from ants. This susceptibility is evidenced by a number of publications that document serious impacts caused by introduced ant species in Hawaii. This proposal would protect Hawaii from many ant taxa that PPQ currently considers non-quarantine significant.

We could not possibly evaluate each of the many thousands of ant species exotic to Hawaii. Nonetheless, the PRA indicates that virtually any exotic ant species can threaten the Islands. The PRA noted that because the delicate Hawaiian ecosystems did not evolve with native ants, exotic ant species pose multiple threats to these systems. Herbivorous species pose potential direct impacts as agricultural pests or by feeding on endangered or threatened plants (e.g. *Atta* spp.). Other ants may displace native ground-dwelling bees that are sole pollinators of threatened native plants. A number of ant species displace large amounts of soil, significantly changing ecosystems. When introduced into new areas, ant species become more aggressive, and their impact is thereby more pronounced.

Although the literature contains numerous examples of adverse impacts caused by ants, the Hawaii Ant Group PRA cited one paper that described how three species of introduced ants caused multiple extinctions of native plant and animal species in Hawaii. Two of those ant species were not actionable under previous APHIS policy.

- 53 -

*Change in Quarantine Action Policy for Ants Intercepted from Commodities Destined to the State of Hawaii*, National Identification Services, Plant Protection and Quarantine, Animal and Plant Health Inspection Service, United States Department of Agriculture, April 10th, 2002.

COUNT I

DEFENDANT ANIMAL AND PLANT HEALTH INSPECTION SERVICE'S
BIOLOGICAL OPINION THAT THE FINAL RULE WILL NOT ADVERSELY
AFFECT FEDERALLY-LISTED OR PROPOSED ENDANGERED OR
THREATENED SPECIES OR THEIR HABITATS IS ARBITRARY
AND CAPRICIOUS, AN ABUSE OF DISCRETION,
AND UNLAWFUL.

57. Plaintiffs incorporate and re-allege paragraphs numbers 1. through 56. hereinabove as if fully set forth herein.

58. Defendant Animal and Plant Health Inspection Service did not disclose to the Fish and Wildlife Service, United States Department of the Interior in the Endangered Species Act consultations all that Defendant Animal and Plant Health Inspection Service knew about adverse impacts of the proposed Final Rule on Federally-listed or proposed Endangered or Threatened Species or their habitats.

59. The honesty oath of witnesses, to provide "the truth, the whole truth, and nothing but the truth," is a staple of procedure dating back to English trials in the 13th Cen-

tury, and this honesty oath informs the question here—just what is required to be provided for Endangered Species Act consultations using "the best scientific and commercial data available?" Certainly it is at least the whole truth. In the case of Endangered Species Act consultations about possible effects on terrestrial Federally-listed or proposed Endangered or Threatened Species or their habitats, these must include any Comments received from private parties. This is what the implementing regulation, 50 C.F.R. § 402.14(d), clearly requires.

60. In *Resources Limited, Inc. v. Robertson*, 35 F.3d 1300, 1304-05 (9th Cir. 1994), the consulting Federal Agency "selectively withheld" from Fish and Wildlife Service, United States Department of the Interior in-house data which showed adverse impacts of high-level timber harvests on grizzly bears. Thus the *Resources Limited* court held that the consulting Federal Agency could not lawfully decide, based on a Biological Opinion from the Fish and Wildlife Service, United States Department of the Interior, that the planned high-level timber harvests would not adversely affect Federally-listed or proposed Endangered or Threatened Species or their habitats. Put another way, there cannot be an "adequate review" unless the whole truth is provided. Defen-

dant Animal and Plant Health Inspection Service did not provide the whole truth to the Fish and Wildlife Service, United States Department of the Interior.

