# United States District Court
# For the District of Columbia

|  |  |  |
|---|---|---|
| _____ | ) | |
| HAWAI`I ORCHID | ) | |
| GROWERS ASSOCIATION, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1182 (RCL) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, *et al.*, | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF INTERIOR, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………………………………ii-iii

STATEMENT OF THE CASE…………………………………………………………………………1-27

ARGUMENT…………………………………………………………………………………………28-32

    I.    DEFENDANT ANIMAL AND PLANT HEALTH INSPECTION SERVICE'S
        BIOLOGICAL OPINION THAT THE FINAL RULE WILL NOT ADVERSELY AFFECT
        FEDERALLY-LISTED OR PROPOSED ENDANGERED OR THREATENED SPECIES OR
        THEIR HABITATS IS ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION,
        AND UNLAWFUL…………………………………………………………………………28-31

    II.   DEFENDANT FISH AND WILDLIFE SERVICE'S CONCURRENCE WITH THE
        BIOLOGICAL OPINION THAT THE FINAL RULE WILL NOT ADVERSELY AFFECT
        FEDERALLY-LISTED OR PROPOSED ENDANGERED OR THREATENED SPECIES
        ARBITRARILY AND CAPRICIOUSLY DISREGARDS THE RISK FROM ENTRY OF
        SUITABLE BREEDING HABITATS…………………………………………………………31-32

CONCLUSION………………………………………………………………………………………32-33

TABLE OF AUTHORITIES

<u>*STATUTES*</u>

5 U.S.C. § 553(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

16 U.S.C. § 1536(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 6, 30

16 U.S.C. § 1536(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>**REGULATIONS**</u>

7 C.F.R. § 319.37-8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7 C.F.R. § 319.37-8(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

7 C.F.R. § 319.37-8(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7 C.F.R. § 319.37-8(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>**CASES**</u>

*American Wildlands v. Norton,*
 193 F. Supp. 2d 244 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,*
 463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Resources Limited, Inc. v. Robertson,*
 35 F.3d 1300 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

STATEMENT OF THE CASE

Parties.

1.  Hawai`i Orchid Growers Association is an unincorporated non-profit service organization. Hawai`i Orchid Growers Association, an alliance of professional orchid growers, was formed in 1995 in Hawai`i County, State of Hawai`i, to coordinate efforts among breeders, propagators, and growers of orchids in Hawai`i. Hawai`i Orchid Growers Association members generate more than $23,000,000 in annual sales. Growers report production expansion of 25 percent per year, and invest up to $1.5 million per acre in new shadehouses and greenhouses stocked with plants. There is a conservative estimate of 250 growers of all sizes throughout the State of Hawai`i, with an average of 10 workers per farm, involving about 3,000 people in this industry. Orchids are the pacesetter in Hawai`i's sales of flower and nursery products, last valued (in 2001) by the Hawai`i Department of Agriculture at $87,976,000. Statement of Material Facts, ¶ 1.

2.  Defendant United States Department of Agriculture is an agency and entity of the United States that has its principal place of business in the District of Columbia. Mike Johanns, sued in his official capacity only, is the Secretary of Agriculture. W. Ron DeHaven, D.V.M., sued in his official capacity only, is the Administrator, Animal and Plant Health Inspection Service, United States Department of Agriculture. Defendant United States Department of the Interior is an Agency and en-

- 1 -

tity of the United States. Gale Norton is the Secretary of the Interior. Secretary Norton is sued in her official capacity only. Matthew J. Hogan is the Acting Director, United States Fish and Wildlife Service. Acting Director Hogan is sued in his official capacity only. It was the Animal and Plant Health Inspection Service, United States Department of Agriculture which, on April 7th, 2003 and again on September 1st, 2004 gained the concurrence of the Fish and Wildlife Service, United States Department of the Interior in a Biological Opinion that the proposed Final Rule would not adversely affect Federally-listed or proposed Endangered or Threatened Species, and then in a Final Rule published Wednesday, May 5th, 2004 added orchids of the genus *Phalaenopsis* from Taiwan to the list of plants that may be imported in an approved growing medium subject to specified growing, inspection, and certification requirements. As of Friday, June 4th, 2004 such importation is allowed subject to the growing, inspection, and certification requirements of 7 C.F.R. § 319.37-8(e) (a part of that which is referred to generally as the "Quarantine 37" regulations). "Importation of Orchids of the Genus *Phalaenopsis* From Taiwan in Growing Media," 69 Fed. Reg. 24916-36 (2004) (to be codified at 7 C.F.R. § 319.37-8(e)). Statement of Material Facts, ¶ 2.

**Kahului Airport.**

3.   In connection with a project at Kahului Airport on the island of Maui, State of Hawai`i to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet, the Hawai`i Department of Transportation and the Federal Aviation Administration, United States Department of Transportation conducted a Biological Assessment and, as required by 16 U.S.C. § 1536(a)(2) initiated Endangered Species Act consultations with the Fish and Wildlife Service to assess the po-

tential effects of the project on Federally-listed or proposed Endangered or Threatened Species or their habitats. Statement of Material Facts, ¶ 3.

4.   A part of the Biological Assessment was a paper entitled "Effectiveness of Potential Mitigation Measures for Selected Invasive Alien Taxa" prepared and published by Dr. Francis Howarth of the Department of Natural Sciences, Bishop Museum, Honolulu, Hawai`i on February 3rd, 1997. The paper was later published as Appendix H of the "Alien Species Biological Assessment" prepared under contract with the Federal Aviation Administration, United States Department of Transportation and published on March 10th, 1997. Dr. Howarth has particular concern for invasion by biting midges, and he focuses on the risk on invasion by the *Culicoides* species through introduction of suitable breeding habitats, not on the risk of invasion that might be imposed through entry of specific hosts:

**Immature Midges in Breeding Habitats:**

   **Pre Entry:**

• Damp absorbent material (such as sphagnum, other mosses, and wood chips) used to transport cut flowers and other fresh plant and animal material can harbor immatures of biting midges as well as many other pests. Some *Culicoides* aestivate as dry immatures and can rehydrate and emerge when moistened. This strategy allows for efficient long-distance dispersal in untreated material. Larvae or other immature stages are likely to be found in breeding substrates at any time of the year, even in the temperate region. *Culicoides obsoletus* is thought to over winter as larvae. Therefore, the risk may not be seasonal, unless the shipment is treated or other precautions are taken.
• Treatment of this packing material before use is recommended. Treatments could include heat, dipping or washing with soap solution, or fumigation. Certification that organic packing material is free of pests would further reduce the risk.

**Port of Entry:**

• Suspected substrates should be looked for during inspections and treated if necessary.
• High risk material also may include fresh cut flowers and other living plant material, particularly from high risk areas. Larval biting midges have been intercepted in Hawaii in bromeliad leaf axils, a known habitat for some *Culicoides* species. The recent arrival of the mosquito, *Wyeomyia mitchellii*, is suspected of having been introduced with bromeliads from southeastern North America. A number of plant-feeding insects remain closely associated with their host; some are sessile like the scale and white fly on the stems, flowers, leaves, and fruits of plants.
• Other measures are listed in Table H2 and similar to the descriptions given for the ants.

