# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAWAI'I ORCHID GROWERS ASSOCIATION,　　　） | |
| 　　　　　　　） | |
| Plaintiff,　　　） | |
| 　　　　　　　） | Civil Action No. 05-1182 (RCL) |
| 　　　　　　　） | |
| 　　　　　　　） | |
| UNITED STATES DEPARTMENT OF AGRICULTURE; ） | |
| MIKE JOHANNS, SECRETARY OF AGRICULTURE;　） | |
| W. RON DEHAVEN, ADMINISTRATOR, ANIMAL　） | |
| AND PLANT HEALTH INSPECTION SERVICE;　　） | |
| UNITED STATES DEPARTMENT OF THE INTERIOR; ） | |
| GALE NORTON, SECRETARY OF THE INTERIOR;　） | |
| MATTHEW J. HOGAN, ACTING DIRECTOR, UNITED ） | |
| STATES FISH AND WILDLIFE SERVICE,　　　） | |
| 　　　　　　　） | |
| Defendants.　　） | |
| ──────────────────────────） | |

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 12(b), defendants hereby move to dismiss plaintiffs' First Amended Complaint for lack of standing. In the alternative, defendants also move for summary judgment pursuant to Federal Rule of Civil Procedure 56, as there are no material facts in dispute, and judgment should be granted to defendants as a matter of law. A memorandum supporting this motion is attached hereto. (A table of contents and authorities is attached hereto as Exhibit 1). The arguments in defendants' memorandum also respond to plaintiff's memorandum in support of its motion for summary judgment.

Dated: March 31, 2006　　　　　Respectfully submitted,

　　　　　　　　　　　Sue Ellen Woolridge
　　　　　　　　　　　Assistant Attorney General
　　　　　　　　　　　Environment & Natural Resources Division
　　　　　　　　　　　United States Department of Justice

_____/s/_____

DONNA S. FITZGERALD
Connecticut Bar #411810
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington D.C. 20044-0663
Phone:  (202) 305-0476
Fax: (202) 305-0506
E-mail: Donna.Fitzgerald@usdoj.gov

OF COUNSEL:

Darlene Bolinger
Attorney Advisor General
Regulatory Division
Office of the General Counsel
United States Department of Agriculture
Rm 2319 South Building
1400 Independence Ave., SW
Washington, DC 20250-1400


Peg Romanik, Attorney
Office of the Solicitor
Division of Parks & Wildlife
United States Department of the Interior
1849 C. St., N.W., MS 6557
Washington D.C. 20240

                    ATTORNEYS FOR DEFENDANTS



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


HAWAI'I ORCHID GROWERS ASSOCIATION,          )
                                             )
                          Plaintiff,         )
                                             )  Civil Action No. 05-1182 (RCL)
                                             )

2

```
                                                      )
UNITED STATES DEPARTMENT OF AGRICULTURE; )
MIKE JOHANNS, SECRETARY OF AGRICULTURE;   )
W. RON DEHAVEN, ADMINISTRATOR, ANIMAL     )
AND PLANT HEALTH INSPECTION SERVICE;       )
UNITED STATES DEPARTMENT OF THE INTERIOR; )
GALE NORTON, SECRETARY OF THE INTERIOR;    )
MATTHEW J. HOGAN, ACTING DIRECTOR, UNITED )
STATES FISH AND WILDLIFE SERVICE,          )
                                                      )
                                    Defendants.       )
_____)
```

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTIONS TO DISMISS AND/OR FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

This is the second lawsuit plaintiff has brought challenging a 2004 Final Rule promulgated by the Animal and Plant Health Inspection Service ("APHIS"), a sub-agency within the United States Department of Agriculture ("USDA").  In that rule, APHIS amended regulations governing the importation of plants and plant products to add orchids of the genus Phalaenopsis (orchids) from Taiwan to the list of plants that may be imported in an approved growing medium, subject to specified growing, inspection, and certification requirements.  Final Rule, 69 Fed. Reg. 24,916 (May 5, 2004).  APHIS promulgated the rule in response to a request from Taiwan, and after determining that Phalaenopsis species plants from Taiwan established in approved growing media can be imported without resulting in the introduction into the United States, or the dissemination within the United States, of a plant pest or noxious weed.  Id.

Plaintiff contends that the promulgation of the rule violated the Endangered Species Act, ("ESA"), 16 U.S.C. §§ 1531 et seq. in three respects.  First, plaintiff contends that during the

3

ESA consultation process with the Fish and Wildlife Service ("FWS"), APHIS failed to inform FWS that thrips is a pest associated with <u>Phalaenopsis</u> plants from Taiwan, and that APHIS had purportedly incorrectly told FWS that past interceptions had not detected thrips on <u>Phalaenopsis</u> plants from Taiwan.  Pl. Br. At 28-30.

Second, plaintiff contends that APHIS violated the ESA's requirement to use the "best scientific and commercial data available" when it failed to "recognize[]" Hawaii's "unique ecology" in the consultation process with FWS.  Pl. Br. At 30.  Third, plaintiff contends that FWS violated the ESA by concurring with APHIS's Biological Assessment, failing to consider, as it purportedly had in another, unrelated Biological Opinion, the "risk of invasion by alien species through entry of suitable breeding habitats."  Pl. Br. At 31.

As explained below, plaintiff has failed to demonstrate that it has Article III standing to pursue these claims against defendants.  Moreover, even if this Court finds plaintiff has standing, none of plaintiff's arguments has merit.  The record reflects that APHIS and FWS engaged in a thorough consultation process pursuant to the Endangered Species Act, and plaintiff has failed to demonstrate that, based on the record filed with this Court, the agencies' determinations were arbitrary or capricious.  Accordingly, defendants' motion should be granted, and plaintiff's amended complaint dismissed with prejudice.

## II.  LEGAL BACKGROUND

### A.     The Plant Protection Act and Related Regulations

In 1994 and again, on April 30, 1995, APHIS received a request from Taiwan to amend its plants-in-growing media rule to include plants from the genus <u>Phalaenopsis</u>.  AR 25.

In order to ensure that plants and plant products do not serve as a pathway for the entry of

4

plant pests into the United States, the Plant Protection Act prohibits or restricts the importation

of plants or plant products containing plant pests unless the Secretary of Agriculture authorizes

import pursuant to a permit, or a regulation allowing such movement.  7 U.S.C. § 7701, 7711(a).

The Act delegates broad authority to the Secretary to issue regulations prohibiting or restricting

the importation or movement of any plant or plant product when  necessary to prevent the

introduction of any plant pest into the United States.  7 U.S.C. § 7712.

      Among the restrictions provided by the Act are both a requirement that the plant product

be accompanied by a certificate of inspection, PPA § 412(c)(2), and that entry of the plant

product may be conditioned on compliance with integrated "remedial measures [commonly

known as a 'systems approach'] the Secretary determines to be necessary to prevent the spread

of plant pests."  7 U.S.C. § 7711.[1]  Finally, the Act empowers the Secretary to conduct

warrantless inspections at, among other places, ports of entry, and grants the Secretary the power

to hold, seize, quarantine, treat, or destroy plants in order to prevent the dissemination of new or

"not widely distributed" plant pests.  7 U.S.C. §§ 7715, 7731.

      **B.**    **Quarantine 37 Regulations**

      USDA has implemented its statutory obligations to prohibit or restrict the importation

into the United States of certain plants and plant products to prevent the introduction of plant

pests and noxious weeds at 7 CFR Part 319.  The regulations in ''Subpart—Nursery Stock,

Plants, Roots, Bulbs, Seeds, and Other Plant Products,'' §§ 319.37 through 319.37–14

---

[1]  In order to facilitate the continuing development of these remedial measures, the PPA directed
the Secretary to conduct a study and prepare a report on systems approaches, 7 U.S.C. § 7712(e),
which was published in February 2002.  <u>See</u> AR 1199.

(Quarantine 37), contain, among other things, prohibitions and restrictions on the importation of plants, plant parts, and seeds for propagation.

Quarantine 37 generally prohibits the importation of some plants because of their particular plant pest risks, id. §§ 319.37-2(a) & (b), and provides special permitting, inspection, treatment and even quarantine requirements for other plants in order to prevent or mitigate the risk associated with their importations.  Id. §§ 319.37-5 & 6.  By and large, however, the regulations allow the importation of many plants so long as they are free of sand, soil, and earth, id. § 319.37-8(a),[2] and even allow the importation of epiphytic plants (including orchids) established (rooted and grown) on tree slabs, coconut husks, or coconut fiber.  Id. § 319.37-8(d).

In order to import bare-rooted orchids or orchids established on tree slabs, coconut husks, or coconut fiber, the regulations require a general permit (providing the importer's identity, the numbers and kinds of plants to be imported, the countries of origin, the U.S. port of entry, the means of transportation, and the date of arrival), and an agreement to comply with the permit conditions.  Id. § 319.37-3(b), (c).  The plants themselves must be accompanied by a phytosanitary certificate of inspection, issued by a plant protection official of the country of origin not more than 15 days prior to shipment of the plants, which certifies that the plant has been inspected and is believed to be free from plant pests.  Id. § 319.37-4(a).  See also § 319.37-1 (Definitions:  "phytosanitary certificate of inspection").

Finally, pursuant to the permit conditions, these plants are subject to inspection by

---

[2] APHIS has developed a list of "approved growing media" that may be imported into this country because of their low risk of pest introduction into the United States.  7 C.F.R. § 319.37-8(e)(1); AR 1537-38.  For this same reason, APHIS allows the use of most, if not all, "approved growing media" as packing material to ship bare-rooted plants, including orchids, into the United States.  7 C.F.R. § 319.37-9.

APHIS officials at the U.S. port of entry, subject to treatments contained in the Plant Protection and Quarantine Treatment Manual, and may be denied entry if untreatable.  7 C.F.R. § 319.37-4(b).  Pursuant to this inspection system, APHIS interception records show that since 1988, there have been fewer than 50 interceptions of quarantine-significant pests on Phalaenopsis from Taiwan imported pursuant to this rule.  Final Rule, 69 Fed. Reg. 24, 916, 24, 929; AR 1537.

       **C.**       **The Plants-in-Growing-Media Rule**

Established in 1980, APHIS's plants-in-growing-media rule allows the importation of eleven (now twelve) taxa of plants that are established (rooted and grown) in "approved growing media."  Id. § 319.37-8.  Approved growing media include, inter alia, baked expanded clay pellets, cork, glass wool, organic and inorganic fibers, peat, perlite, sphagnum moss, vermiculite, volcanic rock, or any combination of these media.  Id. § 319.37-8(e)(1).  The growing media must not have been previously used.  Id.  APHIS allows the use of approved growing media because of their low risk of introducing plants pests into the United States.  Final Rule, AR 1537-38.  Independent studies of APHIS-approved growing media have found that the approved media are not hospitable to pest infestation.  May, 2003 Risk Analysis of the Importation of Moth Orchid, Phalaenopsis spp., Plants in Approved Growing Media From Taiwan into the United States, at 18-19, AR 1090-91.

In addition, the plants-in-growing-media rule:

-   Requires plants to be grown in accordance with written agreements (bilateral workplans) between APHIS and the plant protection service of the country where the plants are grown and between the foreign plant protection service and the grower that stipulates provisions concerning how APHIS's regulations will be enforced;[3]

---

[3] The bilateral workplan clarifies the responsibilities of each organization for enforcing the regulations.  Work Plan for Plants in Growing Media from Taiwan, June, 2004, AR 1548-50.

- Requires the plants to be rooted and grown in an approved greenhouse that meets certain requirements for pest exclusion and that is used only for plants being grown in compliance with the plants-in-growing-media rule for at least four months;

- Restricts the source of the seeds or parent plants used to produce the plants, and requires grow-out or treatment of parent plants imported into the exporting country from another country;

- Specifies the sources of water that may be used on the plants, the height of the benches on which the plants must be grown, and the conditions under which the plants must be stored and packaged; and

- Requires that the plants be inspected in the greenhouse and found free of evidence of plant pests no more than 30 days prior to the exportation of the plants.