61. Neither were Defendant Animal and Plant Health Inspection Service's Endangered Species Act incomplete consultations with the Fish and Wildlife Service, United States Department of the Interior the "best science" required by 50 C.F.R. § 402.14(d). The Final Rule is more than just a modification of a "long-term uncontrolled experiment" because the Final Rule impacts Hawai`i's unique ecology and, as well, California, south Florida and the tropical Territories and Commonwealths associated with the United States. Animal and Plant Health Inspection Service recognized Hawai`i's unique ecology when it adopted the Policy Change on ants on April 10th, 2002. But because Hawai`i's unique ecology was not considered when Animal and Plant Health Inspection Service conducted its Endangered Species Act consultations with the Fish and Wildlife Service, United States Department of the Interior, the Endangered Species Act consultations were incomplete and not the "best science" required by 50 C.F.R. § 402.14(d). Thus Defendant Animal and Plant Health Inspection Service's Biological Opinion that the Final Rule will not adversely affect Federally-listed or proposed Endangered or Threatened Species or their habitats is arbitrary, capricious, an

abuse of discretion, and unlawful, in violation of 5 U.S.C. § 706(2)(A), 5 U.S.C. § 706-

(2)(D), 16 U.S.C. § 1531(c)(1), 16 U.S.C. § 1536(a)(2), and 16 U.S.C. § 1538(a).

COUNT II

DEFENDANT FISH AND WILDLIFE SERVICE'S CONCURRENCE WITH THE
BIOLOGICAL OPINION THAT THE FINAL RULE WILL NOT ADVERSELY AFFECT
FEDERALLY-LISTED OR PROPOSED ENDANGERED OR THREATENED SPECIES
EFFECTS AN UNLAWFUL "TAKING."

62. Plaintiffs incorporate and re-allege paragraphs numbers 1. through 56. herein-

above as if fully set forth herein.

63. Scientific studies prepared for the Federal Aviation Administration, United

States Department of Transportation in connection with the project at Kahului Air-

port to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet

demonstrate that the Final Rule and the Biological Opinion which preceded it jeop-

ardize the continued existence of Federally-listed or proposed Endangered or Threat-

ened Species or their habitats. Particularly, these scientific studies show that Califor-

nia, Hawai`i, south Florida, and the tropical Territories and Commonwealths associa-

ted with the United States will be invaded by alien species from Taiwan through the

introduction of suitable breeding habitats. (Three States—California, Florida, and Ha-

wai`i—in 2002 together accounted for 91 percent of all the potted orchids sold). These

suitable breeding habitats are the approved organic growing media, 7 C.F.R. § 319.37-8(e)(1), in which greenhouse-grown plants may be imported under the Quarantine 37 provision (peat, sphagnum moss, and volcanic rock) and other damp absorbent material that is also authorized under the Quarantine 37 provision. The alien pests that will invade Hawai`i from Taiwan include *Forcipomyia taiwana,* little King Kong; *Thripidae* quarantine pests of *Phalaenopsis* spp. orchids in Taiwan; and the mealy-bug, *Planococcus minor.* These scientific studies show that the impact of the invasion of these alien species from Taiwan will include, in addition to predation, herbivory parasitism and competition, interference with pollination, promotion of disturbances such as fire, and change in nutrient regimes, and will favor the spread of other alien species. *Palila v. Hawai`i Department of Land and Natural Resources*, 852 F.2d 1106, 1108 (9th Cir. 1988) ("Taking" includes actions other than direct physical injury).

64. The Fish and Wildlife Service, United States Department of the Interior did not consider, when it concurred with Animal and Plant Health Inspection Service's "No-Jeopardy" Biological Opinion on April 7th, 2003 the imposition of alien species interdiction features to preclude the invasion of hitchhikers, hitchhikers which the

Animal and Plant Health Inspection Service expressly did not regard. Yet for Ka-
hului Airport, it was these alien species interdiction features that were required by
the Fish and Wildlife Service, United States Department of the Interior in a Biologi-
cal Opinion of July 23rd, 1997 to ensure that the continued existence of Federally-
listed or proposed Endangered or Threatened Species were not jeopardized by arriv-
ing hitchhiking alien species.