**Post Entry**

• Organic packing material from high risk areas should be treated before disposal on Maui. This can be accomplished by heat, submersion in insecticidal or soap solution, or by fumigation. Heat (hot water dip) would probably be the cheapest and safest.
• Given the tiny size, cryptic behavior and high mobility, Culicoides are probably very difficult to control or eradicate once they become well established. Therefore, greater reliance must be placed on prevention.

*Effectiveness of Potential Mitigation Measures for Selected Invasive Alien Taxa*, Hawai`i Biological Survey Technical Report Number 3, February 3rd, 1997, at 9. Statement of Material Facts, ¶ 4.

5.  The Biological Assessment was completed on March 10th, 1997 under a contract with the Federal Aviation Administration, United States Department of Transportation. Two sections of the Biological Assessment, Section 5 "Determination of Alien Species" and Section 6 "Impact of Alien Species," deal with the toll taken on Hawai`i by the invasion of alien species. The Biological Assessment summarized in Section 5 the threat to Hawai`i posed by the invasion of alien species:

At present, there are over 2,500 alien arthropod species of insects and about 75+ alien non-marine mollusks established in the wild in Hawaii (Howarth 1985). It is estimated (CGAPS 1996) that, each year, approximately 20 to 30 new alien insects make their way to

Hawaii and become established. Annually, about three of these species turn out to be economic pests (OTA 1993). . . .

   . . . .

The introduction of alien species is the greatest single threat to the conservation of native species and to the integrity of Haleakala National Park and other natural areas on Maui. (Brockie *et al*. 1988). The impacts caused by alien species are the most important factor in population declines, endangerment, and extinctions of native organisms in Hawaii. (CGAPS 1996; Holt 1996). Furthermore, alien species can undo all other conservation programs. Alien species are also a major impediment to agriculture and economic development (including tourism) in Hawaii, causing hundreds of millions of dollars of damage to the economy each year (CGAPS 1996). . . .

*Alien Species Biological Assessment for Kahului Airport Improvements, Kahului, Maui, Hawai`i*,

March 10th, 1997, at 5-1. Statement of Material Facts, ¶ 5.

   6.   Just as in Dr. Howarth's paper, Section 5 of the Biological Assessment likewise focuses on the

risk on invasion by alien species through introduction of suitable breeding habitats, not on the risk of

invasion by alien species that might be imposed through entry of specific hosts:

About 2,000 alien species established in Hawaii arrived inadvertently. Many insects are masters at dispersal. They are common stowaways on aircraft hiding within the plane as well as in cargo. Most of the inadvertent species arrived associated with their host or the substrate used for diapause (*e.g.*, as eggs in soil, plant material, or on their vertebrate hosts). Species arriving on their hosts can be removed during inspection or quarantine, but many cryptic species escape this process. The invisibility of insects is emphasized by the convergent accumulation of the same pests on the same crops in different parts of the world. Over 400 insect species were purposefully introduced, mostly as biological control agents, but a few as pollinators or for other purposes. Many of these purposeful introductions have also had negative environmental impacts (Howarth 1985a; 1991).

*Alien Species Biological Assessment for Kahului Airport Improvements, Kahului, Maui, Hawai`i*,

March 10th, 1997, at 5-1. Statement of Material Facts, ¶ 6.

- 5 -

7.   Upon receipt of the Biological Assessment, on March 11th, 1997 the Federal Aviation Administration, United States Department of Transportation provided it to the Fish and Wildlife Service for Endangered Species Act consultations as required by 16 U.S.C. § 1536(a)(2). The Fish and Wildlife Service issued its Biological Opinion on July 23rd, 1997. In its Biological Opinion, the Fish and Wildlife Service concludes, as to the effects of the project at Kahului Airport to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet, that:

> The most serious potential effects involve introduction of alien species. The effects of alien species have been cited as causes of past decline, and potential further decline, of all T&E [Federally-listed or proposed Endangered or Threatened Species] species in Hawaii (Asquith 1997, NMFS 1992, NMFS & USFWS 1996, USFWS 1983b, 1984, 1990, 1992b, 1996a, 1997, in prep. a, b). The Service believes that all presently listed species on Maui could be adversely affected by alien species not yet on Maui. . . .

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i,* July 23rd, 1997, at 7.

> Almost all alien species introductions in Hawaii are the result of human actions, either governmental or private. For example, a total of 2275 alien invertebrates were intercepted by Federal inspectors in 1994. Out of this total, 89% were found in either air cargo or passenger baggage (Noda and Associates 1997). It is estimated that over 4373 alien species have become established in the wild in the Hawaiian Islands. This includes 956 plants, 46 birds, 19 mammals, 23 reptiles, 4 amphibians, 73 fish, and more than 3247 invertebrates (Eldridge and Miller 1997). In addition to the total number of alien species, the rate at which alien species are entering Hawaii is increasing. The average number of invertebrate introductions per year has gone from 16 during the years between 1937 and 1961, to 20 in the 1970s (TNCH 1992). The current estimated rate of invertebrate introduction to Hawaii is between 20-30 species per year (Noda and Associates 1997).

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i,* July 23rd, 1997, at 23.

The primary concern of the Service is the potential indirect effect of this project on listed and proposed species and critical habitat due to the potential introduction of alien species to the island of Maui (the indirect action area). The continuing influx of alien species poses a grave threat to all native species in Hawaii, including those on Maui. These species are introduced by accidental or deliberate transport on aircraft and ships. The proportion of these species that arrive by air is probably large (BA [the Biological Assessment of March 10th, 1997] table 1-5), especially for those species purposely transported by humans. Because of extensive interisland transport, even native species on other Hawaiian Islands could eventually be affected by alien organisms that become established on Maui.

There is little question that a large number of alien organisms which could be transported purposefully or inadvertently by air could, if established on Maui, cause or contribute to the eventual extinction of listed taxa. Examples include weaver ants, high-altitude mosquitoes, biting midges, snakes and predatory lizards (BA pp. 6-1 to 6-10). Alien plants and animals that colonize native ecosystems can affect listed and proposed species and critical habitat through a variety of means documented in scientific literature. In addition to the direct effects such as predation and herbivory (Cole *et al.* 1992, Sohmer 1996), parasitism (van Riper and van Riper 1985), and competition (Smith 1985), non-native species can interfere with pollination (Cole *et al.* 1992), promote disturbance such as fire (Smith 1985), change nutrient regimes (Vitousek *et al.* 1987), or favor the spread of other alien species (Wester and Wood 1997). . . .

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i*, July 23rd, 1997, at 24-25. In this Biological Opinion, the Fish and Wildlife Service expressly precludes, because of the irreversible and catastrophic consequences of an invasion by an alien species, even the incidental "Take" of Endangered Species and of Threatened Species:

Introduction of alien species as a result of this project, although unlikely, *would be practically irreversible and could have catastrophic consequences for one or more listed species* included in this biological opinion. Therefore, any incidental taking that results from such an introduction is not authorized. . . .

- 7 -

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i,* July 23rd, 1997, at 30 (emphasis added). Statement of Material Facts, ¶ 7.

8.   The Fish and Wildlife Service ultimately issued a "No Jeopardy" Biological Opinion, but doing so the Fish and Wildlife Service required explicit measures to preclude the invasion of alien species at Kahului Airport:

> it is the Service's biological opinion that the Kahului Airport Improvements, including its "state of the art" alien species interdiction features, are not likely to jeopardize the continued existence of any endangered, threatened, or proposed endangered species on Maui. . . .