7 C.F.R. §§ 319.37-8(e)(i)-(viii).

Additionally, pursuant to Quarantine 37 regulations and the workplan provided for in the plants-in-growing-media rule, APHIS subjects initial shipments from a newly approved importation program, such as Phalaenopsis, to extremely rigorous inspections that include, for example, removal of plants from pots to examine roots and growing media. Id. § 319.37-4(b); May, 2003 Environmental Assessment for Proposed Rule at 17, AR 523. During the first year of the program, APHIS inspected a minimum of fifty percent of the shipments, and depending on the results of the inspection, inspection rates may increase or decrease in subsequent years. Final Rule, AR 1535.

---

The workplan also clarifies how specific aspects of the program operate. AR 1550-54. Each grower who wishes to export to the United States must enter into an agreement with the foreign plant agency whereby he or she must agree to comply with the plants-in-growing-media rule and to allow APHIS and foreign plant protection agency inspectors access to the growing facility as necessary to monitor compliance with the provisions of this section. 7 C.F.R. § 319.37-8(e)(2)(I); Work Plan, AR 1545. Further, before growers can export these plants in growing media to the United States, the foreign plant inspection agency must issue a phytosanitary certificate declaring that each batch meets the requirements of applicable regulations. 7 C.F.R. § 319.37-4(a); Work Plan, AR 1548.

Finally, pursuant to Quarantine 37 regulations in general and the workplan provided for in the plants-in-growing-media rule, APHIS retains authority to hold all imports until it can complete an investigation and initiate appropriate measures to remedy any pest problem identified by inspection or any other rule violation. 7 U.S.C. § 7713; 7 C.F.R. §§ 319.37(a) & (b); Work Plan for Plants in Growing Media in Taiwan, June, 2004, AR 1554. 1554. APHIS's potential remedies in such an event include stopping imports from a specific producer or shutting down the entire program, if the circumstances were to show that such action were warranted. 7 C.F.R. §§ 319.37(a) & (b); Work Plan for Plants in Growing Media in Taiwan, June, 2004, AR 1554. In addition, the regulations allow APHIS to review and modify any import program as necessary to ensure that it continues to prevent the import of quarantine plant pests. 7 C.F.R. §§ 319.37(a) & (b); AR 1554.

### D. The Endangered Species Act and Section 7 Consultation

In the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 et seq., Congress directed the Secretaries of Interior and Commerce to list as endangered those species which are "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. §§ 1532(6), 1533. The ESA affords listed species certain protections. For example, Section 9 of the ESA prohibits any unauthorized "take" of an endangered species . 16 U.S.C. § 1538(a)(1)(b).

Section 7 of the ESA requires each federal agency to "insure" that any action that it authorizes, funds, or carries out "is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). To achieve this objective, an agency proposing an action, such as APHIS in this case, must consult with the United States Fish and

Wildlife Service (FWS).  <u>See</u> 16 U.S.C. § 1536; 50 C.F.R. §§ 402.03, 402.13, 402.14.

 The FWS regulations allow for informal and formal consultation.  Informal consultation is an optional process that includes all discussions, correspondence, <u>etc.</u>, between the FWS and the action agency, and that is designed to assist the action agency in determining whether formal consultation or a conference is required.  <u>See</u> 50 C.F.R. § 402.13(a).  The action agency first prepares a biological assessment or evaluation to assess the effects of its action on listed species in all areas to be affected directly or indirectly by the action.  <u>Defenders of Wildlife v. Norton</u>, 257 F. Supp. 2d 53, 59 (D.D.C. 2003).

 If during informal consultation the action agency determines that its proposed action is not likely to adversely affect listed species or critical habitat, and the FWS concurs in writing, the consultation process is terminated, and no further action is necessary.  <u>See</u> 50 C.F.R. § 402.13(a); <u>see also id.</u> § 402.14(b).  If the action agency determines that the proposed action is likely to adversely affect a listed species, formal consultation with the FWS is required.  50 C.F.R. § 402.14(a); <u>accord</u> <u>Defenders of Wildlife</u>, 257 F. Supp. 2d at 59.  Formal consultation procedures require the U.S. Fish & Wildlife Service to prepare a biological opinion including a conclusion as to whether the proposed action is likely to jeopardize the continued existence of a listed species or result in destruction or adverse modification of critical habitat.  <u>Water Keeper Alliance v. United States Dep't of Defense</u>, 271 F.3d 21, 26 (1st Cir. 2001); 50 C.F.R. § 402.14(g).

 The Endangered Species Act and implementing regulations require both the action agency and FWS to use the "best scientific and commercial data available" in the consultation process.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).  Likewise, the Court's review of the

claim is under that act, and "the Court's review of the scientific data included in the

administrative record is limited to an inquiry as to whether the record supports the agency's

findings and whether the agency's actions were based on the best scientific data available."

American Wildlands v. Norton, 193 F. Supp. 2d 244, 252 (D.D.C. 2002) (internal quotes

omitted).  The court "is not in a position to make policy judgments based on conflicting or

uncertain scientific data."  Id.  The court must only determine whether the agency has met

certain "minimal standards of rationality."  Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir. 1976).

An agency is not obligated to conduct independent studies to improve upon the best

available science, nor to resolve inconclusive aspects of the scientific information.  Center for

Biological Diversity v. Lohn, 296 F. Supp. 2d 1223, 1236 (W.D. Wash. 2003) (citing Southwest

Center for Biological Diversity v. Babbitt, 215 F.3d 58, 61 (D.C. Cir. 2000)).  Rather, the

standard "merely prohibits the Secretary [or an action agency] from disregarding available

scientific evidence that is in some way better than the evidence he relies on."  Southwest Center

for Biological Diversity v. Babbitt, 215 F.3d 58, 60 (D.C. Cir. 2000) (citation omitted).  For

example, a federal district court held the FWS violated this requirement in listing a species when

the agency knew that its underlying information was inaccurate.  Center for Biological Diversity,

296 F. Supp. 2d at 1239.

## III.  FACTUAL BACKGROUND

### A.  Request to Amend Rule

In 1994 and again, on April 30, 1995, APHIS received a request from Taiwan to amend

its plants-in-growing media rule to include plants from the genus Phalaenopsis.  AR 25.  In

response to this request, APHIS performed a risk assessment pursuant to the risk evaluation

standards set forth by the plants-in-growing-media rule in effect at the time.  See 7 C.F.R.

§ 319.37-8(g) (1998); AR 1346-66.  APHIS prepared the Pest Risk Assessment ("PRA") to

"examine plant pest risks associated with the importation of live Phalaenopsis plants in

sphagnum growing medium from Taiwan into the United States."  1997 PRA at 1, AR 1348.

In order to consider that request and determine whether to propose a rule change, the

Quarantine 37 regulations required APHIS to, among other things:

- collect information about the plant and growing medium and about the method of preparing the plant for importation;

- evaluate the history of past plant pest interceptions or introductions into the United States associated with the plant;

- catalogue the potential plant pests associated with the type of plant in the country of origin and determine if any of the pests is a quarantine pest;

- conduct an individual pest risk assessment by estimating the probability that the pest (i) will be on or with the plant at the time of importation, (ii) will survive in transit and enter the United States undetected, and (iii) will colonize once entering the United States, and by estimating the actual and perceived economic, environmental, and social damage that would occur if the pest is introduced, colonizes, and spreads; and

- determine whether the overall compilation of risk is greater than the risk of importing the plant with bare roots.

7 C.F.R. § 319.37-8(g) (1998).

Pursuant to that risk analysis, APHIS identified seven quarantine pests associated with

Phalaenopsis from Taiwan, but determined that there was no greater risk that these seven pests

would follow Phalaenopsis plants into this country if the plants were established in approved

growing media than if the plants were imported in bare-root form.  1997 PRA at 16, AR 1363.

Accordingly, on September 1, 1998, APHIS published a notice in the Federal Register

proposing to amend the plants-in-growing-media rule to allow the importation of Phalaenopsis

established in an approved growing medium from all countries.  See 63 Fed. Reg. 46,403–06

(Sept. 1, 1998). APHIS accepted comments on its proposal for a total of 90 days, ending

December 1, 1998.[4]

     APHIS received numerous comments, including those from plaintiff and from the

Hawai'i Department of Agriculture.  In response to the comments received on the proposed rule,

APHIS narrowed the application of its proposal to allow only the importation of Phalaenopsis in

growing media from Taiwan.  AR 1524, Final Rule, 69 Fed. Reg. 24, 916 (May 5, 2004).

     In 2003, APHIS also updated the initial risk assessment that was prepared in 1997 in

support of the rulemaking.  The initial risk assessment identified pests that are known to be

associated with Phalaenopsis plants in Taiwan and assessed the risk posed by those pests in the

absence of the mitigative effects of the requirements of the plants in growing media rule, which,

as noted above, are designed to establish and maintain a pest-free production environment and to

ensure the use of pest-free seeds or parent plants.  1997 PRA at 16, AR 1363.

     Consequently, one change APHIS made in the 2003 Risk Analysis was to add a

substantial discussion of how the risk mitigation measures contained in the plants-in-growing-

media rule mitigate the risks posed by the six quarantine pests that were identified as likely to

follow Phalaenopsis from Taiwan.  AR 1127-1136  (Part III of the 2003 Risk Analysis).  Based

on this revised risk assessment, APHIS published its final determination in the Federal Register

on May 5, 2004, that it was no longer necessary to prohibit the importation of Phalaenopsis from

Taiwan in order to prevent the introduction or dissemination of quarantine plant pest within the

---

[4]  APHIS extended the comment period on the proposed rule from 60 to 90 days in a notice
published in the Federal Register on October 29, 1998.  See 63 Fed Reg. 57,932 (Oct. 29, 1998).

United States.  Final Rule, 69 Fed. Reg. 24,916 (May 5, 2004); AR 1524-44.[5]

**B. The ESA, Section 7 Consultation Process**

**1. APHIS'S Biological Evaluation.**

APHIS also initiated consultation pursuant to Section 7 of the ESA to assess the potential

effects of the proposed action on endangered or threatened species.  AR 330.  In September,

2002, APHIS sent FWS a biological evaluation (BE) which included, as Appendix 2, a 1997 Pest

Risk Assessment APHIS had prepared.  AR 347; AR 387 (Appendix 2).[6]

The Washington Office of FWS sent a letter to Regions 1 - 6, asking them to review the

BE and determine whether the appropriate listed and proposed species were considered, whether

potential direct and indirect impacts to listed and proposed species and critical habitat were

adequately analyzed, and whether there are any other relevant impacts or factors that should be

considered, and to submit their comments to the Washington Office.  AR 330.

The BE identified, among other things, the mitigation measures to be imposed on the

importation of the orchids, which include a four month quarantine period in Taiwan, AR 361-62,

---

[5]APHIS made additional changes in the 2003 Risk Analysis.  One, APHIS lowered the risk
assessment for five of the identified pests associated with Phalaenopsis.  AR 1533 (discussion of
2003 Risk Assessment in Final Rule, middle column).  Two, APHIS searched for any additional
research and data published since it prepared the 1997 risk assessment that could have a bearing
on the findings of the risk assessment and updated the document accordingly.  AR 1524-25.
Specifically, APHIS removed the fungus Colletotrichum phalaenopsidis, which it had listed in
the 1997 assessment as a quarantine significant pest with the potential to follow Phalaenopsis
from Taiwan into the United States, from further consideration.  AR 1533.

[6]In fact, FWS personnel had been involved even earlier in the issue of imports of
Phalaenopsis plants from Taiwan, as FWS and APHIS personnel traveled to Taiwan in March,
2002 for bilateral talks regarding the proposed importation.  April 1, 2002 Letter from Richard
Dunkle, APHIS to Gary Frazer, FWS.  AR 2080.

a port of entry inspection at specially staffed and equipped Plant Inspection Stations, AR 362, and inspection of greenhouses and the plants within them to ensure that the greenhouses meet standards, and the plants are free of pests.  AR 359, 362.