   65. The value of Hawai`i's Federally-listed or proposed Endangered or Threatened
Species and their habitats is "incalculable," just as Congress has supposed. *Bob House*
*v. United States Forest Service,* 974 F. Supp. 1022, 1028 (E.D. Ky. 1997). A "Taking" of
Federally-listed Endangered or Threatened Species includes "to harass, harm, pursue,
hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any
such conduct." 16 U.S.C. § 1532(19). "Harm" may be demonstrated by scientific stud-
ies, and this "harm" need not have already occurred—a reasonably certain threat of
imminent harm, just as is shown in the scientific studies prepared for the Federal
Aviation Administration, United States Department Transportation in connection
with the project at Kahului Airport to strengthen Runway 2/20 and extend the length
of Runway 2/20 to 9,600 feet, is sufficient for injunctive relief under the Endangered

Species Act. *Bob House*, 974 F. Supp., at 1029-1032. A "Taking" occurs when challeng-ed Agency action has "some prohibited impact on an endangered species." *Defenders of Wildlife v. Administrator, Environmental Protection Agency*, 882 F.2d 1294, 1301 (8th Cir. 1989), *citing Palila Hawai`i Department of Land and Natural Resources*, 639 F.2d 495, 497 (9th Cir. 1981). The Biological Opinion of Animal and Plant Health In-spection Service in which the Fish and Wildlife Service, United States Department of the Interior has concurred is an unlawful "Taking" of Hawai`i's Federally-listed or proposed Endangered or Threatened Species and their habitats in violation of 5 U.S.C. § 706(2)(A), 16 U.S.C. § 1531(c)(1), and 16 U.S.C. § 1538(a).

66. The Fish and Wildlife Service, United States Department of the Interior did not review all relevant information "otherwise available" when it concurred in the "No-Jeopardy" Biological Opinion of the Animal and Plant Health Inspection Serv-ice on April 7th, 2003. Specifically, the Fish and Wildlife Service, United States De-partment of the Interior did not consider its own recommendations, recommenda-tions earlier submitted by the Hawai`i Ant Group, recommendations that Ha-wai`i's unique ecology mandates consideration of Hawai`i separate from consider-ation of the continental United States. This was a violation of 50 C.F.R. § 402.14(g)

and resulted in a "Taking" of Hawai`i's Federally-listed or proposed Endangered or

Threatened Species and their habitats in violation of 5 U.S.C. § 706(2)(A), 5 U.S.C. §

706(2)(A), 16 U.S.C. § 1531(c)(1), and 16 U.S.C. § 1538(a).

COUNT III

DEFENDANT FISH AND WILDLIFE SERVICE'S CONCURRENCE WITH THE
BIOLOGICAL OPINION THAT THE FINAL RULE WILL NOT ADVERSELY AFFECT
FEDERALLY-LISTED OR PROPOSED ENDANGERED OR THREATENED SPECIES
ARBITRARILY AND CAPRICIOUSLY DISREGARDS THE RISK OF
INTRODUCTION OF SUITABLE BREEDING HABITATS.

67. Plaintiffs incorporate and re-allege paragraphs numbers 1. through 56. herein-

above as if fully set forth herein.

68. Scientific studies prepared for the Federal Aviation Administration, United

States Department of Transportation in connection with the project at Kahului Air-

port to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet

focus on the risk of invasion by alien species through introduction of suitable breeding

habitats, not, as in the Final Rule or in the Biological Opinion which preceded it, on

the risk that might be imposed through entry of specific hosts, here, finished, flower-

ing *Phalaenopsis* spp. orchid plants in pots from Taiwan. The Fish and Wildlife Serv-

ice, United States Department of the Interior, did not regard this different focus when

it concurred with Defendant Animal and Plant Health Inspection Service's Biological Opinion that the Final Rule will not adversely affect Federally-listed or proposed Endangered or Threatened Species.

69. The Endangered Species Act imposes a duty on all Federal Agencies to "conserve" Federally-listed Endangered Species and Threatened Species, i.e., a duty to insure that Federal actions do not jeopardize the continued existence of Endangered Species and Threatened Species or critical habitat. 16 U.S.C. § 1531(c)(1); *National Audubon Society, Inc. v. Gray Davis*, 307 F.3d 835, 852 (9th Cir. 2002).