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i,* July 23rd, 1997, at 29. The alien species interdiction features required by the Fish and Wildlife Service include, *inter alia*:

•   Pre-treatment of aircraft cargo holds to "greatly reduce the risk of biting midges, mosquitoes and other passively carried insects being introduced to Maui," this to be by "[n]on-chemical pesticidal measures such as sticky traps or light traps."

•   new Agriculture Arrival Inspection Facilities including a data link between arrival gates and baggage claim; an X-ray machine to inspect arriving baggage (including carry-on baggage); and office space, kennels, and inter-terminal golf carts.

•   additional Arrival Inspectors, an anticipated staffing level of two detector dogs and eleven human inspectors.

- 8 -

• a new Air Cargo Building, including an industrial air curtain barrier to prevent escape of any insects during inspection of air cargo containers; offices and facilities; lab space, freezer and sterilization/incineration facilities; space for X-ray equipment; and computer equipment and facilities for the Hawai`i Department of Agriculture's alien species database system.

• a Quality Control Program including yearly reports with "summaries of all alien species interceptions from airport-based operations, their origin and mode of arrival, to the extent possible, and estimates of the efficiency of the inspection system for various taxonomic groups of concern."

*Biological Opinion of the U.S. Fish and Wildlife Service for the Kahului Airport Improvements, Phases 1 and 2 Kahului, Maui, Hawai`i,* July 23rd, 1997, at 26-28. Statement of Material Facts, ¶ 8.

**Informal Rulemaking Proceedings.**

9.   Importation of plants and plant products is restricted or prohibited to prevent the introduction or dissemination of plant pests and noxious weeds. Subpart 37 of Section 319, Title 37, Code of Federal Regulations (known generally as the Quarantine 37 regulations) sets out prohibitions and restrictions on the importation of nursery stock, plants, roots, bulbs, seeds, and other propagative plant products. Generally, this Subpart requires that imported plants "shall be free of sand, soil, earth, and other growing media." 7 C.F.R. § 319.37-8(a). Now, certain greenhouse-grown plants from eleven listed taxa may be imported in an approved growing medium. 7 C.F.R. § 319.37-8(e). This Quarantine 37 provision specifies attributes for the greenhouses in which plants from these eleven listed taxa are to be cultivated, including requirements that these greenhouses must have screening with openings of not more than 0.6 mm on all vents and openings except entryways; that entryways must

be equipped with automatic closing doors, 7 C.F.R. § 319.37-8(e)(2)(ii); and that plants in these greenhouses must be rooted and grown in approved growing media on benches supported by legs and raised at least 46 cm above the floor, 7 C.F.R. § 319.37-8(e)(2)(vi). These general program requirements are supplemented for *Rhododendron* spp., 7 C.F.R. § 319.37-8(e)(2)(ii), -8(e)(2)(ix), -8(e)(2)(x), and for *Hyacinthus* spp., 7 C.F.R. § 319.37-8(f). Statement of Material Facts, ¶ 9.

10.  As required by 5 U.S.C. § 553(b), on September 1st, 1998 Animal and Plant Health Inspection Service issued notice of a proposed Rule in the FEDERAL REGISTER. 63 Fed. Reg. 46403-46406 (1998). Administrative Record, at 0027-31. In 1997 the Government of Taiwan had requested that Animal and Plant Health Inspection Service consider amending 7 C.F.R. § 319.37-8(e) to allow importation of *Phalaenopsis* spp. orchid plants established in sphagnum moss as a growing medium. By April 1997 Animal and Plant Health Inspection Service had concluded in a Risk Assessment that "the importation of *Phalaenopsis* spp. orchids from any country—not just Taiwan—under the conditions required by § 319.37-8(e) would pose no greater pest risk than is posed by the importation of epiphytic orchid material currently allowed entry from any country as bare-rooted plants under § 319.37-8(a) or established on other epiphytic growing media (tree fern slabs, coconut husks, or coconut fiber) under § 319.37-8(d)." Thus Animal and Plant Health Inspection Service proposed a Rule which would "allow *Phalaenopsis* spp. orchids to be imported into the United States established in approved growing media from any country provided the orchids were produced, handled, and imported in accordance with the requirements of § 319.37-8(e) . . . ." 63 Fed. Reg. 46404 (1998). Statement of Material Facts, ¶ 10.

- 10 -

**Comments on the Proposed Rule of 1998.**

11. On October 26th, 1998 the Pacific Islands Ecoregion, Fish and Wildlife Service wrote Animal and Plant Health Inspection Service that the proposed Rule might affect three species of native Hawai`ian orchids, one of which, *Platanthera holochila* is listed as an Endangered Species, and, as well, *Anoectochilus sandvicensis* and *Liparis hawaiiensis*, both of which are species of concern. The Fish and Wildlife Service wrote that introduction of the alien arthropod, mollusks, and fungi identified in the Pest Risk Assessment of 1997 could be detrimental to these orchid species "by altering the critical conditions required by Hawaiian orchid [sic] for successful germination, growth, and reproduction." The Fish and Wildlife Service requested that Animal and Plant Health Inspection Service enter into the formal consultations required by 16 U.S.C. § 1536(a)(1). On November 30th, 1998 Fish and Wildlife Service wrote Animal and Plant Health Inspection Service that the proposed Rule might affect a total of seven species of native orchids (both on the Mainland United States, and in Hawai`i) listed as Endangered or Threatened Species, that these impacts may result in the need to list additional native orchid species as Threatened or Endangered Species, that Hawai`i Department of Agriculture has records of alien species associated with importations of bare-rooted orchid seedlings (through its State-mandated 60-day quarantine of high pest-risk bare-rooted orchid seedlings from foreign countries located south of 30 degrees north latitude) that are not addressed in the Pest Risk Assessment of 1997, and that because many of the pests listed in the Pest Risk Assessment of 1997 are polyphagous, 113 federally-listed plant species from the Mainland United States and 48 federally-listed plant species from Hawai`i might be affected in addition to *Orchidaceae*. Finally, because the Pest

- 11 -

Risk Assessment of 1997 conceded that Animal and Plant Health Inspection Service lacks biological information on the majority of the mollusks and arthropods identified as quarantine pests, Fish and Wildlife Service suggested that "the potential impacts of orchid importation cannot be adequately addressed at this time." Statement of Material Facts, ¶ 11.

12. The Hawai`i Department of Agriculture provided Comments on November 25th, 1998. The Hawai`i Department of Agriculture explained to Animal and Plant Health Inspection Service that the Hawai`i State quarantine provision then in effect considers the plant family *Orchidaceae* generally as a long term crop with enhanced pest risk. Likewise, the Hawai`i Department of Agriculture explained the distinction that it draws between crops from countries north of 30 degrees north latitude and crops from countries south of 30 degrees north latitude—these latter countries, which have a tropical climate like that in Hawai`i, present higher pest risk. Statement of Material Facts, ¶ 12.