The BE also considered the potential direct and indirect effects of the importation on all threatened, endangered, proposed, and candidate species in the United States.  AR 364.  The BE then listed the species that may be adversely impacted by potential pests.  AR 365-66.  The BE noted that the initial Pest Risk Assessment had identified and listed the quarantine pests that may follow the pathway on Phalaenopsis from Taiwan into the United States.  AR 368.  The BE determined that the chances of potential direct effects to listed species are remote because, among other things, a direct effect would require a series of events to occur, which is not likely, and, at any rate, the mitigation measures to be imposed on the proposed importation are likely to reduce, eliminate, and/or prevent the pests from following the pathway and entering the United States.  AR 369.

The BE also analyzed potential indirect effects to listed species, which, if they occurred, would likely be seen as reductions in food supply, cover, or breeding sites, due to the pest affecting the plant host.  AR 371.  The BE determined that because of a number of factors, including the mitigation measures associated with the importation and the variety of plants that are sources of food for listed species, the potential indirect effects to listed species are negligible and discountable.  Id.

The BE determined that the importation may effect, but was not likely to adversely effect, threatened and endangered species.  Id.  In its conclusion, the BE noted that even if the importation did not have mitigation controls, there is no evidence that any listed, proposed, or

candidate species are hosts for the pests that may enter the United States.  Id.  With the addition

of the mitigation measures, APHIS determined that indirect effects are likely to be minimal,

because plants that are used by listed, proposed, or candidate species for food, cover, or breeding

sites will not be placed at risk.  Id.  Moreover, as APHIS noted, each potentially affected listed

species is unlikely to be suitable as a host because of genetic limits that control host-pathogen

interactions.  Id.  Finally, the BE cited the mitigation measures that are designed to eliminate,

reduce, and prevent the association of pests with the Phalaenopsis in Taiwan, and which are

highly effective in preventing the entry of pests into the United States.  AR 372.

### 2.  FWS's Concurrence

After reviewing the BE and meeting with APHIS, the FWS concurred in APHIS's

Biological Evaluation.  As part of the consultation process, the record here reflects the comments

the United States Fish and Wildlife Service made on the BE.  For example, the Regional Director

of the Southeast Region informed the Director of the FWS that all Ecological Services Field

Offices in the region reviewed the BE, and the region identified no specific instances where it

would not concur with APHIS's determination that the proposed importation is not likely to

adversely affect listed species or adversely modify critical habitat.  AR 344.  Likewise, the

Southeast Region of FWS (Region 4) identified no additional listed or proposed species which

should have been included in the BE, and identified no additional effects which should have

been discussed in the BE, in addition to those potential effects already considered.  Id.

The record also reflects the determination by Region 6 of FWS that it concurred with the

BE, based on implementation that follows the requirements set forth by APHIS and identified in

the BE.  AR 342.  Region 6 also concurred that other direct and indirect affects from importation

are negligible.  Id.  Region 1 noted that the associated risk to listed species relative to the

existing risk associated with current importation practices is negligible, and, to the best of its

knowledge, the document considers the appropriate listed and proposed species.  AR 331.

Region 5 did not submit comments.  AR 332.

On March 21, 2003, the Washington Office of FWS responded to APHIS, and provided the

comments of all of the regions.  March 21, 2003 Letter from Gary Frazer, Assistant Director for

Endangered Species, FWS to John H. Payne, Acting Director, APHIS, AR 307-309.  The FWS

identified two areas of concern that remained after the review of the BE by the regions, and

correspondence between APHIS and the regions.  Those two concerns were:  (1) why several

species of quarantine pest thrips were purportedly eliminated from consideration, and (2) why

the BE referred to aqueous zone solution in relation to the sphagnum moss.  AR 308.[7]

The concerns were resolved at a meeting held between APHIS and FWS April 2-3, 2003,

the results of which were documented in meeting minutes.  AR 304-06.  APHIS also sent FWS a

letter on April 3, 2003 to address these two remaining issues.  AR 301-302.  In response to

FWS's request to clarify why several species of quarantine significant thrips were eliminated

from consideration, APHIS advised that the thrips were originally considered in the quarantine

pest list in the PRA, but were not considered a pest that would follow the importation pathway.

AR 304.  APHIS advised that it conducted extensive literature searches which revealed that none

---

[7]As to the reference to ozonated water, APHIS noted that it is not prescribed or required by
AHPIS, but on a site visit to Taiwanese propagation facilities, was seen being used as a
disinfectant.  AR 301; AR 305.  APHIS further noted that unused sphagnum moss as an
approved growing medium does not require disinfection treatment, but there is no reason to
believe using ozonated water has adverse consequences to listed and proposed species, and
APHIS did not expect it to adversely affect the mitigation measures that are required.  AR 310;
AR 305.

17

of the thrips identified in the PRA have ever been reported on <u>Phalaenopsis</u>.  AR 301.

Moreover, a review of pest interceptions made over the past eight years on bare-rooted

<u>Phalaenopsis</u> plants from Taiwan shows that thrips have not been intercepted.  <u>Id.</u>; <u>see also</u> AR

304.[8]  Furthermore, APHIS referred to certain measures, such as the use of air-curtains, and

screening, which would prevent the introduction of pests, including thrips, into greenhouses.  <u>Id</u>.

    APHIS also noted that pest interception information regarding commercially imported

products entering the United States is collected and available, and is used by APHIS to monitor

the effectiveness of the application of mitigation measures, and incidents of non-compliance.

AR 302.  New threats are immediately evaluated, and appropriate actions taken.  <u>Id</u>.  APHIS

concluded this April 3 correspondence by advising that the importation of <u>Phalaenopsis</u> from

Taiwan in approved growing media will not adversely effect threatened and endangered species.

<u>Id</u>.

    On April 7, 2003, the FWS advised that after reviewing the BE, additional supporting

documentation, and the April 3, 2003 letter from APHIS, it concurred with APHIS's

determination that the importation of <u>Phalaenopsis</u> from Taiwan in approved growing media

would not adversely affect Federally listed or proposed endangered or threatened species or their

habitat as a result of the action.  AR 299.  The FWS concluded the section 7 consultation process

_____

[8]  Minutes from the April 2-3 meetings also demonstrate that APHIS noted that it is not expected
that pests associated with plants in the wild, such as mealybug crawlers, will end up in the
greenhouses.  <u>Id.</u>  Finally, APHIS noted that all propagative material being imported will be sent
to APHIS plant inspection stations at ports of entry where, at least in the beginning, a large
percentage of the shipment will be inspected, and some will be uprooted from the media to check
for pests in the roots.  <u>Id.</u> at 304-05.  If quarantine pests are intercepted at the plant inspection
stations, the shipment will be treated, re-exported or destroyed, which will be costly for
propogators, and therefore, an incentive for growers to export clean plants.  <u>Id.</u> at 305.

by concurring with APHIS's determination that the importation of <u>Phalaenopsis</u> species orchids from Taiwan in approved growing media will not adversely affect federally listed or proposed endangered or threatened species or their habitats.  <u>Id</u>.

### 3.    Re-Initiation of Consultation in the Context of Programmatic Consultations.

In October, 2003, APHIS sent FWS a letter requesting initiation of informal programmatic consultation under the ESA regarding the importation of plants established in approved growing media and produced in accordance with Plant Protection and Quarantine Requirements. October, 2003 Letter from Lee Ann Thomas, Acting Director, APHIS to Gary Frazer, Assistant Director, Endangered Species, Fish and Wildlife Service.  AR 2243.  APHIS also submitted documents in support of the requested consultation, including the risk analysis APHIS had prepared regarding the importation of <u>Phalaenopsis</u> plants in approved growing media from Taiwan.  <u>Id</u>.  APHIS noted that the mitigation measures described in the documents submitted had "proven effective in similar programs, [and] will effectively mitigate potential pest risks and will protect threatened and endangered species and their habitats."  AR 2244.

FWS responded in March, 2004, stating that it interpreted APHIS's subsequent submission of documents to indicate that APHIS also wanted to re-initiate section 7 consultation on two APHIS actions, one of which was the proposed rule allowing import of <u>Phalaenopsis</u> species orchids from Taiwan.  March 18, 2004 Letter from Richard Sayers, Chief, Branch of Consultation and Habitat Conservation Planning, FWS to Michael A. Lidsky, APHIS, AR 2237. The letter noted that the re-initiation and incorporation of the two previous individual consultations into one programmatic consultation would provide a "consistent foundation for future requests for plant importation in APHIS-approved growing media."  <u>Id</u>.

19

In the same letter, FWS recommended that APHIS require a .4 mm screen mesh in APHIS-approved greenhouses, in order to prevent thrips infestations of the <u>Phalaenopsis</u> plants, as prior inter-agency discussions led FWS to believe that the .6 mm screen mesh size would be inadequate. AR 2239.

APHIS responded with a June 2, 2004 letter, which advised that FWS's impression that greenhouses would have a screen mesh size of smaller than .6 mm was a mis-understanding, and noted that at .2 mm, thrips could get in through screen sizes of even .4 mm, which FWS had recommended. June 2, 2004 Letter from Michael R. Lidsky, APHIS to Richard Sayers, FWS at 3, AR 2233, 2234-35. APHIS further advised that requiring screen size of smaller than .6 mm would require adapting greenhouse construction to accommodate the need for air circulation and cooling fans, particularly in humid climates, and that mitigation measures, such as routine or repeated pesticide sprays, when warranted, will reduce the risk of infestation and possible introduction of thrips into the United States. <u>Id</u>.

In response, FWS advised that APHIS's June 2, 2004 correspondence addressed FWS's recommendations, and included the additional information and clarification that FWS sought in its March 18, 2004 letter. September 1, 2004 Letter from Gary Frazer, FWS to Michael Lidsky, APHIS at 2, AR 2125. FWS further advised that its initial determination was "may affect, but not likely to adversely affect," and that the determination after re-initiation was the same. <u>Id</u>. The letter concluded the section 7 consultation on the proposed program to import plants established in APHIS-approved growing media and produced in accordance with requirements set forth at 7 C.F.R. § 319.37. <u>Id</u>.

**C. Plaintiff's Prior Lawsuit.**

In its first lawsuit, filed June 4, 2004 in this District, plaintiff argued that APHIS's Final Rule was arbitrary and capricious and not based on sound science, that APHIS had violated the National Environmental Policy Act, 42 U.S.C. § 4321, and that APHIS had violated the Endangered Species Act's (ESA) requirement to use the best science available in its ESA consultation with the FWS.  Second Amended Complaint filed in Hawaiian Orchid Grower's Association v. USDA, Civil No. 04-914 (JR) (D.D.C.), Docket No. 14.  Plaintiff moved for a preliminary injunction and for summary judgment.  Docket Nos. 3 & 17 in Hawaiian Orchid Grower's Association v. USDA, Civil No. 04-914 (JR) (D.D.C.).

Defendants' response and cross-motion for summary judgment raised the jurisdictional defenses of lack of standing under the Plant Protection Act, NEPA, and the ESA, and failure to comply with the ESA's 60 day notice of intent to sue.  Docket No. 22.  The government also argued that the final rule was not arbitrary or capricious, and that APHIS had complied with NEPA and the ESA in its promulgation of the rule.  Id.

The Court denied the government's motion to dismiss for lack of standing, but granted the government's motion to dismiss plaintiff's ESA challenge on the grounds that plaintiff had not provided the requisite 60 days advance notice of its intent to sue.  Docket Nos. 30 & 31.  On the merits, the Court held that the government did not act in an arbitrary or capricious manner, and did not violate NEPA, and the court granted defendants' motion for summary judgment and denied plaintiff's motion for summary judgment.  Id.

**D.  Plaintiff's March 31, 2005 Notice of Intent to Sue Under the ESA.**

On March 31, 2005, plaintiff sent a letter to the Secretaries of Interior and Agriculture, and to U.S. Fish and Wildlife Service Acting Director Matt Hogan and APHIS Administrator W. Ron

DeHaven, informing them of plaintiff's intent to file suit under the Endangered Species Act.

March 31, 2005 Letter from Mr. Cyrus E. Phillips, IV, Attorney at Law.

### E.  Plaintiff's Amended Complaint

Plaintiff filed a Complaint on June 13, 2005, and an Amended Complaint on June 24,

2005.  Docket Nos. 1, 3.  Defendants filed their answer on September, 2005, and filed the

administrative record on December 21, 2005.  Docket Nos. 14, 24.