70. The failure of the Fish and Wildlife Service, United States Department of the Interior to regard the risk of invasion of alien species from Taiwan through introduction of suitable breeding habitats, a risk earlier identified in scientific studies performed for the Federal Aviation Administration, United States Department of Transportation and presented to the Fish and Wildlife Service, United States Department of the Interior, was arbitrary, capricious, and an abuse of discretion, all in violation of 5 U.S.C. § 706(2)(A) and 16 U.S.C. § 1531(c)(1).

COUNT IV

THE BIOLOGICAL OPINION THAT THE FINAL RULE WILL NOT ADVERSELY AFFECT
FEDERALLY-LISTED OR PROPOSED ENDANGERED OR THREATENED SPECIES
AND DEFENDANT FISH AND WILDLIFE SERVICE'S CONCURRENCE WITH IT
ARE BREACHES OF THE KAHULUI AIRPORT MEMORANDUM OF UNDERSTANDING.

71. Plaintiffs incorporate and re-allege paragraphs numbers 1. through 56. herein-above as if fully set forth herein.

72. Defendant United States Department of Agriculture and Defendant United States Department of the Interior are both in breach of their obligations under the Memorandum of Understanding and under the Federal-State Alien Species Action Plan for the Kahului Airport, Maui that is incorporated into the Memorandum of Understanding. The Memorandum of Understanding recognizes and requires changes as conditions warrant. The Federal-State Alien Species Action Plan requires additional specific risk assessments. The Final Rule here in issue clearly warrants a specific risk assessment for the potential of alien species introductions from Taiwan, alien species that will certainly arrive at Kahului Airport through introduction of suitable breeding habitats, the pots in which mature *Phalaenopsis* spp. orchid plants are imported from Taiwan.

- 63 -

73. The failure of the United States Department of Agriculture and the failure of the United States Department of the Interior to consult with the Hawai`i parties to the Memorandum of Understanding, and to conduct a specific risk assessment for the potential of alien species introductions along with importations of potted *Phalaenopsis* spp. orchid plants from Taiwan are unlawful breaches of the Memorandum of Understanding. These unlawful breaches are violations of 5 U.S.C. § 706(2)(A) and 16 U.S.C. § 1531(c)(1).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request: (a) that this Court declare as arbitrary, capricious, an abuse of discretion, and unlawful the Defendant Animal and Plant Health Inspection Service's Biological Opinion that the Final Rule will not adversely affect Federally-listed or proposed Endangered or Threatened species or their habitats; (b) that this Court order the Defendant Animal and Plant Health Inspection Service, through a Permanent Injunction, to rescind the addition of *Phalaenopsis* spp. from Taiwan to the list of plants that may be imported in an approved growing medium subject to the growing, inspection, and certification requirements specified in 7 C.F.R. § 319.378(e); (c) that this Court declare that the Final Rule and

the Biological Opinion which preceded it amount to an unlawful "Taking" of Hawai`i's Federally-listed or proposed Endangered or Threatened Species and their habitats; (d) that this Court declare as arbitrary, capricious, an abuse of discretion, and unlawful Defendant's Fish and Wildlife Service, United States Department of the Interior concurrence with the Biological Opinion of the Animal and Plant Health Inspection Service; (e) that this Court declare as unlawful the breaches of the Memorandum of Understanding by Defendant United States Department of Agriculture and Defendant United States Department of the Interior and (f) that this Court grant such other and further relief as may be just and proper.

With aloha,

/s/ Cyrus E. Phillips, IV

_____
Cyrus E. Phillips, IV
D.C. Bar Number 456500

1828 L Street, N.W., Suite 660
Washington, D.C. 20036-5112
Telephone:        (202) 466-7008
Facsimile:        (202) 466-7009
Electronic Mail: *lawyer@procurement-lawyer.com*

Attorney of record for Plaintiffs,
Hawai`i Orchid Growers Association.

- 65 -