13. The Hawai`i Department of Agriculture was careful to explain that since 1953 it has routinely intercepted pests on shipments of high pest-risk bare-rooted orchid seedlings (bare-rooted orchid seedlings from countries south of 30 degrees north latitude, pests that are detected while these high pest-risk bare-rooted orchid seedlings were then being held in State-mandated quarantine for 60 days. These same shipments of high pest-risk bare-rooted orchid seedlings had been examined and passed by inspectors of the exporting country, and examined and passed by inspectors of the Animal and Plant Health Inspection Service, before moving into State-mandated quarantine. Hawai`i Department of Agriculture suggested that the supposed "modern" conditions of the Quarantine 37 regulations would not reduce pest risk to a minimum—even if the existing system was working (and it

- 12 -

was not—importations examined in two different inspections were deemed to be safe and, actually, they were not), there was no reason to suppose that adherence to 7 C.F.R. § 319.37-8(e) would result in minimal risk. Statement of Material Facts, ¶ 13.

14.  It turns out that Hawai`i Department of Agriculture had had first-hand experience in 1993 with a program much like the growing, inspection, and certification requirements of 7 C.F.R. § 319.37-8(e). In its Comments, Hawai`i Department of Agriculture explained that it had allowed the importation of 50,000 bare-rooted *Phalaenopsis* spp. orchid seedlings from Taiwan under a special permit, a special permit which required that the orchid seedlings be obtained from tissue cultures contained in sterile flasks, that the orchid seedlings be grown-out in Taiwan in a greenhouse enclosed by screens and doors, and that Hawai`i Department of Agriculture inspectors examine and approve each and every bare-rooted *Phalaenopsis* spp. orchid seedling before export from Taiwan. These same bare-rooted *Phalaenopsis* spp. orchid seedlings were later examined by Animal and Plant Health Inspection Service inspectors in Hawai`i and then moved to a State-mandated quarantine facility where they were held for 60 days. Animal and Plant Health Inspection Service inspectors found a snail and 2 mites upon entry of the bare-rooted *Phalaenopsis* spp. orchid seedlings into the United States. But during the State-mandated 60-day quarantine period, more pests emerged. Under the proposed Rule, however, there would be no fall-back procedures, because Animal and Plant Health Inspection Service had announced that it would preempt Hawai`i Department of Agriculture regulations mandating a 60-day quarantine of importations of high pest-risk bare-rooted immature orchid seedlings, or of importations of high pest-risk mature orchid plants. Hawai`i Department of Agricul-

ture wrote Animal and Plant Health Inspection Service that the proposed Rule was "a high risk for introduction as well as for establishment," that based on this experience "the proposed safeguards implemented in the foreign country and the inspection performed at the port-of-entry" would not "be sufficient to keep harmful non-indigenous species out of the United States." Statement of Material Facts, ¶ 14.

15. Hawai`i Department of Agriculture explained that a mature potted *Phalaenopsis* spp. orchid plant is a self-sustaining entity and for this reason poses the highest risk for the spread and establishment of non-indigenous invasive species. Mature potted *Phalaenopsis* spp. orchid plants cannot be turned in such a way to facilitate seeing signs of infestation, tiny entry holes of pests that feed internally, or seeing minute pests such as *Thripidae* that can hide in unopened flower spikes. Likewise, Hawai`i Department of Agriculture explained that greenhouses with screens and even automatic doors are not impermeable to all insects, pests, and disease pathogens, that the required 0.6 mm screen hole size (7 C.F.R. § 319.37-8(e)(2)(ii)) will not exclude the crawler stage of mealybugs, and that, as has happened with past Animal and Plant Health Inspection Service inspections of readily-observable bare-rooted *Phalaenopsis* spp. orchid seedlings, "mealybug crawler-infested orchids would then be placed on store shelves and rapidly dispersed throughout the United States." Statement of Material Facts, ¶ 15.

16. The Hawai`i Orchid Growers Association provided Comments on November 30th, 1998 as later did the Society of American Florists, the American Nursery and Landscape Association, the Hawai`i Department of Land and Natural Resources, the Hawai`i Department of Agriculture, the

- 14 -

United States Fish and Wildlife Service, the United States Department of the Interior, the United States Geological Survey, the University of Hawai`i, and Hawai`i's Congressional Delegation. Statement of Material Facts, ¶ 16.

**Ants.**

17. On October 25th, 2001 the Hawai`i Ant Group, a comprehensive cooperative Federal/State committee responsible for developing a strategy to protect the State of Hawai`i from exotic ant introductions, presented to Animal and Plant Health Inspection Service its analysis and a request to change Animal and Plant Health Inspection Service's policy for ants moving into, or through, the State of Hawai`i. The Hawai`i Ant Group is compromised of representatives from the Hawai`i Department of Agriculture, the Hawai`i Department of Natural Resources, the Bishop Museum, the Entomological Society of America's Social Insect Specialist Group, the National Invasive Species Council, the Department of the Interior's National Park Service, the Biological Resources Division of the United States Geological Survey, the Department of the Interior's Fish and Wildlife Service, and United States Department of Agriculture's Forest Service. Statement of Material Facts, ¶ 17.

18. The Hawai`i Ant Group presented its work to Animal and Plant Health Inspection Service in a paper entitled *Request and Analysis to Change the Quarantine Policy for Ants Moving Into, or Through, the State of Hawaii.* Statement of Material Facts, ¶ 18.

19. It had been the policy of Animal and Plant Health Inspection Service that ants found in plants or plant material presented for entry would not require a report, or quarantine action, except for non-native species of ants in eight genera (e.g., red imported fire ants, *Solenopsis invicta*), and that

- 15 -

no action would be taken on shipments found to be infested with native continental United States ant species, or established non-native continental ant species (genera which have established within the continental United States and are not under domestic quarantine control). This policy of the Animal and Plant Health Inspection Service applied without regard to the status of ant species in Hawai`i, even if the destination of the infested shipment was Hawai`i. This policy was premised on the conclusion of Animal and Plant Health Inspection Service that "on balance, it seems that ants prey both on plant pests and predators of plant pests and can be considered environmentally neutral in terms of plant pest impact." *Request and Analysis to Change the Quarantine Policy for Ants Moving Into, or Through, the State of Hawaii,* Hawai`i Ant Group, October 25th, 2001, at 4-5. Statement of Material Facts, ¶ 19.

20.  Hawai`i Ant Group proposed a new policy that all species of ants intercepted at ports-of-entry and destined to, or through, the State of Hawai`i would require quarantine action and would be considered reportable if (1) they are not already established and widespread in Hawai`i and (2) the life stages found in a given shipment indicate the ability to reproduce. In addition, shipments found to be infested with ants already established and widespread in Hawai`i would be required to be reported to the Hawai`i Department of Agriculture. Statement of Material Facts, ¶ 20.

21.  Hawai`i Ant Group argued that a new policy was required because:

• The existing policy is directed towards protecting the continental United States where a diverse array of native species of ants are present. The State of Hawaii is a collection of isolated insular environments that have no native ant species. This intensifies the potential for damage from introduced ants because Hawaii's native fauna and flora never de-

- 16 -

veloped evolutionary strategies against social insects. Introduced ants in Hawaii are not environmentally neutral as stated in the current PPQ ant policy.

• The Animal and Plant Health Inspection Service's mandate for protecting agricultural crops has been expanded to protection of native plant species and plant pollinators since the original ant policy was established. The protection of threatened and endangered species from introduced non-native invasive species is also identified as current policy by the USDA Secretary's office (USDA, 2001). Hawaii is particularly high on the priority list because it has the highest percentage of endemic plants and animals of any location within the United States and possibly the world. Many of these plants and animals are Federally listed and protected. Ants are a major threat to many of these listed species not only because of direct damage to plants, but also because of secondary effects such as removing native insect pollinators.