While plaintiff's amended complaint filed in this action raised four counts against the Final

Rule, only two counts (Counts I and III) remain before this Court, as the parties stipulated to

dismissal of Counts II and IV soon after defendants moved to dismiss those counts.  Docket Nos.

19 and 20 (order granting stipulation).  Plaintiff's Amended Complaint should be dismissed with

prejudice, and its motion for summary judgment denied.

## IV.  ARGUMENT

### A.  Plaintiff Has Failed To Establish Standing Under Article III.

The critical threshold inquiry in the invocation of the jurisdiction of the federal courts is

whether plaintiff has demonstrated a sufficient "case or controversy," i.e., whether plaintiff has

alleged such a personal stake in the outcome in the outcome of the controversy as to warrant

invocation of federal court jurisdiction and its remedial powers.  Warth v. Seldin, 422 U.S. 490,

498-99 (1975) (internal quotation marks and cit. omitted).

To establish the requisite Article III standing, plaintiff bears the burden of demonstrating,

at an "irreducible minimum," that:  (1) it has suffered a "concrete and particularized" injury

which is "actual and imminent" rather than "conjectural or hypothetical;" (2) the injury was

caused by or is "fairly traceable to" the action of the defendants; and (3) a favorable decision by

the court is likely to redress the injury.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61

(1992); Fund for Animals, Inc. v. Norton, 322 F.3d 728, 733 (D.C. Cir. 2003) (applying three

part standing test to motion to intervene as defendant-intervenor in ESA case); National Ass'n of

Home Builders v. Norton, 298 F. Supp. 2d 68, 80 (D.D.C. 2003) (plaintiff bears the burden of

establishing the existence of standing, as it has invoked federal court jurisdiction).

　　　Moreover, the injury must have actually occurred or be imminent.  Schmier v. United

States Court of Appeals for the Ninth Circuit, 279 F.3d 817, 821 (9th Cir. 2001).  Hypothetical,

speculative or other possible future injuries do not suffice to establish the requisite injury in fact.

Id.  See also Northwest Airlines v. FAA, 795 F.2d 195, 201 (D.C. Cir. 1986) (holding that

plaintiff failed to allege sufficient injury in fact by alleging only the threat of future injury).

　　　To meet the standing requirements under the ESA, plaintiff must demonstrate that listed

species are in fact threatened by the proposed federal action, and that plaintiff will be directly

affected aside from any general interest in the subject matter.  Lujan, 504 U.S. at 562-63 (the

injury-in-fact test requires "more than an injury to a cognizable interest.  It requires that the party

seeking review be himself among the injured.") (internal quotation marks and cit. Omitted);

accord, Defenders of Wildlife v. Norton, 257 F. Supp. 2d 53, 62 (D.D.C. 2003); see also

Mountain States Legal Foundation v. Glickman, 92 F.3d 1228, 1236-37 (D.C. Cir. 1996) (noting

that a plaintiff must at least demonstrate an interest that is "directly affected" by the government

action to survive a motion to dismiss for lack of standing) (internal quotations omitted).

　　　Furthermore, "[a]t the summary judgment stage, plaintiff may not merely allege its

standing to sue, but must support its claims with affidavits or other evidence of specific facts."

Lujan, 504 U.S. at 561; Defenders of Wildlife, 257 F. Supp. 2d at 62.

Plaintiff fails to demonstrate the requisite injury-in-fact.  Plaintiff contends that three species of native orchids, one of which is endangered and the other two are listed as Species of Concern, may be harmed by possible introduction of pests with the imported orchids, and that because of its avocation, plaintiff has the opportunity to "observe native Hawaiian orchids" daily.  Amd. Compl. At ¶ 35.  These claims are made only in its amended complaint, however, and plaintiff has failed to produce any evidence, such as affidavits, to support these conclusory assertions.

Moreover, these claims are essentially conclusions, with no supporting factual assertions or explanation.  For example, there is no explanation how these three species of native orchids, including the endangered species, are purportedly harmed, or will be harmed, by the import of Phalaenopsis plants.  Likewise, there is no explanation or factual demonstration as to how plaintiff is or would be injured by harm to any of these three species of native orchids.

There is no showing that plaintiff engages in and pursues this daily "opportunity," that it will lose this daily opportunity, or that it will be injured by such a loss.  Plaintiff has made no showing, with the required affidavit, that it is or will be injured in a concrete and particular way by the alleged violations of the ESA.

This flaw is especially notable given that the Final Rule went into effect in June, 2004.  69 Fed. Reg. 24,916 (May 5, 2004).  Given that the Rule has been in effect for almost two years, plaintiff should be able to demonstrate a concrete injury to itself, if there was one.  It has not, and this Court should dismiss this case for lack of standing because plaintiff has not demonstrated injury-in-fact.  Schmier v. United States Court of Appeals for the Ninth Circuit, 279 F.3d 817, 821 (9th Cir. 2001) (holding that the injury must have actually occurred or be imminent, and that

24

hypothetical, speculative, or other possible future injuries do not satisfy the injury-in-fact test).

Plaintiff also fails to demonstrate the requisite "causal connection between the injury and the conduct complained of." Defenders of Wildlife, 504 U.S. at 560. This second prong of the constitutional standing inquiry requires plaintiffs to demonstrate that it is "substantially probable" that the challenged acts of the defendants will cause the asserted injury. Florida Audubon Soc. v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996). The injury must be "fairly . . . traceable to the challenged action of the defendants, and not . . . [t]he result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (citing Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42 (1976)).

In a procedural violation case, such as this one, plaintiff must demonstrate "two links: one connecting the disputed procedure to a substantive government decision that may have been wrongly decided because of the procedural violation, and another connecting the substantive government decision to the plaintiffs' particularized injuries." Defenders of Wildlife v. Norton, 257 F. Supp.2d 53, 63-64 (D.D.C. 2003) (citing Florida Audubon Soc'y, 94 F.3d at 669) (applying standing analysis to claim brought under the ESA).

Plaintiff has provided no explanation as to how the purported flaws in the Section 7 consultation result in any injury to the native orchids or to itself. For example, while plaintiff argues that APHIS failed to provide FWS with the correct information regarding thrips infestations, that APHIS improperly failed to consider Hawaii's "unique ecology" in the Section 7 consultation process, and that the FWS improperly failed to consider possible pest introduction through suitable breeding habitat, Pl. Br. At 28-32, plaintiff has provided no explanation as to how any of these three alleged flaws in the ESA Section 7 consultation translate to an injury to

plaintiff or to any of the three species of native orchids that plaintiff refers to in its Amended Complaint.

Finally, plaintiff also fails to satisfy the third prong of constitutional standing, which requires that it be "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Defenders of Wildlife, 504 U.S. at 561 (quoting Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38 & 43 (1976)); Defenders of Wildlife, 257 F. Supp. 2d at 64.  Plaintiff asks this Court to issue a declaratory judgment that APHIS and FWS were arbitrary and capricious in their Section 7 consultation, and to order the permanent rescission of Phalaenopsis to the list of plants that may be imported in approved growing medium, subject to the growing, inspection, and certification requirements of 7 C.F.R. § 319.378(e).  Amended Complaint at Prayer for Relief.  However, given that plaintiff has failed to demonstrate the requisite injury-in-fact, it is not clear how the ruling plaintiff seeks would eliminate any purported harm to native Hawaiian orchids, or to plaintiff itself.

Plaintiff has failed to demonstrate it has the requisite Article III standing, and this Court should grant defendants' motion to dismiss on that ground, and dismiss the Amended Complaint.

## B.     EVEN IF PLAINTIFF HAD STANDING, DEFENDANTS HAVE NOT VIOLATED THE ESA.

Even if plaintiff had standing to pursue its claims here, defendants have not violated the ESA in the consultation process.

### 1.  Standard of Review of Agency Action Under the Administrative Procedure Act.

While plaintiff's suit is brought pursuant to the ESA's citizen suit provision, the ESA does not specify a standard of review, and consequently, judicial review is governed by Section 706 of the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.  Cabinet Mountains Wilderness v.

Peterson, 685 F.2d 678, 685 (D.C. Cir. 1982); Accord, Newton County Wildlife Ass'n v. Rogers, 141 F.3d 803, 808 (8th Cir. 1998) (confining judicial review to the administrative record in an ESA citizen suit case).

Under the APA, a court may overturn agency action only if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or in excess of its statutory jurisdiction or authority.  5 U.S.C. §§ 706(2)(A), (C); see also Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989); accord, The Cape Hatteras Access Preservation Alliance v. United States Dep't of the Interior, 344 F.Supp.2d 108, 118 (D.D.C. 2004).   This standard of review is narrow.  Marsh, 490 U.S. at 378.  The court must consider whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors.  Fund for Animals v. Babbitt, 903 F.Supp. 96, 105 (D.D.C. 1995) (citing Marsh, 490 U.S. at 378).

The scope of review is also limited to the administrative record that was before the agency at the time the agency made its decision.  Florida Power and Light Co. v. Lorion, 470 U.S. 729, 743 (1985).  Plaintiff has the burden of showing that defendants acted in a manner contrary to the APA.  San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Comm'n, 789 F.2d 26, 37 (D.C. Cir. 1986).

A particularly deferential standard of review is especially appropriate where, as here, an agency is "making predictions, within its area of special expertise, at the frontiers of science." Baltimore Gas & Electric v. NRDC, 462 U.S. 87, 103 (1983); accord, Carlton v. Babbitt, 900 F.Supp. 526, 530 (D.D.C. 1995).  Moreover, "[w]hen specialists express conflicting views, an

agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." <u>Greenpeace Action v. Franklin</u>, 14 F.3d 1324, 1332 (9th Cir. 1992) (quoting <u>Marsh</u>, 490 U.S. at 378).

Accordingly, absent a showing of arbitrary action, a court must assume an agency has exercised its discretion appropriately. <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976). An agency's determination that its action will not threaten endangered species is to be set aside only if arbitrary and capricious. <u>National Audubon Soc'y v. Hester</u>, 801 F.2d 405, 407 (D.C. Cir. 1986).

### 2. Defendants Have Not Violated the ESA.

Plaintiff bases its ESA arguments primarily on the notion that both agencies, APHIS and FWS, purportedly ignored relevant information during the Section 7 consultation process. Plaintiff contends that APHIS failed to provide FWS with information regarding thrips infestations during the consultation process, and that in preparing the Biological Evaluation to submit to FWS, APHIS improperly failed to consider Hawaii's "unique ecology," a factor plaintiff contends should have been considered.

As to the FWS, plaintiff contends it improperly failed to consider whether infestation was possible through the introduction of suitable breeding habitats. All of plaintiff's arguments fail.

### a. APHIS Provided FWS with Relevant Information Regarding Thrips.

Plaintiff's first argument is that APHIS purportedly mis-informed the FWS about the alleged threat of <u>thrips</u> infestation from the import of the orchids. Plaintiff contends that APHIS incorrectly told the FWS that thrips is not a pest on <u>Phalaenopsis</u> plants from Taiwan, and that pest interceptions in the preceding eight years had not reported thrips infestations. Pl. Br. At 28.

28

Plaintiff bases its assertion on the following items:  1) the 1997 Pest Risk Assessment prepared by APHIS identified thrips as a pest associated with Phalaenopsis plants from Taiwan; 2) plaintiff itself submitted a comment during the rulemaking explaining that the .6 mm screen mesh size proposed for the greenhouses in Taiwan would not exclude the thrips identified in the 1997 PRA; and 3) the State of Hawaii Department of Agriculture also submitted a comment reporting that in 1993, Hawaii had allowed an importation of 50,000 bare-rooted Phalaenopsis orchids under a special permit and subject to certain protective measures, and several pests were nevertheless detected at the point of entry, and during the sixty day quarantine period the State imposed.  Pl. Br. At 28-29.

While it is not clear from the administrative record whether APHIS provided FWS the comments from plaintiff and the State of Hawaii Department of Agriculture during the Section 7 process, the record is clear that APHIS and FWS discussed the issue of thrips infestations, including the issue of the appropriate screen mesh size for the greenhouses.