Statement of Material Facts, ¶ 21.

22.  Hawai`i Ant Group explained:

Introduced ants are notorious for causing economic and environmental damage to the ecosystems in which they have been established. Most susceptible are those ecosystems that have no native ant species.

Hawaii lacks native ant species. If any single taxa of invasive species belongs to the top of the list of organisms to be concerned about in Hawaii, ants should be it. On the continental land masses ants are often the dominant ecological force in a natural community. Their biomass and energy consumption usually exceeds those of all the vertebrate species combined. They are the principal predators (Holldobler and Wilson, 1990) and prime movers of soil within most terrestrial ecosystems (Lyford, 1963; Wilson, 1973). In addition, leaf cutter ants are, species for species, the major herbivores in South and Central America (Weber, 1972). Ants shape, and often maintain, the plant and animal communities in which they live (Wilson, 1973; Jeanne, 1979; Levieux, 1982; Sorensen and Schmidt, 1987; Holldobler and Wilson, 1990).

The scientific literature is full of examples where introduced ants have resulted in native species extinctions covering a wide range of taxa in Hawaii and elsewhere (Zimmerman, 1948, Solem 1976, Gagne and Howarth, 1982; Lubin, 1984; Howarth, 1985; Howarth and Medeiros, 1988; Howarth and Ramsay, 1991; Cole et al., 1992; Gillespie and Reimer, 1993; Reimer, 1994; Wilson, 1996; Loope, 1998; LaPolla et al., 2000).

- 17 -

To understand why Hawaii's plants and animals are particularly vulnerable to ants, an understanding of the geological and evolutionary history of the islands is necessary. The Hawaiian archipelago comprises a southeast-trending chain of eight major and 124 smaller islands, reefs and shoals stretching 1600 miles across a highly isolated area of the northeast Pacific Ocean. The substantial age of the island chain (over 40 million years), its isolation (over 2000 miles from the nearest continent), and the variety of habitats created by Hawaii's relatively high mountains has created a special biota of plants and animals, different from any other on earth (Medeiros and Loope, 1994).

Hawaii is a prime example of oceanic island ecosystems that are highly susceptible to damage from newly established non-native organisms. Much of the existing endemic biota is believed to have evolved from approximately 1,000 original colonists (Mueller-Dombois, et al., 1981). It is estimated that before man came to the islands a new group successfully colonized Hawaii about once every 50,000 years on average. Hawaii's relative isolation from the biological forces that shape continental organisms has resulted in ecosystems that are unique and very vulnerable to invasion.

As a result, Hawaii has one of the highest levels of endemism in the world, with over 99% for terrestrial arthropods (Zimmerman, 1948) and 89% for the flora (Wagner et al., 1990). Approximately one-third of all Federally-listed threatened and endangered species occur in Hawaii (Stein et al., 2000).

Unfortunately, Hawaii also has the distinction of having the highest extinction rate of native species of any State in the Union even though the total number of plant and animal species in Hawaii are among the lowest for any State (Stein et al., 2000). It is well documented that non-native species are currently the predominant cause of biodiversity loss in Hawaii, even more than habitat destruction (Howarth and Ramsay, 1991; Medeiros and Loope, 1994; Stein et al, 2000).

Ants are not native to Hawaii. Unfortunately, close to 40 species of non-native ants have already established in Hawaii because of man's activity. Fortunately, many habitats (including large sections of pristine upland preserves on the larger islands and many of the outlying islands) are still ant-free. In addition, there are numerous other (not yet introduced) ant species that could invade new habitats and/or attack different plants or animals if they become established in Hawaii (Loope et al., 2001). Even in the case where one ant species would replace another, the results are not a simple one-for-one substitution but more often a radical restructuring of the entire arthropod community (Porter et al., 1988). Currently, the National Park Service, US Fish and Wildlife Service and the

- 18 -

State of Hawaii are actively protecting natural areas from ant introductions in an effort
to protect native plant and animal communities.

. . . .

[T]he impact of ants on the environment is impossible to categorize as either just plant
pests (a PPQ responsibility) or just animal pests. For example, at Haleakala National
Park on Maui, there is an active control program against the recently introduced Argen-
tine ant because of its potential to eliminate the endemic rare native ground nesting bees
*Nesoprosopis volcanicus* and *N. nivalis*. The reason for concern is not only for the pro-
tection of these rare insects, but also because these bees are the primary pollinators of
the famous endangered Haleakala Silversword (*Argyroxiphium sanwicense macro-
cephalum*) (Medeiros and Loope, 1994). Elimination of the bees may likely mean elimi-
nation of the plant. Additional Hawaiian introductions of primarily predatory ant spe-
cies into areas where ants are not currently present will likely impact other endemic na-
tive arthropods that share symbiotic relationships with threatened or rare endemic plant
species.

Statement of Material Facts, ¶ 22.

23. On April 10th, 2002 Animal and Plant Health Inspection Service's National Identification

Services adopted the proposed new policy. It is the mission of Animal and Plant Health Inspection

Service's National Identification Services to "determine which organisms are quarantine pests using

pest risk analysis models." Statement of Material Facts, ¶ 23.

24. With this Policy Change, Animal and Plant Health Inspection Service's National Identifica-

tion Services recognized Hawai`i's unique ecology:

To address the proposed policy, NIS considered the potential impact of exotic ants on
the Islands and the impact on trade that a more restrictive policy would impose.

NIS accepts the proposal that exotic ant species not present or widely distributed on the
Hawaiian Islands should be excluded from Hawaii. The proposal explains that ants
could not have co-evolved with native flora and fauna in Hawaii because the State has
no native ant species. Consequently, plants and animals on the Islands are particularly
susceptible to herbivory predation and competition from ants. This susceptibility is
evidenced by a number of publications that document serious impacts caused by intro-

- 19 -

duced ant species in Hawaii. This proposal would protect Hawaii from many ant taxa that PPQ currently considers non-quarantine significant.

We could not possibly evaluate each of the many thousands of ant species exotic to Hawaii. Nonetheless, the PRA indicates that virtually any exotic ant species can threaten the Islands. The PRA noted that because the delicate Hawaiian ecosystems did not evolve with native ants, exotic ant species pose multiple threats to these systems. Herbivorous species pose potential direct impacts as agricultural pests or by feeding on endangered or threatened plants (e.g. *Atta* spp.). Other ants may displace native ground-dwelling bees that are sole pollinators of threatened native plants. A number of ant species displace large amounts of soil, significantly changing ecosystems. When introduced into new areas, ant species become more aggressive, and their impact is thereby more pronounced.

Although the literature contains numerous examples of adverse impacts caused by ants, the Hawaii Ant Group PRA cited one paper that described how three species of introduced ants caused multiple extinctions of native plant and animal species in Hawaii. Two of those ant species were not actionable under previous APHIS policy.

*Change in Quarantine Action Policy for Ants Intercepted from Commodities Destined to the State of Hawaii*, National Identification Services, Plant Protection and Quarantine, Animal and Plant Health Inspection Service, United States Department of Agriculture, April 10th, 2002. Statement of Material Facts, ¶ 24.