First, APHIS provided FWS the 1997 PRA that plaintiff cites to, as it was Appendix II to APHIS's BE.  AR 347; AR 387 (Appendix D).  That initial risk assessment identified pests that are known to be associated with Phalaenopsis plants in Taiwan and assessed the risk posed by those pests in the absence of the mitigative effects of the requirements of the plants in growing media rule, which are designed to establish and maintain a pest-free production environment and to ensure the use of pest-free seeds or parent plants.  AR 387; 1524 (Final Rule discussing the 1997 PRA).  While the 1997 PRA identified thrips as a "quarantine" pest associated with

Phalaenopsis plants,[9] 1997 PRA at B-7 - B-10, B-14, AR 393 - 396, 400, APHIS determined

thrips were not reasonably likely to follow the pathway, i.e., be included in commercial

shipments of Phalaenopsis plants.  1997 PRA at B-15, AR 401.

APHIS updated the risk document in 2003, and also shared that 2003 document with FWS.

March 18, 2004 Letter from Richard Sayers, Chief, Branch of Consultation and Habitat

Conservation Planning, FWS to Michael A. Lidsky, APHIS at 2, AR 2238.  The 1997 PRA did

not contain a thorough description of how the mitigation measures required under the regulations

in the plants-in-growing-media rule reduced the risk posed by the specific quarantine pests of

Phalaenopsis that were identified in the risk assessment.  Consequently, one change APHIS

made in the 2003 Risk Analysis was to add a substantial discussion of how the risk mitigation

measures contained in the plants-in-growing-media rule mitigate the risks posed by the six

quarantine pests that were identified as likely to follow Phalaenopsis from Taiwan, which do not

include thrips.  AR 1119, 1127-1136 (Part III of the 2003 Risk Analysis).

Second, during the initial consultation, both agencies discussed the issue of thrips,

including the issue of the appropriate screen mesh size.  On March 21, 2003, the Washington

Office of FWS responded to APHIS's BE, and provided the comments of all of the regions.  The

FWS identified two areas of concern that remained after the review of the BE by the regions, and

correspondence between APHIS and the regions, and one of those two concerns was why several

species of quarantine pest thrips were purportedly eliminated from consideration by APHIS.  AR

---

[9]A "quarantine" pest is one that if it is intercepted on a shipment, quarantine action may be
taken.  1997 PRA at B-13, AR 399.

308.[10]

The concern was resolved at a meeting held between APHIS and FWS April 2-3, 2003 AR 304-05, and documented in an April 3, 2003 letter to FWS, as well as minutes from the meetings. AR 301-303, 304-306.  In response to FWS's request to clarify why several species of quarantine significant thrips were eliminated from consideration, APHIS advised FWS that the thrips were originally considered in the quarantine pest list in the PRA, but were not considered a pest that would follow the importation pathway.  AR 304.  In response to FWS's request to clarify why several species of quarantine significant thrips had been eliminated from consideration, APHIS advised that it conducted extensive literature searches which revealed that none of the thrips identified in the PRA had ever been reported on <u>Phalaenopsis</u>.  AR 301, AR 304-305.  APHIS also advised that there was no evidence in its interception database that links quarantine pest thrips to <u>Phalaenopsis</u>, and in a run of the interception database on the morning of the April 3, 2003 meeting, there were no records of thrips on <u>Phalaenopsis</u> orchids.  AR 304-305.

APHIS further explained that <u>Phalaenopsis</u> has been imported bare root into the United States for at least 20 years, and no problems with pests on <u>Phalaenopsis</u> have arisen.  AR 305. Finally, APHIS noted that if a propagation facility has recurring interceptions or their shipments are consistently found to be in non-compliance with APHIS phytosanitary measures, the facility will not be able to import into the United States.  AR 305.

Furthermore, both APHIS and FWS specifically discussed screen mesh size.  In a March, 2003 letter, the FWS asked APHIS to explain how the prescribed .6 mm screening mesh size

---

[10]The second concern FWS raised, why the BE referred to aqueous zone solution in relation to the sphagnum moss, AR 308, is not relevant here.

would exclude thrips from growing areas.  AR 308.  During the meetings in April, 2003,  APHIS explained that while the proposed 0.6 mm mesh screening would not exclude thrips, thrips are not expected to follow the importation pathway of <u>Phalaenopsis</u> into the United States.  AR 304.[11]

The issue of thrips was again raised during the programmatic consultation in 2004.  In a March 18, 2004 letter, FWS recommended that APHIS require a .4 mm screen mesh in APHIS-approved greenhouses, in order to prevent <u>thrips</u> infestations, as prior inter-agency discussions led FWS to believe that the .6 mm screen mesh size would be inadequate.  March 18, 2004 Letter from Richard Sayers, Chief, Branch of Consultation and Habitat Conservation Planning, FWS to Michael R. Lidsky, Plant Health Programs, PPQ, APHIS at AR 2239.

APHIS responded with a June 2, 2004 letter, which advised that FWS's impression that greenhouses would have a screen mesh size of smaller than .6 mm was incorrect, and notes that at .2 mm, thrips could get in through screen sizes of even .4 mm, which FWS had recommended.  June 2, 2004 Letter from Michael R. Lidsky, APHIS to Richard Sayers, FWS at 3, AR 2235.  APHIS further advised that requiring screen size of smaller than .6 mm would require adapting greenhouse construction to accommodate the need for air circulation and cooling fans, particularly in humid climates, and that mitigation measures, such as routine or repeated

---

[11]  While plaintiff only focuses on thrips, minutes from the April 2-3 meetings also demonstrate that APHIS noted that while the .6 mm screen mesh size would not exclude mealybug crawlers, it is not expected that pests associated with plants in the wild, including mealybug crawlers, will end up on the greenhouses.  AR 304.  Finally, APHIS noted that all propagative material being imported will be sent to APHIS plant inspection stations at ports of entry where, at least in the beginning, a large percentage of the shipment will be inspected, and some will be uprooted from the media to check for pests in the roots.  <u>Id.</u> at 304-05.  If quarantine pests are intercepted at the plant inspection stations, the shipment will be treated, re-exported or destroyed, which will be costly for propogators, and is incentive for growers to export clean plants.  <u>Id.</u> at 305.

pesticide sprays, when warranted, will reduce the risk of infestation and possible introduction of thrips into the United States.  <u>Id</u>.

    This second round of consultation was concluded in September, 2004, when FWS sent APHIS a letter stating that the agency's June 2, 2004 correspondence addressed the FWS recommendations, and that it was concluding the section 7 consultation on the proposed program to import plants established in APHIS-approved growing media and produced in accordance with requirements set forth at 7 C.F.R. § 319.37 to prevent the introduction of quarantine pests into the United States.  September 1, 2004 Letter from Gary Frazer, FWS to Michael Lidsky, APHIS at 2, A.R. 2125.  The letter also noted that FWS's initial determination was "may affect, but not likely to adversely affect," and that the determination after re-initiation was the same.  <u>Id</u>. At 2; AR 2125.

    The administrative record demonstrates that APHIS and FWS discussed the issue of thrips at several points during the Section 7 consultation.[12]   Consequently, plaintiff's citation to <u>Resources Limited, Inc. v. Robertson</u>, 35 F.3d 1300 (9th Cir. 1994)  fails to advance its case. There, the court found the Forest Service acted in an arbitrary and capricious manner in failing to

---

[12]Moreover, even assuming APHIS did not provide FWS the comment submitted by the State of Hawaii Department of Agriculture, plaintiff has failed to explain how that is relevant here. Plaintiff has not demonstrated that thrips were intercepted during Hawaii's 1993 import, and plaintiff fails to explain whether the 1993 imports were grown and imported under the same requirements and mitigation measures that APHIS has imposed in its Final Rule at issue here.

    In fact, in response to a comment submitted which referred to the experience of the State of Hawaii, APHIS advised in its Final Rule that inspection is the last safeguard in a series of safeguards required by the rule, and that the various measures other than inspection at the port of entry are intended to ensure that the <u>Phalaenopsis</u> orchids are free of pests prior to arrival at a port of entry into the United States.  AR 1535, Final Rule, 69 Fed. Reg. 24, 916, 24, 927 (May 5, 2004).  As discussed in this memorandum, and as the administrative record shows, APHIS and FWS engaged in a thorough Section 7 consultation, and plaintiff has failed to demonstrate that defendants were arbitrary or capricious.

provide the FWS with data and information indicating that grizzly bears may be adversely

impacted at a timber harvest level lower than what it had shared with the FWS.  35 F.3d at 1304-

05.  The court held that the Forest Service could not rely on the FWS's no jeopardy opinion in

light of its failure to provide FWS with the information.  Id. at 1305.

Here, in contrast, the record reflects numerous discussions between FWS and APHIS

regarding thrips infestation, and plaintiff is wrong to argue that APHIS failed to provide FWS

with the necessary information regarding thrips infestations during the consultation process.

FWS ultimately concurred with APHIS's determination of may affect, but not likely to adversely

affect.

### b.  APHIS was Not Obligated to Consider Hawaii's "Unique Ecology."

Plaintiff's second argument is that APHIS violated the ESA's mandate to use the "best

scientific and commercial evidence available" because it purportedly failed to consider Hawaii's

"unique ecology" during its consultation with FWS.  Plaintiff  contends that when APHIS

adopted a policy change with respect to ants, it purportedly recognized Hawaii's "unique

ecology," and its failure to do so during the Section 7 consultation processes here therefore

means APHIS failed to consider the  "best scientific and commercial evidence."  Pl. Br. At 30.[13]

Plaintiff also suggests that APHIS's explanation that a .6 mm mesh size would be impractical

---

[13]The documents regarding the ant policy are not part of the administrative record here.  The
two documents are Attachment 4 and 5 to the Amended Complaint, which are an October 25,
2001 document titled "Request and Analysis to Change the Quarantine Action Policy for Ants
Moving into, or through, the State of Hawaii," submitted to APHIS by the Hawaii Ant Group,
and e-mail correspondence forwarding an April 10, 2002 announcement from APHIS regarding a
"Change in Quarantine Action Policy for Ants Intercepted from Commodities Destined to the
State of Hawaii," respectively.  Plaintiff moved to admit them as part of the record, and
defendants filed an opposition brief.  Docket Nos. 25, 30.

means APHIS improperly elevated business and profit concerns over concern with respect to potential threats to endangered or threatened species.  Pl. Br. At 31.  Plaintiff's argument fails on several fronts.

"[T]he Court's review of the scientific data included in the administrative record is limited to an inquiry as to whether the record supports the agency's findings and whether the agency's actions were based on the best scientific data available."  American Wildlands v. Norton, 193 F. Supp. 2d 244, 252 (D.D.C. 2002) (internal quotes omitted).  The court must only determine whether the agency has met certain minimal standards of rationality.  Id. (citing Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir. 1976).  The standard "merely prohibits [APHIS] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on."  Southwest Center for Biological Diversity v. Babbitt, 215 F.3d 58, 60 (D.C. Cir. 2000) (citation omitted)(emphasis added).

First, the portions of the ant policy documents that plaintiff cites make no reference to Hawaii's unique ecology.  The cited portion of APHIS's ant policy makes clear that APHIS decided to exclude "exotic ant species not present or widely distributed on the Hawaiian Islands" because ants did not co-evolve with native flora and fauna, and therefore, plants and animals on the island are "particularly susceptible to herbivory predation and competition from ants."  Pl. Br. At 19 (Statement of Fact #24).

APHIS's ant policy is, by its own terms, based on a concern that ants would out-compete native flora and fauna.  There is no reference in the cited portion of the APHIS document to a "unique ecology," and nothing in the cited portion of the document supports the notion that a failure to account for or address Hawaii's "unique ecology" during Section 7 consultation means

that the agency has failed to rely on the "best scientific or commercial evidence available."
Plaintiff fails to explain how APHIS's decision to exclude ants from Hawaii, out of concern that
they would out-compete Hawaii's native fauna and flora, has any bearing on the Section 7
consultation process at issue here, and its citation to APHIS's ant policy fails to advance its
argument in any manner.