### Endangered Species Act Consultations.

25. Animal and Plant Health Inspection Service commenced the statutorily-required consultations, 16 U.S.C. § 1536(c)(1), with the Fish and Wildlife Service with the submission by Animal and Plant Health Inspection Service, on September 5th, 2002, of the requisite Biological Evaluation. By then, Animal and Plant Health Inspection Service had narrowed application of the proposed Rule to

"tissue culture and greenhouse-grown *Phalaenopsis* orchids in growing media" from Taiwan only.

Statement of Material Facts, ¶ 25.

26. On March 21ˢᵗ, 2003 Fish and Wildlife Service wrote Animal and Plant Health Inspection

Service that Fish and Wildlife Service had "identified two areas of residual concern," one of which

was as follows:

> It is not clear why the several species of quarantine pest thrips were eliminated from con-
> sideration as pests that are likely to follow the importation pathway. The phytosanitary
> measures do not appear to adequately address the potential for infestation of thrips, result-
> ing in a substantial risk of the organisms entering greenhouse units, openings, and vent
> coverings. Specifically, the prescribed screening mesh size does not appear fine enough to
> exclude thrips from growing areas. Please provide an explanation why these species of
> thrips were dropped from the list of quarantine pests, and the rationale for the prescribed
> screening mesh size.

Statement of Material Facts, ¶ 26.

27. At a conference convened on April 2ⁿᵈ and 3ʳᵈ, 2003 Animal and Plant Health Inspection

Service responded to this "residual concern" as follows:

> Thrips is a pest of Orchidaceae in Taiwan; however, there is no evidence in either the scien-
> tific literature or from the interceptions at APHIS plant inspection stations that thrips is a
> pest on *Phalaenopsis*. PPQ ran a search on their database for thrips interceptions on *Pha-
> laenopsis* from Taiwan. No interceptions turned up. . . . *Phalaenopsis* has been imported
> bare root into the United States for at least 20 years. During that time no problems with
> pests on Phalaenopsis have arisen. The importation has amounted to a long-term uncon-
> trolled experiment.

Statement of Material Facts, ¶ 27.

28. On April 3ʳᵈ, 2003 Animal and Plant Health Inspection Service, again responding to this "re-

sidual concern," wrote the Fish and Wildlife Service as follows:

> The thrips identified in the pest risk assessment (PRA) were not considered for several reasons. The extensive literature searches APHIS conducted revealed that none of the thrips identified in the PRA have ever been reported on Phalaenopsis. Furthermore, a review of pest interceptions made over the past eight years on bare-rooted Phalaenopsis plants from Taiwan show that thrips have not been intercepted. . . .

Statement of Material Facts, ¶ 28.

29.  The Pest Risk Assessment of 1997 prepared by Animal and Plant Health Inspection Service had reported, from a literature search, and from review of Animal and Plant Health Inspection Service interception records of bare-rooted *Phalaenopsis* spp. orchid seedlings, that the following pests were "associated" with *Phalaenopsis* spp. from Taiwan: *Dichromothrips* sp., *Frankliniella intonsa*, *Frankliniella schultzei*, *Phlaeothripidae* sp., *Thripidae* sp., *Thrips hawaiiensis*, and *Thrips palmi* Karny. The Hawai`i Orchid Growers Association's Comments submitted on November 30th, 1998 had carefully explained that the required 0.6 mm screen hole size would not exclude the *Thripidae* quarantine pests of *Phalaenopsis* spp. orchids in Taiwan that had been identified in the Pest Risk Assessment of 1997. And in Comments submitted on November 25th, 1998 Hawai`i Department of Agriculture had reported that in 1993 it had allowed an importation of 50,000 bare-rooted *Phalaenopsis* spp. orchids into Hawai`i under a special permit whereby the plants were obtained from flasked material, the greenhouses in Taiwan were enclosed by screens and doors, and Hawai`i Department of Agriculture inspectors had traveled to Taiwan and there inspected and approved "each and every Phalaenopsis plant for packing." Nonetheless, several pests were intercepted by Animal and Plant Health Inspection Service when the bare-rooted plants were presented for entry into the United States, and even more pests were found after these bare-rooted *Phalaenopsis* spp. orchid seedlings

- 22 -

were thereafter grown-out in a quarantine house in Hawai`i for the then State-mandated period of 60 days post-entry quarantine. Hawai`i Department of Agriculture had also reported, in its Comments, that greenhouses with screens and automatic doors are not impermeable to all insects, pests, and disease pathogens. Animal and Plant Health Inspection Service revealed none of this readily available data to the Fish and Wildlife Service. Statement of Material Facts, ¶ 29.

30. On April 7th, 2003 the Fish and Wildlife Service concurred with the determination of the Animal and Plant Health Inspection Service that the proposed Rule would not adversely affect Federally-listed or proposed Endangered or Threatened Species or their habitats. The Fish and Wildlife Service considered no alien species interdiction features such as those it had imposed to preclude the invasion of hitchhiking alien species at Kahului Airport, alien species interdiction features that were a condition of the "No Jeopardy" Biological Opinion earlier issued by the Fish and Wildlife Service. Neither did the Fish and Wildlife Service consider the difference between an assessment of risk of alien species invasion through entry of specific hosts, *viz.*, *Phalaenopsis* spp. orchid plants, and an assessment of risk of alien species invasion through introduction of suitable breeding habitats for alien species, i.e., the pots filled with sphagnum moss in which mature *Phalaenopsis* spp. orchid plants enter from Taiwan. Statement of Material Facts, ¶ 30.

<u>The Risk Analysis of May 2003.</u>

31. On May 9th, 2003 Animal and Plant Health Inspection Service revised and reissued the Pest Risk Assessment of 1997 as the Risk Analysis of 2003. Animal and Plant Health Inspection Service also issued an Environmental Assessment in May 2003. Animal and Plant Health Inspection Service

- 23 -

did not then, in either document, review the Comments that had been received on the Pest Risk Assessment of 1997. Statement of Material Facts, ¶ 31.

32. Animal and Plant Health Inspection Service's 1997 Risk Assessment and 2003 Risk Analysis are supposedly premised on available scientific literature and Animal and Plant Health Inspection Service's pest inspection records for imported seedlings of the genus *Phalaenopsis* and the plant family *Orchidaceae*. 69 Fed. Reg. 24920 (2004). In fact, the 1997 Risk Assessment and the 2003 Risk Analysis are limited to "quarantine pests" "specifically linked in scientific literature or APHIS interception records with orchids of the genus *Phalaenopsis*." 69 Fed. Reg. 24922 (2004). This focus on the risk of invasion of alien species through entry of specific hosts, orchids of the genus *Phalaenopsis*, rather than the risk of invasion of alien species through introduction of suitable breeding habitats, is entirely inconsistent with the Biological Assessment of March 10th, 1997 prepared for the Federal Aviation Administration, United States Department of Transportation and entirely inconsistent with the Biological Opinion of July 23rd, 1997 by the Fish and Wildlife Service, United States Department of the Interior, both assessing the effects of the project at Kahului Airport to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet. This Biological Assessment and the Biological Opinion regarding Kahului Airport focus not on the risk of invasion of alien species through entry of specific hosts, but rather on the risk of invasion by alien species through introduction of suitable breeding habitats. Animal and Plant Health Inspection Service's 1997 Risk Assessment and the 2003 Risk Analysis expressly do not consider "accidental hitchhikers." Contrariwise, the alien species interdiction features imposed in the Biological Opinion by the Fish and Wildlife Service as a condition

- 24 -

of the "No Jeopardy" finding for the project at Kahului Airport to strengthen Runway 2/20 and extend the length of Runway 2/20 to 9,600 feet are focused on accidental hitchhikers. Statement of Material Facts, ¶ 32.