Moreover, while APHIS advised FWS that a screen mesh size smaller than .6 mm could
not practically be required in greenhouse construction, APHIS also noted that smaller screens,
such as the .4 mm that FWS suggested, would not exclude <u>thrips</u> that can be as small as .2 mm.
Moreover, APHIS advised that mitigation measures, such as routine or repeated pesticide sprays,
when warranted, will reduce the risk of infestation and possible introduction of thrips into the
United States.  AR 2235.  Thus, contrary to plaintiff's suggestion, APHIS did not improperly
ignore a threat to endangered and threatened species in favor of saving Taiwanese greenhouses
money.

Second, even if the cited ant policy documents did refer to or discuss Hawaii's unique
ecology, plaintiff fails to explain how a reference to Hawaii's "unique ecology" is, in and of
itself, a form of scientific or commercial evidence that must be considered in all ESA
consultations that have any bearing on Hawaii.  Plaintiff makes only the conclusory assertion
that APHIS's stated ant policy purportedly recognized Hawaii's "unique ecology," whereas the
Section 7 consultation process here did not, and therefore, APHIS did not rely on the "best
scientific or commercial evidence available."  Pl. Br. At 31.  Plaintiff provides no real support
for this argument.

The discussion in Section a above demonstrates that APHIS engaged in a thorough

36

consultation with FWS. Plaintiff has failed to demonstrate that, based on the administrative

record before this Court, APHIS did not use the best scientific and commercial data available.

### c. **FWS Has not Violated the ESA**

Plaintiff's final argument is that FWS has violated the ESA by failing to consider whether

alien species could enter the United States through entry of "suitable breeding habitats," as it had

purportedly considered when it prepared a Biological Opinion in 1997 addressing improvements

at an airport in Maui. Pl. Br. At 31. According to plaintiff, FWS failed to consider whether

"alien species" could be imported through the growing medium for the plants, i.e., the pots filled

with sphagnum moss. Pl. Br. At 32. Thus, according to plaintiff, FWS failed to "consider an

important part of the problem, and FWS's concurrence in APHIS's Biological Evaluation and

no-effect determination is arbitrary and capricious. Id. (internal quotation marks and cits.

Omitted).

Plaintiff provides no record citation for its assertion that FWS failed to consider the risks

associated with the growing medium, and its argument fails. The record here demonstrates that

during both the initial consultation and the programmatic consultation in 2004, FWS reviewed

the rule as a whole, which authorizes entry of Phalaenopsis plants from Taiwan, in approved

growing media.

The record is replete with discussion demonstrating that the Section 7 consultation

considered the risks posed by import of Phalaenopsis plants in growing media, such as sphagnum

moss. For example, the 1997 PRA that was attached as an appendix to the APHIS's BE stated

that while Phalaenopsis and other orchids were allowed entry as bare root plants or growing in

tree fern or coconut husk or fiber, the importation of live Phalaenopsis plants from Taiwan in

37

sphagnum growing medium is a "potential pathway for introduction of plant pests."  BE at B-4 -

B-5; AR at 390-391.  The 1997 PRA further noted that APHIS's Quarantine 37 regulations

provide a "general regulatory authority for importation of nursery stock," and that commercial

sphagnum is allowed entry as an approved growing medium pursuant to those regulations.  AR

390, AR 404 (citing 7 C.F.R. § 319.37-8).  Finally, the 1997 PRA noted that <u>Phalaenopsis</u>

species are successfully grown in sphagnum from New Zealand, and that APHIS had contracted

a study to evaluate peat and other materials as growing media.  AR 390.

Likewise, the BE that APHIS provided FWS contained a section identifying "Specific

Mitigation Measures for Propagative Materials," AR at 355, and the 2003 Risk Analysis explains

that it is examining the "phytosanitary risks associated with the potential importation, from

Taiwan into the United States, of moth orchid plants rooted in APHIS-approved growing media."

2003 Risk Analysis at 1, AR 2295.  The 2003 Risk Analysis also noted that use of approved

growing media is one mitigation measure required by APHIS regulations to "effectively remove

[] pests from the pathway, thus precluding them from establishment in the United States."  2003

Risk Assessment at 18, AR at 2313.  For example, use of approved growing media is one

mitigative measure expected to ensure that the <u>Phalaenopsis</u> plants are free of mollusk eggs.

2003 Risk Analysis at 22, AR 2317.

Moreover, the record contains documents reflecting FWS's identification and

consideration of the risk from the growing media.  In a November 30, 1998 comment letter on

the proposed rule, FWS noted and discussed the possible risk of introduction of alien species or

diseases through the import of the growing medium, and the possible resulting harm to Hawaii's

native orchids and other native flora.  AR 267-268.

Likewise, in a memo to the FWS Director, the Regional Director of FWS's Southeast Region commented that "[p]hytosanitary or protective measures might be effective, but non-native pests could still gain access to the U.S. during importation if approved growing media (especially natural plant products such as sawdust, buckwheat hulls or sphagnum moss) were infested or contaminated." Memo from Regional Director, Southeast Region to Director at A.R. 345. The memo further noted APHIS could require or target inspections of the approved clean growing media as it inspects plant growing facilities in the exporting country. Id.

Furthermore, during the initial consultation, FWS sent APHIS a letter, dated March 21, 2003, stating that FWS recognized that APHIS would use a "systems approach in pest risk management for the importation of Phalaenopsis in approved growing media," consisting of three phases: harvesting plant material from mother stock, cultivation and packaging of descendant plants, and importation of these plants to the United States." March 21, 2003 Letter from FWS to APHIS, AR 307.

Finally, during the April 2-3, 2003 meeting, APHIS and FWS discussed the use of ozonated water in Taiwanese greenhouses, and APHIS noted that using unused sphagnum moss as an approved growing medium does not require disinfection treatment. AR 305.[14]

In conclusion, the record in this case belies plaintiff's argument that the FWS ignored the issue of whether pests could be imported in the approved growing medium, i.e., the sphagnum moss. As the discussion and record citations above demonstrate, FWS considered the risks

---

[14]Furthermore, APHIS noted that ozonated water is not prescribed or required by APHIS, but on a site visit to Taiwanese propagation facilities, ozonated water was seen being used as a disinfectant. AR 301; AR 305. APHIS further advised FWS that there was no reason to believe using ozonated water has adverse consequences to listed and proposed species, and APHIS did not expect it to adversely affect the mitigation measures that are required. AR 310; AR 305.

posed by the importation of plants in approved growing media, and discussed those risks with

APHIS during the Section 7 consultation.  FWS reviewed the rule in its entirety, and determined

after review of the BE, and discussions with APHIS, that the importation may affect, but would

not likely adversely affect, federally-listed species.  AR 299; AR 2124-2125.

Consequently, plaintiff's citation to <u>American Wildlands v. Norton</u>, 193 F.Supp. 244, 256

(D.D.C. 2002) fails to advance its case.  There, in a challenge to FWS's determination that

listing of the westslope cutthroat trout (WCT) as endangered or threatened was not warranted,

the court found FWS failed to provide any "reasoned discussion" or "scientifically based

explanation" for including hybrid stock in determining the population status of WCT when the

agency recognized that hybridization was a threat to WCT's viability.  193 F.Supp.2d at 254-56.

Here, in contrast, the record, as discussed above, demonstrates that during the Section 7

consultation, FWS reviewed the pest risk posed by the importation of <u>Phalaenopsis</u> in approved

growing medium, and plaintiff has failed to demonstrate that this determination was arbitrary

and capricious.[15]

### CONCLUSION

For the reasons expressed above, defendants' motion to dismiss, or, in the alternative, for

summary judgment, should be granted, plaintiff's motion for summary judgment denied, and

plaintiff's Amended Complaint dismissed with prejudice.

Dated: March 31, 2006                    Respectfully submitted,

---

[15]Likewise, plaintiff's attempt to show some flaw in FWS's concurrence by referring to the 1997 BiOp for airport improvements on Maui fails.  Nothing in the portions of the BiOp cited by plaintiff (Pl. Br. At 6-9, at 32) provide any demonstration that FWS somehow failed to consider an "important part of the problem" in the ESA consultation on the orchid rule.

Sue Ellen Woolridge
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

_____/s/_____
DONNA S. FITZGERALD
Connecticut Bar #411810
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington D.C. 20044-0663
Phone:  (202) 305-0476
Fax: (202) 305-0506
E-mail: Donna.Fitzgerald@usdoj.gov

OF COUNSEL:

Darlene Bolinger
Attorney Advisor General
Regulatory Division
Office of the General Counsel
United States Department of Agriculture
Rm 2319 South Building
1400 Independence Ave., SW
Washington, DC 20250-1400

Peg Romanik, Attorney
Office of the Solicitor
Division of Parks & Wildlife
United States Department of the Interior
1849 C. St., N.W., MS 6557
Washington D.C. 20240

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HAWAI'I ORCHID GROWERS ASSOCIATION,   )
   )
        Plaintiff,   )
   )   Civil Action No. 05-1182 (RCL)
   )
   )
UNITED STATES DEPARTMENT OF AGRICULTURE;)
MIKE JOHANNS, SECRETARY OF AGRICULTURE;  )
W. RON DEHAVEN, ADMINISTRATOR, ANIMAL   )
AND PLANT HEALTH INSPECTION SERVICE;   )
UNITED STATES DEPARTMENT OF THE INTERIOR;)
GALE NORTON, SECRETARY OF THE INTERIOR;  )
MATTHEW J. HOGAN, ACTING DIRECTOR, UNITED)
STATES FISH AND WILDLIFE SERVICE,   )
   )
        Defendants.   )
_____)

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants submit this statement of material facts as to which there is no genuine issue pursuant to LCvR 56.1.  It is well-established that, in cases such as this one, where plaintiffs are seeking judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 706, the scope of that judicial review is properly limited to the administrative record that was before the agency at the time that it made its decision.  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).  The reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.  Id.

1. In 1994 and again, on April 30, 1995, APHIS received a request from Taiwan to amend its plants-in-growing media rule to include plants from the genus Phalaenopsis.  AR 25.

2. In response to this request, APHIS performed a risk assessment pursuant to the risk

42

evaluation standards set forth by the plants-in-growing-media rule in effect at the time.  See 7

C.F.R. § 319.37-8(g) (1998); AR 1346-66.

3.  APHIS prepared the Pest Risk Assessment ("PRA") to "examine plant pest risks

associated with the importation of live Phalaenopsis plants in sphagnum growing medium from

Taiwan into the United States."  1997 PRA at 1, AR 1348.

4.  Pursuant to that risk analysis, APHIS identified seven quarantine pests associated with

Phalaenopsis from Taiwan, but determined that there was no greater risk that these seven pests

would follow Phalaenopsis plants into this country if the plants were established in approved

growing media than if the plants were imported in bare-root form.  1997 PRA at 16, AR 1363.

5.  On September 1, 1998, APHIS published a notice in the Federal Register proposing to

amend the plants-in-growing-media rule to allow the importation of Phalaenopsis established in

an approved growing medium from all countries.  See 63 Fed. Reg. 46,403–06 (Sept. 1, 1998).

6.  In 2003, APHIS also updated the initial risk assessment that was prepared in 1997 in

support of the rulemaking.  AR 1127-1136.

7.  Based on this revised risk assessment, APHIS published its final determination in the

Federal Register on May 5, 2004, that it was no longer necessary to prohibit the importation of

Phalaenopsis from Taiwan in order to prevent the introduction or dissemination of quarantine

plant pest within the United States.  Final Rule, 69 Fed. Reg. 24,916 (May 5, 2004); AR 1524-

44.

8.  APHIS initiated consultation pursuant to Section 7 of the ESA to assess the potential

effects of the proposed action on endangered or threatened species.  AR 330.

9.  In September, 2002, APHIS sent FWS a biological evaluation (BE) which included, as

Appendix 2, a 1997 Pest Risk Assessment APHIS had prepared.  AR 347; AR 387 (Appendix 2).

10.  The Washington Office of FWS sent a letter to Regions 1 - 6, asking them to review the BE and determine whether the appropriate listed and proposed species were considered, whether potential direct and indirect impacts to listed and proposed species and critical habitat were adequately analyzed, and whether there are any other relevant impacts or factors that should be considered, and to submit their comments to the Washington Office.  AR 330.