33.  The 1997 Risk Assessment and the 2003 Risk Analysis consider only the climate of the Mainland United States, and there only of south Florida, whose climate is akin to the tropical climate of Taiwan, and was thought to be at risk. The Animal and Plant Health Inspection Service does not, in these Documents, regard Hawai`i's unique ecology. Statement of Material Facts, ¶ 33.

**The Proposed Rule of 2003.**

34.  On Friday, May 9th, 2003 Animal and Plant Health Inspection Service announced publicly in the FEDERAL REGISTER a proposed Rule allowing the importation from Taiwan only of mature *Phalaenopsis* spp. orchid plants potted in sphagnum moss as a growing medium. Animal and Plant Health Inspection Service there explained that in response to Comments on the proposed Rule of 1998 it had "narrowed the application of the rule to *Phalaenopsis* spp. from Taiwan only and entered into formal section 7 consultation with the U.S. Fish and Wildlife Service." Further, Animal and Plant Health Inspection Service explained that it had received concurrence on its determination "that the importation of *Phalaenopsis* spp. from Taiwan will not adversely affect federally listed or proposed endangered or threatened species or their habitats." Statement of Material Facts, ¶ 34.

**Comments on the Proposed Rule of 2003.**

35.  Again, the Hawai`i Orchid Growers Association provided Comments, this time on July 9th, 2003. Comments were also submitted by the Society of American Florists, the Florida Nurserymen &

- 25 -

Growers Association, the American Nursery & Landscape Association, the Hawai`i Department of Agriculture, and Hawai`i's Congressional Delegation. Statement of Material Facts, ¶ 35.

**Reinitiation of Endangered Species Act Consultations.**

36. On October 1st, 2003 Animal and Plant Health Inspection Service re-opened its Endangered Species Act consultations with the Fish and Wildlife Service. Statement of Material Facts, ¶ 36.

37. Fish and Wildlife Service responded to these re-opened Endangered Species Act consultations by once again raising a question about the adequacy of the screening for the greenhouses in Taiwan where the *Phalaenopsis* spp. orchid plants are to be established in pots of sphagnum moss:

> We had understood during the interagency discussions and subsequent agreement that 0.6 mm mesh size for greenhouse, opening, and vent screening was inadequate to prevent the introductions of thrips infestations into APHIS-approved greenhouses, and that 0.4 mm mesh size or less would be used. Using the smaller mesh size would provide an additional degree of insurance against an infestation of thrips and reduce the potential for importing thrips into the United States. Please explain how requiring use of 0.6 mm mesh will prevent thrips introductions.

Statement of Material Facts, ¶ 37.

38. When it responded on June 2nd, 2004 to this question from Fish and Wildlife Service, Animal and Plant Health Inspection admitted that its selection of mesh size for the greenhouses was based on economics, not on any concern for species preservation:

> Regarding the comment that FWS understood from our discussions that PPQ would require a mesh size smaller than 0.6 mm for the greenhouse, opening, and vent screenings to prevent the introductions of thrips infestations into APHIS-approved greenhouses, PPQ assumes that this was a misunderstanding. PPQ recognizes that thrips are very small insects, approximately 0.2 mm, and could get in through even the 0.4 mm mesh size suggested by FWS. Mesh size of 0.6 mm is the most practical for many situations; smaller mesh sizes would require adapting greenhouse construction to accommodate the need for air circula-

- 26 -

tion and cooling fans, especially in more humid climates. However, PPQ incorporates spe-
cific equivalent mitigation measures, including routine or repeated pesticide sprays, when
warranted, to reduce the risk of infestation and possible introduction of thrips into the
United States.

Statement of Material Facts, ¶ 38.

39. On September 1st, 2004 the Fish and Wildlife Service concurred with the determination of the

Animal and Plant Health Inspection Service that the proposed Rule for the importation from Taiwan

of finished, flowering *Phalaenopsis* spp. orchid plants established in pots of sphagnum moss was "not

likely to adversely affect" Federally-listed species or designated critical habitat. Statement of Material

Facts, ¶ 39.

### The Final Rule.

40. On Wednesday, May 5th, 2004 Animal and Plant Health Inspection Service published its

Final Rule adding an additional taxon of plants, mature *Phalaenopsis* spp. orchid plants from

Taiwan potted in sphagnum moss, that may be imported subject to the growing, inspection, and

certification requirements of 7 C.F.R. § 319.37-8(e). "Importation of Orchids of the Genus *Phalaen-

opsis* From Taiwan in Growing Media," 69 Fed. Reg. 24916-36 (2004) (to be codified at 7 C.F.R. §

319.37-8(e)). Statement of Material Facts, ¶ 40.

---

ARGUMENT

---

**I.   Defendant Animal and Plant Inspection Service's Biological Opinion That the Final Rule Will Not Adversely Affect Federally-Listed or Proposed Endangered or Threatened Species or Their Habitats is Arbitrary and Capricious, An Abuse of Discretion, and Unlawful.**

During the Endangered Species Act consultations in April 2003 Animal and Plant Health Inspection Service wrongly told the Fish and Wildlife Service that thrips is not a pest on *Phalaenopsis* spp. plants from Taiwan and that pest interceptions in the preceding eight years had not reported thrips infestations.

The Pest Risk Assessment of 1997 prepared by Animal and Plant Health Inspection Service had reported, from a literature search, and from review of Animal and Plant Health Inspection Service interception records on bare-rooted *Phalaenopsis* spp. orchid seedlings, that the following pests were "associated" with *Phalaenopsis* spp. from Taiwan: *Dichromothrips* sp., *Frankliniella intonsa*, *Frankliniella schultzei*, *Phlaeothripidae* sp., *Thripidae* sp., *Thrips hawaiiensis*, and *Thrips palmi* Karny. The Hawai`i Orchid Growers Association's Comments submitted on November 30th, 1998 had carefully explained that the required 0.6 mm screen hole size would not exclude the *Thripidae* quarantine pests of *Phalaenopsis* spp. orchids in Taiwan that had been identified in the Pest Risk Assessment of 1997. And in Comments submitted on November 25th, 1998 Hawai`i Department of Agriculture had reported that in 1993 it had allowed an importation of 50,000 bare-rooted *Phalaenopsis* spp. orchids into Hawai`i under a special permit whereby the plants were obtained from flasked material, the

- 28 -

greenhouses in Taiwan were enclosed by screens and doors, and Hawai`i Department of Agriculture inspectors had traveled to Taiwan and there inspected and approved "each and every Phalaenopsis plant for packing." Nonetheless, several pests were intercepted by Animal and Plant Health Inspection Service when the bare-rooted plants were presented for entry into the United States, and even more pests were found after these bare-rooted *Phalaenopsis* spp. orchid seedlings were thereafter grown-out in a quarantine house in Hawai`i for the then State-mandated period of 60 days post-entry quarantine. But Animal and Plant Health Inspection Service revealed none of this readily available data to the Fish and Wildlife Service.