11.  The BE identified, among other things, the mitigation measures to be imposed on the importation of the orchids, which include a four month quarantine period in Taiwan, AR 361-62, a port of entry inspection at specially staffed and equipped Plant Inspection Stations, AR 362, and inspection of greenhouses and the plants within them to ensure that the greenhouses meet standards, and the plants are free of pests.  AR 359, 362.

12.  The BE also considered the potential direct and indirect effects of the importation on all threatened, endangered, proposed, and candidate species in the United States.  AR 364.

13.  The BE then listed the species that may be adversely impacted by potential pests.  AR 365-66.

14.  The BE noted that the initial Pest Risk Assessment had identified and listed the quarantine pests that may follow the pathway on <u>Phalaenopsis</u> from Taiwan into the United States.  AR 368.

15.  The BE determined that the chances of potential direct effects to listed species are remote because, among other things, a direct effect would require a series of events to occur, which is not likely, and, at any rate, the mitigation measures to be imposed on the proposed importation are likely to reduce, eliminate, and/or prevent the pests from following the pathway

44

and entering the United States.  AR 369.

16.  The BE also analyzed potential indirect effects to listed species, which, if they occurred, would likely be seen as reductions in food supply, cover, or breeding sites, due to the pest affecting the plant host.  AR 371.

17.  The BE determined that because of a number of factors, including the mitigation measures associated with the importation and the variety of plants that are sources of food for listed species, the potential indirect effects to listed species are negligible and discountable.  AR 371.

18.  The BE determined that the importation may effect, but was not likely to adversely effect, threatened and endangered species.  AR 371.

19.  In its conclusion, the BE noted that even if the importation did not have mitigation controls, there is no evidence that any listed, proposed, or candidate species are hosts for the pests that may enter the United States.  AR 371.

20.  With the addition of the mitigation measures, APHIS determined that indirect effects are likely to be minimal, because plants that are used by listed, proposed, or candidate species for food, cover, or breeding sites will not be placed at risk.  AR 371.

21.  Moreover, as APHIS noted, each potentially affected listed species is unlikely to be suitable as a host because of genetic limits that control host-pathogen interactions.  AR 371.

22.  Finally, the BE cited the mitigation measures that are designed to eliminate, reduce, and prevent the association of pests with the Phalaenopsis in Taiwan, and which are highly effective in preventing the entry of pests into the United States.  AR 372.

23.  The Regional Director of the Southeast Region of the FWS informed the Director of

the FWS that all Ecological Services Field Offices in the region reviewed the BE, and the region identified no specific instances where it would not concur with APHIS's determination that the proposed importation is not likely to adversely affect listed species or adversely modify critical habitat.  AR 344.

24.  Likewise, the Southeast Region of FWS (Region 4) identified no additional listed or proposed species which should have been included in the BE, and identified no additional effects which should have been discussed in the BE, in addition to those potential effects already considered.  AR 344.

25.  The record also reflects the determination by Region 6 of FWS that it concurred with the BE, based on implementation that follows the requirements set forth by APHIS and identified in the BE.  AR 342.

26.  Region 6 also concurred that other direct and indirect affects from importation are negligible.  AR 342.

27.  Region 1 noted that the associated risk to listed species relative to the existing risk associated with current importation practices is negligible, and, to the best of its knowledge, the document considers the appropriate listed and proposed species.  AR 331.

28.  Region 5 did not submit comments.  AR 332.

29.  On March 21, 2003, the Washington Office of FWS responded to APHIS, and provided the comments of all of the regions.  AR 307-309.

30.  The FWS identified two areas of concern that remained after the review of the BE by the regions, and correspondence between APHIS and the regions.  AR 308.

31.  One concern was why several species of quarantine pest thrips were purportedly

eliminated from consideration.  AR 308.

32.  The concerns were resolved at a meeting held between APHIS and FWS April 2-3, 2003, the results of which were documented in meeting minutes.  AR 304-06.

33.  APHIS also sent FWS a letter on April 3, 2003 to address these two remaining issues. AR 301-302.

34.  In response to FWS's request to clarify why several species of quarantine significant thrips were eliminated from consideration, APHIS advised that the thrips were originally considered in the quarantine pest list in the PRA, but were not considered a pest that would follow the importation pathway.  AR 304.

35.  APHIS advised that it conducted extensive literature searches which revealed that none of the thrips identified in the PRA have ever been reported on Phalaenopsis.  AR 301.

36.  A review of pest interceptions made over the past eight years on bare-rooted Phalaenopsis plants from Taiwan shows that thrips have not been intercepted.  AR 301, 304.

37.  Minutes from the April 2-3 meetings also demonstrate that APHIS noted that it is not expected that pests associated with plants in the wild, such as mealybug crawlers, will end up in the greenhouses.  AR 301, 304.

38.  APHIS noted that all propagative material being imported will be sent to APHIS plant inspection stations at ports of entry where, at least in the beginning, a large percentage of the shipment will be inspected, and some will be uprooted from the media to check for pests in the roots.  AR 304-05.  If quarantine pests are intercepted at the plant inspection stations, the shipment will be treated, re-exported or destroyed, which will be costly for propogators, and therefore, an incentive for growers to export clean plants.  AR 305.

39.   APHIS also identified certain measures, such as screening, which would prevent the introduction of pests, including thrips, into greenhouses.  AR 301, 304.

40.  APHIS also noted that pest interception information regarding commercially imported products entering the United States is collected and available, and is used by APHIS to monitor the effectiveness of the application of mitigation measures, and incidents of non-compliance. AR 302.

41.  APHIS also noted that new threats are immediately evaluated, and appropriate actions taken.  AR 302.

42.  APHIS concluded this April 3 correspondence by advising that the importation of Phalaenopsis from Taiwan in approved growing media will not adversely effect threatened and endangered species.  AR 302.

43.  On April 7, 2003, the FWS advised that after reviewing the BE, additional supporting documentation, and the April 3, 2003 letter from APHIS, it concurred with APHIS's determination that the importation of Phalaenopsis from Taiwan in approved growing media would not adversely affect Federally listed or proposed endangered or threatened species or their habitat as a result of the action.  AR 299.

44.  The FWS concluded the section 7 consultation process by concurring with APHIS's determination that the importation of Phalaenopsis species orchids from Taiwan in approved growing media will not adversely affect federally listed or proposed endangered or threatened species or their habitats.  Id.

45.  In October, 2003, APHIS sent FWS a letter requesting initiation of informal programmatic consultation under the ESA regarding the importation of plants established in

48

approved growing media and produced in accordance with Plant Protection and Quarantine Requirements.  AR 2243.

46.  APHIS also submitted documents in support of the requested consultation, including the risk analysis APHIS had prepared regarding the importation of Phalaenopsis plants in approved growing media from Taiwan.  AR 2243.

47.  APHIS noted that the mitigation measures described in the documents submitted had "proven effective in similar programs, [and] will effectively mitigate potential pest risks and will protect threatened and endangered species and their habitats."  AR 2244.

48.  FWS responded in March, 2004, stating that it interpreted APHIS's subsequent submission of documents to indicate that APHIS also wanted to re-initiate section 7 consultation on two APHIS actions, one of which was the proposed rule allowing import of Phalaenopsis species orchids from Taiwan.  AR 2237.

49.  The letter noted that the re-initiation and incorporation of the two previous individual consultations into one programmatic consultation would provide a "consistent foundation for future requests for plant importation in APHIS-approved growing media."  AR 2237.

50.  In the same letter, FWS recommended that APHIS require a .4 mm screen mesh in APHIS-approved greenhouses, in order to prevent thrips infestations of the Phalaenopsis plants, as prior inter-agency discussions led FWS to believe that the .6 mm screen mesh size would be inadequate.  AR 2239.

51.  APHIS responded with a June 2, 2004 letter, which advised that FWS's impression that greenhouses would have a screen mesh size of smaller than .6 mm was a mis-understanding, and noted that at .2 mm, thrips could get in through screen sizes of even .4 mm, which FWS had

49

recommended.  AR 2233, 2234-35.

52.  APHIS further advised that requiring screen size of smaller than .6 mm would require adapting greenhouse construction to accommodate the need for air circulation and cooling fans, particularly in humid climates, and that mitigation measures, such as routine or repeated pesticide sprays, when warranted, will reduce the risk of infestation and possible introduction of thrips into the United States.  AR 2233, 2234-35.

53.  In response, FWS advised that APHIS's June 2, 2004 correspondence addressed FWS's recommendations, and included the additional information and clarification that FWS sought in its March 18, 2004 letter.  AR 2125.

54.  FWS further advised that its initial determination was "may affect, but not likely to adversely affect," and that the determination after re-initiation was the same.  AR 2125.

55.  The letter concluded the section 7 consultation on the proposed program to import plants established in APHIS-approved growing media and produced in accordance with requirements set forth at 7 C.F.R. § 319.37.  AR 2125.

56.  APHIS's 1997 initial risk assessment identified pests that are known to be associated with Phalaenopsis plants in Taiwan and assessed the risk posed by those pests in the absence of the mitigative effects of the requirements of the plants in growing media rule, which are designed to establish and maintain a pest-free production environment and to ensure the use of pest-free seeds or parent plants.  AR 387; AR 1524 (Final Rule discussing the 1997 PRA).

57.  While the 1997 PRA identified thrips as a "quarantine" pest associated with Phaleanopsis plants, AR 393 - 396, 400, APHIS determined thrips were not reasonably likely to follow the pathway, i.e., be included in commercial shipments of Phalaenopsis plants.  AR 401.

58.  APHIS updated the risk document in 2003, and also shared that 2003 document with FWS.  AR 2238.

59.  One change APHIS made in the 2003 Risk Analysis was to add a substantial discussion of how the risk mitigation measures contained in the plants-in-growing-media rule mitigate the risks posed by the six quarantine pests that were identified as likely to follow Phalaenopsis from Taiwan, which do not include thrips.  AR 1119, 1127-1136.

60.  The 1997 PRA that was attached as an appendix to the APHIS's BE stated that while Phalaenopsis and other orchids were allowed entry as bare root plants or growing in tree fern or coconut husk or fiber, the importation of live Phaleanopsis plants from Taiwan in sphagnum growing medium is a "potential pathway for introduction of plant pests."  AR at 390-391.

61.  The PRA further noted, however, that commercial sphagnum is allowed entry as an approved growing medium pursuant to those regulations.  AR 390, AR 404 (citing 7 C.F.R. § 319.37-8).

62.  The Biological Evaluation ("BE") that APHIS provided FWS contained a section identifying "Specific Mitigation Measures for Propagative Materials."  AR at 355.

63.  The 2003 Risk Analysis explains that it is examining the "phytosanitary risks associated with the potential importation, from Taiwan into the United States, of moth orchid plants rooted in APHIS-approved growing media."  2003 Risk Assessment at 1, AR 2295.

64.  The 2003 Risk Analysis also noted that use of approved growing media is one mitigation measure required by APHIS regulations to "effectively remove [] pests from the pathway, thus precluding them from establishment in the United States."  2003 Risk Analysis at 18, AR at 2313.

51

65.  The 2003 Risk Analysis noted that use of approved growing media is one mitigative measure expected to ensure that the <u>Phalaenopsis</u> plants are free of mollusk eggs.  2003 Risk Analysis at 22, AR 2317.

66.  In a November 30, 1998 comment letter on the proposed rule, FWS noted and discussed the possible risk of introduction of alien species or diseases through the import of the growing medium, and the possible resulting harm to Hawaii's native orchids and other native flora.  AR 267-268.

67.  In a memo to the FWS Director, the Regional Director of FWS's Southeast Region commented that "[p]hytosanitary or protective measures might be effective, but non-native pests could still gain access to the U.S. during importation if approved growing media (especially natural plant products such as sawdust, buckwheat hulls or sphagnum moss) were infested or contaminated."  Memo from Regional Director, Southeast Region to Director, AR 345.

68.  The memo further noted APHIS could require or target inspections of the approved clean growing media as it inspects plant growing facilities in the exporting country.  AR 345.

69.  During the initial consultation, FWS sent APHIS a letter, dated March 21, 2003, stating that FWS recognized that APHIS would use a "systems approach in pest risk management for the importation of <u>Phalaenopsis</u> in approved growing media," consisting of three phases: harvesting plant material from mother stock, cultivation and packaging of descendant plants, and importation of these plants to the United States."  March 21, 2003 Letter from FWS to APHIS, AR 307.