The honesty oath of witnesses, to provide "the truth, the whole truth, and nothing but the truth," is a staple of procedure dating back to English trials in the 13th Century, and this honesty oath informs the question here—just what is required to be provided for Endangered Species Act consultations using "the best scientific and commercial data available?" Certainly it is at least the whole truth. In the case of Endangered Species Act consultations about possible effects on terrestrial Federally-listed or proposed Endangered or Threatened Species or their habitats, an action Agency, here the Animal and Plant Health Inspection Service, cannot misrepresent to the Fish and Wildlife Service just what the action Agency has learned. But this is exactly what Animal and Plant Health Inspection Service did when it told the Fish and Wildlife Service that thrips is not a pest on *Phalaenopsis* spp. plants from Taiwan and that pest interceptions in the preceding eight years had not reported thrips infestations.

- 29 -

In *Resources Limited, Inc. v. Robertson*, 35 F.3d 1300, 1304-05 (9th Cir. 1994), the consulting Federal Agency "selectively withheld" from the Fish and Wildlife Service in-house data which showed adverse impacts of high-level timber harvests on grizzly bears. Thus the *Resources Limited* Court held that the consulting Federal Agency could not lawfully decide, based on a Biological Opinion from the Fish and Wildlife Service, that the planned high-level timber harvests would not adversely affect Federally-listed or proposed Endangered or Threatened Species or their habitats. Put another way, there cannot be an "adequate review" unless the whole truth is provided. Defendant Animal and Plant Health Inspection Service here did not provide the whole truth to the Fish and Wildlife Service. Indeed, Defendant Animal and Plant Health Inspection Service lied to the Fish and Wildlife Service.

Defendant Animal and Plant Health Inspection Service knew when it conducted its Endangered Species Act, 16 U.S.C. § 1536(a)(2), consultations with Defendant Fish and Wildlife Service during the period October 2002 through April 7th, 2003 and again during the period October 1st, 2003 through September 1st, 2004, that Hawai`i's ecology is unique—Animal and Plant Health Inspection Service had recognized Hawai`i's unique ecology when it adopted the policy change on ants on April 10th, 2002. But Hawai`i's unique ecology was not considered when Animal and Plant Health Inspection Service conducted its Endangered Species Act consultations with the Fish and Wildlife Service, and thus these Endangered Species Act consultations were incomplete and did not use the "best scientific and commercial data available" as required by 16 U.S.C. § 1536(a)(2). Indeed, Animal and Plant Health Inspection Service explained, during its Endangered Species Act consultations with the Fish and Wildlife Service on June 2nd, 2004, that the required mesh size for the greenhouses in Tai-

- 30 -

wan where the *Phalaenopsis* spp. orchid plants are to be established in pots of sphagnum moss is based on economics (smaller mesh sizes would require adapting greenhouse construction in the humid climate of Taiwan to accommodate the need for air circulation and cooling fans), and is not based on pest risk, or on Hawai`i's unique ecology (Hawai`i and Taiwan are both in the same tropical climate), or on potential threats to Federally-listed or proposed Endangered or Threatened Species or their habitats.

**II.   Defendant Fish and Wildlife Service's Concurrence With the Biological Opinion That the Final Rule Will Not Adversely Affect Federally-Listed or Proposed Endangered or Threatened Species Arbitrarily and Capriciously Disregards The Risk From Entry of Suitable Breeding Habitats.**

When it concurred with Defendant Animal and Plant Health Inspection Service on April 7th, 2003 and again on September 1st, 2004 that the proposed Rule allowing entry from Taiwan of finished, flowering *Phalaenopsis* spp. orchid plants established in pots of sphagnum moss would not adversely affect Federally-listed or proposed Endangered or Threatened Species or their habitats, Defendant Fish and Wildlife Service did not regard the risk of invasion by alien species through entry of suitable breeding habitats, a risk that had been earlier accredited by Defendant Fish and Wildlife Service in a 1997 Biological Opinion as to the effects of the Federally-funded improvement project at Kahului Airport, Maui, Hawai`i. Indeed, Defendant Fish and Wildlife Service then concluded such an invasion of an alien species "*would be practically irreversible and could have catastrophic consequences for one or more listed species.*" Emphasis added.

- 31 -

Any reasoned discussion of potential adverse effects resulting from the proposed, now Final, Rule allowing entry from Taiwan of finished, flowering *Phalaenopsis* spp. orchid plants established in pots of sphagnum moss necessarily involves consideration *not only* of the specific host, *viz., Phalaenopsis* spp. orchid plants, *but also* consideration of the consequences of entry of suitable breeding habitats for alien species, i.e., the pots filled with sphagnum moss in which mature *Phalaenopsis* spp. orchid plants enter from Taiwan. Fish and Wildlife Service knew of this risk from entry of suitable breeding habitats, but Fish and Wildlife Service never thought about it, either on April 7th, 2003, or on September 1st, 2004. This was a "fail[ure] to consider an important part of the problem," and thus Fish and Wildlife Service's concurrence with Animal and Plant Health Inspection Service's Biological Opinion that the Final Rule will not adversely affect Federally-listed or proposed Endangered or Threatened Species or their habitats was arbitrary and capricious. *American Wildlands v. Norton*, 193 F. Supp. 2d 244, 256 (D.D.C. 2002), *citing Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983).

## CONCLUSION

There are no genuine issues of material fact, and as a matter of law, Hawai`i Orchid Growers Association is entitled to Summary Judgment. Hawai`i Orchid Growers Association thus respectfully requests that the Court grant Summary Judgment for the Plaintiffs.

Hawai`i Orchid Growers Association asks: (a) that this Court declare as arbitrary, capricious, an abuse of discretion, and unlawful the Defendant Animal and Plant Health Inspection Service's

Biological Opinion that the Final Rule will not adversely affect Federally-listed or proposed En-

dangered or Threatened Species or their habitats; (b) that this Court order Defendant Animal

and Plant Health Inspection Service, through a Permanent Injunction, to rescind the addition of

*Phalaenopsis* spp. from Taiwan to the list of plants that may be imported in an approved growing

medium subject to the growing, inspection, and certification requirements specified in 7 C.F.R. §

319.37-8(e); (c) that this Court declare as arbitrary, capricious, an abuse of discretion, and unlaw-

ful Defendant Fish and Wildlife Service's concurrence with the Biological Opinion of the Animal

and Plant Health Inspection Service; and (d) that this Court grant such other and further relief as

may be just and proper.

> With aloha,
>
> /s/ Cyrus E. Phillips, IV
>
> _____
> Cyrus E. Phillips, IV
> D.C. Bar Number 456500
> February 10th, 2006
>
> 1828 L Street, N.W., Suite 660
> Washington, D.C. 20036-5112
> Telephone:      (202) 466-7008
> Facsimile:      (202) 466-7009
>
> Electronic Mail:      *lawyer@procurement-lawyer.com*
>
> Attorney of record for Plaintiffs,
> Hawai`i Orchid Growers Association.

- 33 -

CERTIFICATE OF SERVICE

I hereby certify that on Friday, February 10th, 2006 a true and complete copy of this Memorandum of Points and Authorities was filed electronically via the Court's Electronic Case Filing System, through which notice of the filing will be sent to:

Donna S. Fitzgerald, Esq.

Electronic Mail:     donna.fitzgerald@usdoj.gov

Attorney of record for Defendants,
United States Department of Agriculture,
*et al.*, and
United States Department of the Interior, *et al.*

/s/ Cyrus E. Phillips, IV

_____
Cyrus E. Phillips, IV

- 34 -