70.  The Final Rule went into effect in June, 2004.  69 Fed. Reg. 24,916 (May 5, 2004).

Dated: March 31, 2006                Respectfully submitted,

Sue Ellen Woolridge
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice


_____/s/_____
DONNA S. FITZGERALD
Connecticut Bar #411810
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington D.C. 20044-0663
Phone:  (202) 305-0476
Fax: (202) 305-0506
E-mail: Donna.Fitzgerald@usdoj.gov

OF COUNSEL:

Darlene Bolinger
Attorney Advisor General
Regulatory Division
Office of the General Counsel
United States Department of Agriculture
Rm 2319 South Building
1400 Independence Ave., SW
Washington, DC 20250-1400


Peg Romanik, Attorney
Office of the Solicitor
Division of Parks & Wildlife
United States Department of the Interior
1849 C. St., N.W., MS 6557
Washington D.C. 20240

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAWAI'I ORCHID GROWERS ASSOCIATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 05-1182 (RCL) |
| | ) |
| | ) |
| UNITED STATES DEPARTMENT OF AGRICULTURE; | ) |
| MIKE JOHANNS, SECRETARY OF AGRICULTURE; | ) |
| W. RON DEHAVEN, ADMINISTRATOR, ANIMAL | ) |
| AND PLANT HEALTH INSPECTION SERVICE; | ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR; | ) |
| GALE NORTON, SECRETARY OF THE INTERIOR; | ) |
| MATTHEW J. HOGAN, ACTING DIRECTOR, UNITED | ) |
| STATES FISH AND WILDLIFE SERVICE, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL UNDISPUTED FACTS

Defendants hereby respond to plaintiff's Statement of Undisputed Material Facts.

Defendants note that while they disagree with certain statements by plaintiff, the disagreements

do not rise to the level of a genuine dispute over a material fact.

Statement of Material Fact ##1-2:  Defendants do not object.

Statement of Material Fact ##3-8: Defendants object to Statements of Material Fact ##3-8

because they do not cite to administrative record documents.  These statements largely appear to

repeat allegations in the Amended Complaint.  Defendants responded to those allegation in their

answer.

Statement of Material Fact #9: No objection.

Statement of Material Fact #10: No objection.

54

Statement of Material Fact #11: Defendants object to the fourth sentence of Statement of Material Fact #11, in that the cited November 30, 1998 letter from the FWS to APHIS does not refer to Hawaii Department of Agriculture records.  Also, the letter does not state that any impacts to the seven species of native orchids may result in the need to list additional native orchid species, and the letter does not state that because many of the pests listed in the 1997 PRA are polyphagous, 11 federally-listed plant species from the mainland and 48 federally-listed plant species from Hawaii may be affected.  Defendants object to the fifth sentence of Statement of Material Fact #11, as the cited November 30, 1998 letter from the FWS to APHIS does not state that APHIS's 1997 PRA "conceded that [APHIS] lacks biological information on the majority of the mollusks and arthropods identified as quarantine pests, . . . ."

Statement of Material Fact ##12-13.  Statements of Material Fact #12 and 13 purport to characterize the November 25, 1998 comment letter from the State of Hawaii Department of Agriculture, which speaks for itself and is the best evidence of its contents.  Defendants object to any assertion that is not consistent with the letter .

Statement of Material Fact #14.  Defendants object to the first and last sentences of Statement of Material Fact #14, as they do not accurately state the contents of the cited letter from the State of Hawaii Department of Agriculture.  Defendants also note that the cited letter does not refer to any "preempt[ion]" by APHIS of the State's regulations requiring a 60 day quarantine period on imports of high pest-risk bare-rooted immature orchid seedlings, or high pest-risk mature orchid plants.  The remaining sentences of Statement of Material Fact #14 purport to characterize the letter, which speaks for itself and is the best evidence of its contents.

Statement of Material Fact #15.  Statements of Material Fact #15 purports to characterize

the comment letter from the State of Hawaii Department of Agriculture, which speaks for itself and is the best evidence of its contents.  Defendants object to any assertion that is not consistent with the letter.

Statement of Material Fact #16.  No objection.

Statement of Material Fact ##17-24:  Defendants object to Statements of Material Fact ##17-24 because they do not cite to administrative record documents.  These statements largely appear to repeat allegations in the Amended Complaint.  Defendants responded to those allegation in their answer.  Moreover, the allegations primarily characterize documents which speak for themselves and are the best evidence of their contents.

Statement of Material Fact #25.  No objection, although defendants note that while APHIS submitted the Biological Evaluation to FWS in September, 2002 to initiate Section 7 consultation, APHIS and FWS discussed the proposed rule at a meeting held on January 26, 2001, AR 2104-2107, and FWS and APHIS personnel traveled to Taiwan in March, 2002 for bilateral talks regarding the proposed importation.  April 1, 2002 Letter from Richard Dunkle, APHIS to Gary Frazer, FWS.  AR 2080.

Statement of Material Fact ##26-28.  Defendants do not object to Statement of Material Fact ##26-28, but they note that the Statements characterize administrative record documents which speak for themselves, and are the best evidence of their contents.  Defendants object to characterizations that are inconsistent with the documents.

Statement of Material Fact #29.  All but the last sentence of Statement of Material Fact #29 characterizes administrative record documents, which speak for themselves and are the best evidence of their contents.  Defendants object to characterizations that are inconsistent with the

documents.  Defendants object to the last sentence of paragraph 29 because APHIS shared the

1997 PRA with FWS.  Defendants note that while it is not clear from the administrative record

whether APHIS provided FWS the comments of plaintiff and the State of Hawaii Department of

Agriculture on the proposed rule, defendants' memorandum explains that APHIS and FWS

discussed the issue of thrips during the Section 7 consultation, including the issue raised in

plaintiff's comment regarding screen mesh size, and that even assuming APHIS did not share the

comment of the State of Hawaii, Department of Agriculture with FWS, plaintiff has failed to

demonstrate the relevance in this case.  AR 301, 304, 2235, 2239.

Statement of Material Fact #30.  Statement of Material Fact #30 characterizes an

administrative record documents which speak for themselves and are the best evidence of their

contents, and therefore, no response is required.  Defendants object to any allegations that are

inconsistent with the documents.

Statement of Material Fact #31.  Defendants do not object to the first two sentences of

Statement of Material Fact #31.  As to the third sentence of Statement of Material Fact #31,

defendants object, because while the 2003 Risk Analysis and the EA did not specifically discuss

comments submitted on the 1997 PRA, APHIS reviewed all comments and addressed the

comments submitted on the 1997 PRA in the Final Rule, and plaintiff has failed to demonstrate

that APHIS was required to do otherwise.  AR 1524.

Statement of Material Fact #32.  Defendants object to the first two sentences of Statement

of Material Fact #32 in that they characterize administrative record documents that speak for

themselves and are the best evidence of their contents, and defendants object to plaintiff's

characterization of the documents as flawed.  Defendants object to the remaining allegations of

Statement of Material Fact #32 in that they compare record documents with non-record documents. Moreover, the documents speak for themselves, are the best evidence of their contents, and defendants object to allegations or characterizations that are not consistent with the documents.

Statement of Material Fact #33. Defendants object to Statement of Material Fact #33 in that it characterizes the 1997 PRA and 2003 Risk Analysis as flawed. The documents, which are in the administrative record, speak for themselves and are the best evidence of their contents, and defendants object to allegations or characterizations that are not consistent with the documents. Moreover, while defendants agree that the 1997 PRA considered only the climate of South Florida, defendants disagree that the 2003 Risk Analysis considered only the climate of South Florida, and note that the 2003 Risk Analysis was corrected to "show that plant hardiness zone 11 includes other States besides Florida." AR 1530, Final Rule, 69 Fed. Reg. 24, 916, 24922 (May 5, 2004).

Statement of Material Fact ##34-35. No objection.

Statement of Material Fact #36. Defendants object to the characterization in Statement of Material Fact #36, and aver that on October 1, 2003, APHIS sent FWS a letter requesting initiation of informal programmatic consultation under the ESA regarding the importation of plants established in approved growing media and produced in accordance with Plant Protection and Quarantine Requirements. AR 2243.

Statement of Material Fact #37. Defendants object to the characterization in Statement of Material Fact #37 that FWS found the .6 mm screen mesh size in greenhouses is "inadequate." On the contrary, after raising a question about it with APHIS, AR 2239, APHIS responded with a

58

June 2, 2004 letter that explained why the .6 mm screen mesh size, in combination with mitigation measures, was adequate to protect against <u>thrips</u> infestation, AR 2233, 2234-35.  FWS responded that APHIS's June 2, 2004 correspondence addressed FWS's recommendations, and included the additional information and clarification that FWS sought in its March 18, 2004 letter.  AR 2125.

Statement of Material Fact #38.  Defendants object to the characterization in Statement of Material Fact #38 that APHIS "admitted" that the .6 mm screen mesh size was based solely on economics, and not out of any concern for species preservation, and defendants likewise object to plaintiff's attempt to characterize APHIS's assertions in its June 2, 2004 correspondence as improper.  As discussed above in response to Statement of Material Fact #37, and in defendants' brief in support of their motions to dismiss and for summary judgment and in response to plaintiff's motion, APHIS advised that FWS's impression that greenhouses would have a screen mesh size of smaller than .6 mm was a mis-understanding, and noted that at .2 mm, <u>thrips</u> could get in through screen sizes of even .4 mm, which FWS had recommended.  June 2, 2004 Letter from Michael R. Lidsky, APHIS to Richard Sayers, FWS at 3, AR 2233, 2234-35.  APHIS further advised that requiring screen size of smaller than .6 mm would require adapting greenhouse construction to accommodate the need for air circulation and cooling fans, particularly in humid climates, and that mitigation measures, such as routine or repeated pesticide sprays, when warranted, will reduce the risk of infestation and possible introduction of <u>thrips</u> into the United States.  AR 2234-35.

In response, FWS advised that APHIS's June 2, 2004 correspondence addressed FWS's recommendations, and included the additional information and clarification that FWS sought in

its March 18, 2004 letter.  September 1, 2004 Letter from Gary Frazer, FWS to Michael Lidsky, APHIS at 2, AR 2125.  FWS further advised that its initial determination was "may affect, but not likely to adversely affect," and that the determination after re-initiation was the same.  <u>Id</u>. The letter concluded the section 7 consultation on the proposed program to import plants established in APHIS-approved growing media and produced in accordance with requirements set forth at 7 C.F.R. § 319.37.  <u>Id</u>.

Statement of Material Fact #39.  Defendants note that plaintiff's Statement of Material Fact #39 does not accurately characterize FWS's September 1, 2004 letter.  FWS advised that its initial determination on the proposed importation was "may affect, but not likely to adversely affect," and that the determination after re-initiation was the same.  AR 2125.  The letter concluded the section 7 consultation on the proposed program to import plants established in APHIS-approved growing media and produced in accordance with requirements set forth at 7 C.F.R. § 319.37.  <u>Id</u>.

Statement of Material Fact #40.  No objection.

Dated: March 31, 2006          Respectfully submitted,

                               Sue Ellen Woolridge
                               Assistant Attorney General
                               Environment & Natural Resources Division
                               United States Department of Justice

                               _____/s/_____
                               DONNA S. FITZGERALD
                               Connecticut Bar #411810
                               Trial Attorney
                               Natural Resources Section
                               Environment & Natural Resources Division
                               United States Department of Justice
                               P.O. Box 663
                               Washington D.C. 20044-0663

Phone:  (202) 305-0476
Fax: (202) 305-0506
E-mail: Donna.Fitzgerald@usdoj.gov

OF COUNSEL:

Darlene Bolinger
Attorney Advisor General
Regulatory Division
Office of the General Counsel
United States Department of Agriculture
Rm 2319 South Building
1400 Independence Ave., SW
Washington, DC 20250-1400

Peg Romanik, Attorney
Office of the Solicitor
Division of Parks & Wildlife
United States Department of the Interior
1849 C. St., N.W., MS 6557
Washington D.C. 20240