# United States District Court
# For the District of Columbia

_____
                                                    )
HAWAI`I ORCHID                                      )
GROWERS ASSOCIATION,                                )
                                                    )
      Plaintiff,                               )
                                                    )
      v.                                       )    Civil Action No. 05-1182 (RCL)
                                                    )
UNITED STATES DEPARTMENT                            )
OF AGRICULTURE, *et al.*,                           )
                                                    )
      and                                      )
                                                    )
UNITED STATES DEPARTMENT                            )
OF INTERIOR, *et al.*,                              )
                                                    )
      Defendants.                              )
_____

PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS AND/OR FOR SUMMARY JUDGMENT AND REPLY
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iv-vi

I.    PLAINTIFFS HAVE ARTICLE III STANDING ................................................................ 1

II.   STANDARD OF REVIEW   ................................................................................................6

III.  THE "BEST SCIENTIFIC AND COMMERCIAL DATA AVAILABLE" STANDARD.................8

IV.   APHIS WITHHELD KEY DOCUMENTS FROM USFWS, AND, IN DOING SO,
      VIOLATED THE ESA.......................................................................................................9

      A.   COMMENTS FROM THE HAWAI`I ORCHID GROWERS AND FROM
           HDOA PROVIDE THE BEST AVAILABLE SCIENTIFIC AND
           COMMERCIAL DATA REGARDING THRIPIDAE PESTS OF
           PHALAENOPSIS SPP. ORCHIDS, DATA NOT PROVIDED DURING
           THE CONSULTATION PROCESS BY APHIS TO USFWS........................................10

      B.   THE ISSUE OF THRIPS INFESTATION WAS NOT ADEQUATELY
           ADDRESSED BY APHIS OR BY USFWS...........................................................15

      C.   THE ISSUE OF APPROPRIATE SCREEN MESH SIZE FOR THE
           PROGRAM GREENHOUSES WAS SWEPT UNDER THE RUG.................................18

      D.   THE RE-INITIATION OF ESA CONSULTATIONS AGAIN RAISED
           QUESTIONS ABOUT THE ADEQUACY OF THE SCREEN MESH
           SIZE FOR THE PROGRAM GREENHOUSES, AND, AGAIN,
           APHIS OBFUSCATED THE ISSUE.....................................................................21

      E.   APHIS NEVER EVALUATED THE ACTION'S EFFECT ON
           CRITICAL HABITAT OF FEDERALLY-LISTED SPECIES........................................22

V.    USFWS VIOLATED THE ESA IN CONCURRING WITH APHIS THAT THE
      PROPOSED RULE WOULD "NOT ADVERSELY AFFECT" LISTED SPECIES AND
      THEIR HABITATS, WITHOUT CONDUCTING THE REQUIRED EVALUATION OF
      KNOWN PEST RISKS ASSOCIATED WITH THE GROWING MEDIA..................................25

      A.   THE PROBLEM WAS IDENTIFIED, BUT NOT EVALUATED.....................................25

      B.   THE PRAS ALSO IDENTIFIED THE PROBLEM.....................................................28

      C.   APHIS IMPROPERLY RELIED ON THE EXISTING REGULATORY PROGRAM AS
           THE EXCLUSIVE METHOD TO RESOLVE LEGITIMATE CONCERNS..........................29

D.  NO BIOLOGICAL EVALUATION WAS CONDUCTED TO ADDRESS
THE PROBLEM; NONETHELESS, USFWS CONCURRED IN APHIS'
"NO ADVERSE AFFECT" DETERMINATION ............................................................................................30

CERTIFICATE OF SERVICE..........................................................................................................................33

TABLE OF AUTHORITIES

_STATUTES_

5 U.S.C. § 702......................................................................................................................7

5 U.S.C. § 706....................................................................................................................23

5 U.S.C. § 706(2)(A)............................................................................................................7

16 U.S.C. § 1533(a)..............................................................................................................6

16 U.S.C. § 1536..................................................................................................................6

16 U.S.C. § 1536(a)(2)......................................................................6, 8, 9, 15, 23, 25

16 U.S.C. § 1538(a)..............................................................................................................6

16 U.S.C. § 1540(g)..............................................................................................................7

_REGULATIONS_

7 C.F.R. § 319.37-8............................................................................................................26

7 C.F.R. § 319.37-8(e)..........................................................19, 20, 26, 27, 30, 31

7 C.F.R. § 319.37-8(e)(1)..................................................................................................30

7 C.F.R. § 319.37-8(e)(2)(II)............................................................................................19

7 C.F.R. § 319.37-8(g)........................................................................................................27

50 C.F.R. § 402.03................................................................................................................6

50 C.F.R. § 402.12..............................................................................................................31

50 C.F.R. § 402.12(a)....................................................................................................23, 30

50 C.F.R. § 402.13................................................................................................................6

50 C.F.R. § 402.14................................................................................................................6

50 C.F.R. § 402.14(d)............................................................................................................6

<u>CASES</u>

*Action Alliance of Senior Citizens v. Heckler,*
789 F.2d 931 (D.C. Cir. 1986)................................................................................................4

*ALLTEL Corp. v. Federal Communications Commission,*
838 F.2d 551 (D.C. Cir. 1988)................................................................................................7

*American Rivers v. U.S. Army Corps of Engineers,*
271 F. Supp. 2d 230 (D.D.C. 2003)....................................................................................8, 22

*\*American Society for the Prevention of Cruelty to Animals v. Ringling Brothers,*
317 F.3d 334 (D.C. Cir. 2003).................................................................................................4

*American Wildlands v. Norton,*
193 F. Supp. 2d 244 (D.D.C. 2002)................................................................................8, 25, 31

*Animal Legal Defense Fund, Inc. v. Glickman,*
154 F.3d 426 (D.C. Cir. 1998)................................................................................................4

*Bennett v. Spear,*
520 U.S. 154 (1997)..............................................................................................................2

*Carlton v. Babbitt,*
26 F. Supp. 2d 102 (D.D.C. 1998) .........................................................................................7

*Center for Biological Diversity v. Lohn,*
296 F. Supp. 2d 1223 (W.D. Wash. 2003) ............................................................................7

*Chevron U.S.A., Inc. v. Federal Energy Regulatory Commission,*
193 F. Supp. 2d 54 (D.D.C. 2002) .........................................................................................4

*City of Kansas City Missouri v. HUD,*
923 F.2d 188 (D.C. Cir. 1991)................................................................................................7

*Conner v. Burford,*
848 F.2d 1441 (9th Cir. 1988)................................................................................................8

*\*Defenders of Wildlife v. Norton,*
257 F. Supp. 2d 53 (D.D.C. 2003).......................................................................................3, 5

*Defenders of Wildlife v. U.S. EPA,*
420 F.3d 946 (9th Cir. 2005)..................................................................................................9

*Friends of the Earth v. Laidlaw Environmental Services,*
528 U.S. 167 (2000)..............................................................................................................1

*Fund for Animals v. Norton,*
322 F.3d 728 (D.C. Cir. 2003)................................................................................................2

*Greenpeace Action v. Franklin,*
14 F.3d 1324 (9th Cir. 1992)..................................................................................................8

*Greenpeace v. National Marine Fisheries Service,*
80 F. Supp. 2d 1137 (W.D. Wash. 2000).........................................................................23, 25

*Hunt v. Washington State Apple Advertising Commission,*
432 U.S. 333 (1977)..............................................................................................1

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)..............................................................................................2

*Marsh v. Oregon Natural Resources Council,*
490 U.S. 360 (1989)..........................................................................................7, 24

*Motor Vehicle Manufacturer's Association v. State Farm Mutual
Automobile Insurance Co.,* 463 U.S. 29 (1983)...............................................7, 24

*National Wildlife Federation v. Norton,*
332 F. Supp. 2d 170 (D.D.C. 2004).................................................................8, 25

*\*Natural Resources Defense Council, Inc. v. Evans,*
364 F. Supp. 2d 1083 (N.D. Cal. 2003)...........................................................8, 15

*Pacific Coast Federation of Fishermen's Associations v. U.S. Bureau
of Reclamation,* 138 F. Supp. 2d 1228 (N.D. Cal. 2001)....................................31

*\*Resources Limited, Inc. v. Robertson,*
35 F.3d 1300 (9th Cir. 2004)...............................................................................9

*Sierra Club v. Environmental Protection Agency,*
292 F.3d 895 (D.C. Cir. 2002)..............................................................................1

*Tennessee Valley Authority v. Hill,*
437 U.S. 153 (1978).............................................................................................23

*The Williams Companies v. Federal Energy Regulatory Commission,*
345 F.3d 910 (D.C. Cir. 2003)...............................................................................4

*Warth v. Seldin,*
422 U.S. 490 (1975)...............................................................................................3

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## I.  PLAINTIFFS HAVE ARTICLE III STANDING.

An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 181 (2000), citing *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977); *Sierra Club v. Environmental Protection Agency*, 292 F.3d 895, 898 (D.C. Cir. 2002). The Hawai`i Orchid Growers Association (Hawai`i Orchid Growers) is just such an entity. It is comprised of "breeders, propagators, and growers of orchids in Hawaii." Administrative Record, at 1598.[1] "Its goals are to promote the development of [the orchid] industry by supporting marketing, research and education projects." AR 1598. The Hawai`i Orchid Growers is comprised of 144 members. AR 768. A listing of 130 members of the Association, many of whom are commercial enterprises, is set out in the Administrative Record. AR 1600-09. One or more of its members grow *Phalaenopsis* orchids (AR 1601, 1603), and one or more such members specialize in potted *Phalaenopsis* spp. orchids, (AR 1606, 1608). At issue here is the Final Rule published Wednesday, May 5th, 2004 which adds orchids of the genus *Phalaenopsis* from Taiwan to the list of plants that may be imported in an approved growing medium. AR 1524-44.

Article III standing, U.S. CONST., art. III, § 2, requires: (1) injury in fact—certainly impending invasion of a legally protected interest that is itself concrete and particular; (2) injury that is fairly traceable to the challenged act; and (3) injury that is likely to be redressed by a favorable decision, al-

---

[1]    In this memorandum, the Administrative Record will be cited as follows: "AR [page(s)]."

- 1 -

though this redress need be no more than a proper identification of the risks to particular interests. *Bennett v. Spear*, 520 U.S. 154, 167 (1997), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Fund for Animals v. Norton*, 322 F.3d 728, 732-733 (D.C. Cir. 2003).

There are three species of native Hawai`ian orchids, one of which, *Platanthera holochila*, is listed as an Endangered Species, and the others, *Anoectochilus sandvicensis* and *Liparis hawaiiensis*, are both species of concern. All three species of native Hawai`ian orchids are found only in Hawai`i. Designated critical habitat for *Platanthera holochila* is bog hummocks that support a variety of mosses and bryophytes; *Anoectochilus sandvicensis* and *Liparis hawaiiensis* are associated with mosses that grow on the trunks of trees in wet forests. AR 40-41. *Anoectochilus sandvicensis* is an "associated native species" in critical habitat of the Endangered Species *Adenophorus periens* (pendant kihi fern), 68 Fed. Reg. 12987-12988 (2003), and *Liparis hawaiiensis* (awapuhiakanaloa) is an associated native species in critical habitat of the Endangered Species *Phyllostegia hirsuta*, 68 Fed. Reg. 35964-35965 (2003).

Defendant Fish and Wildlife Service, United States Department of Interior (USFWS), has made it clear that the Final Rule may be detrimental to these native Hawai`ian orchids by altering critical conditions required for their successful germination, growth, and reproduction, and has made it clear that possible infestations in Hawai`i of *Thripidae* pests of *Phalaenopsis* spp. orchids from Taiwan (also in a tropical climate) are an "area" of "residual concern." AR 267-68. Indeed, this risk to the native Hawai`ian orchids provides the requisite standing. Declaration of Arnold Hara, May 1st, 2006 (Hara Dec.), at ¶ 6 .

Each day, Plaintiffs have the opportunity to observe the native Hawai`ian orchids. Indeed, because of their avocational interest in *Orchidaceae*, Plaintiffs are more likely than other people to

make such observations. *Defenders of Wildlife v. Norton*, 257 F. Supp. 2d 53, 62-63 (D.D.C. 2003). Having such commercial, educational, and aesthetic interests, members of the Hawai`i Orchid Growers have a particularized interest to prevent harm to, and, potentially, the extinction of, the native Hawai`ian orchids. Members of the Hawai`i Orchid Growers thus have a personal stake in the outcome of this controversy that warrants this Court's intervention. *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975).

It is a certainty that the threat of introduction of alien pests into Hawai`i and the rest of the United States is significantly heightened by the Final Rule. See Hara Dec. ¶¶ 1-7. Among the alien pests that likely will be introduced are invasive *Thripidae* pests of *Phalaenopsis* spp. orchids brought to Hawai`i from Taiwan and the blood-sucking midge *Forcipoymia taiwana*, known in Taiwan as "little King Kong," and a serious environmental problem there, which may well invade Hawai`i through eggs laid in the sphagnum moss, in which maturing *Phalaenopsis* spp. orchids are cultivated in Taiwan, sphagnum moss that will be allowed entry into Hawai`i with mature potted *Phalaenopsis* spp. orchid plants. AR 786-87, 1041-45, 1057-59.

Dr. Arnold Hara, a University of Hawai`i Professor and Entomologist, explains with particularity the events that will happen now that the Final Rule is in place. First, the importation of finished, flowering *Phalaenopsis* spp. orchid plants *and* the sphagnum moss in which maturing *Phalaenopsis* spp. orchids are cultivated in Taiwan, sphagnum moss that will be allowed entry into Hawai`i with mature potted *Phalaenopsis* spp. orchid plants, provides an inviting vehicle for "hitchhiking" alien pests. Hara Dec. ¶ 5. After the inevitable arrival of these "hitchhiking" alien pests, they will spread in the outdoors environment of Hawai`i, a tropical environment like that of Taiwan. Hara Dec. at ¶ 2. Once these "hitchhiking" alien pests establish themselves in Hawai`i, they will not discriminate, and

they will voraciously infest all species of *Orchidaceae*, including the plants grown for sale by members of the Hawai`i Orchid Growers, and, as well, the native Hawai`ian orchids. Hara Dec. ¶ 6.

These impacts to the Hawai`i Orchid Growers far exceed the "trifle" necessary to establish standing. *Chevron U.S.A., Inc. v. Federal Energy Regulatory Commission*, 193 F. Supp. 2d 54, 60 (D.D.C. 2002), *aff'd sub nom. The Williams Companies v. Federal Energy Regulatory Commission*, 345 F.3d 910 (D.C. Cir. 2003), quoting *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) ("For purposes of Article III, the injury 'need not be large or intense; an 'identifiable trifle,' the Supreme Court has said, is sufficient to meet the constitutional minimum.'").

And the Hawai`i Orchid Growers have a particularized interest in the native Hawai`ian orchids. A member of the Hawai`i Orchid Growers explains efforts, so far unsuccessful, to propagate *Anoectochilus sandvicensis* or *Liparis hawaiiensis*. Declaration of Bob Zeller, April 21st, 2006. This is the sort of aesthetic interest that is sufficient for standing, *American Society for the Prevention of Cruelty to Animals v. Ringling Brothers*, 317 F.3d 334, 336-37 (D.C. Cir. 2003), and this aesthetic interest will be harmed by the introduction of alien pests if the Final Rule is not set aside. Indeed, the Final Rule threatens *Platanthera holochila, Anoectochilus sandvicensis,* and *Liparis hawaiiensis*—no more is required to satisfy the causation prong of Constitutional standing. *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 440-41 (D.C. Cir. 1998).

The injury threatened by the Final Rule is not merely conjectural or hypothetical. Defendants have failed to properly assess the impact on the native Hawai`ian orchids that will result from the alien pests that will be introduced under the Final Rule. As more fully discussed below, the Administrative Record chronicles just how Defendants have failed to identify these pests and the impact of

- 4 -

their introduction into the fragile environment of Hawai`i. At one point, USFWS made it clear that the Final Rule may be detrimental to these native Hawai`ian orchids by altering critical conditions required for their successful germination, growth, and reproduction. Now, however, USFWS is deafeningly silent.

And the injury threatened by the Final Rule is exacerbated by the pre-emption of the former regime of State-mandated inspection and quarantine. AR 97, 1048-49. Since 1953, the Hawai`i Department of Agriculture (HDOA) has routinely intercepted pests on shipments of high pest-risk bare-rooted orchid seedlings (bare-rooted orchid seedlings from countries south of 30 degrees north latitude as is Taiwan [AR 118]), pests that are detected while these high pest-risk bare-rooted orchid seedlings were then being held in State-mandated quarantine for sixty days. AR 86-87. These same shipments of high pest-risk bare-rooted orchid seedlings had been examined and passed by inspectors of the exporting country, and examined and passed by inspectors of the Defendant Animal and Plant Health Inspection Service (APHIS), before moving into State-mandated quarantine.

Plaintiff's challenges to the Final Rule will indeed be redressed by a favorable decision in this case. It is not just that Defendants have performed procedural steps in an incorrect or inaccurate manner—Defendants have overlooked the creation of a demonstrable risk to Plaintiff's particularized personal and environmental interests, and it is likely that a second, proper review of Taiwan's importation request will correct these errors and impose additional phytosanitary measures such that Plaintiff is protected from invasive pests, and the native Hawai`ian orchids are secure. *Cf. Defenders of Wildlife*, 257 F. Supp. 2d at 64.

The Endangered Species Act (ESA) requires the Secretary of Interior to list as Endangered or Threatened those species whose habitat or range may be destroyed, modified, or curtailed; or where

there is an "inadequacy of existing regulatory mechanisms;" or where "other natural or manmade factors" affect the continued existence of such species. 16 U.S.C. § 1533(a). The ESA affords listed species certain protections, including prohibitions against any unauthorized "take" of an Endangered or Threatened species. 16 U.S.C. § 1538(a). Section 7 of the ESA requires each Federal agency to ensure that any action it authorizes, funds, or carries out "is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). To achieve this objective, Agency "consultation" is required. *See* 16 U.S.C. § 1536; 50 C.F.R. §§ 402.03, 402.13, 402.14. In fulfilling the Consultation requirement under the ESA, each Agency "shall use the best scientific and commercial data available" in the Consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

Here, the native Hawai`ian orchids will be seriously impacted by "hitchhiking" alien pests that will arrive with the importation of finished, flowering *Phalaenopsis* spp. orchid plants *and* the sphagnum moss in which maturing *Phalaenopsis* spp. orchids are cultivated in Taiwan, sphagnum moss that will be allowed entry into Hawai`i with mature potted *Phalaenopsis* spp. orchid plants. These "hitchhiking" alien pests, once established in the outdoor environment of Hawai`i, will devastate the native Hawai`ian orchids. Hara Dec. ¶ 6. And this devastation falls squarely within the zone of interests protected by the ESA.

### REPLY MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## II. STANDARD OF REVIEW.

This case is brought under the citizen suit provisions of the ESA, 16 U.S.C. § 1540(g). Because the ESA does not specify its own standard of review, judicial review is governed by Section 706 of

the Administrative Procedure Act. 5 U.S.C. §§ 702, 706(2)(A); *Carlton v. Babbitt*, 26 F. Supp. 2d 102, 106 (D.D.C. 1998).

Under the Administrative Procedure Act, a reviewing court may overturn Agency action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); s*ee also Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturer's Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983); s*ee also ALLTEL Corp. v. Federal Communications Commission*, 838 F.2d 551, 562 (D.C. Cir. 1988) (holding that the presumption of Agency expertise may be rebutted if Agency decisions are not reasoned).

Although a narrow review standard, judicial review under the Administrative Procedure Act does not shield an Agency from a "thorough, probing, in-depth review." *Center for Biological Diversity v. Lohn*, 296 F. Supp. 2d 1223, 1231 (W.D. Wash. 2003). An Agency seeking to justify its action may not offer a new explanation for the action, but must be judged on the rationale and record that led to the challenged decision. *City of Kansas City Missouri v. HUD*, 923 F.2d 188, 192 (D.C. Cir. 1991) ("arbitrary and capricious review . . . demands evidence of reasoned decision-making *at the agency level*; agency rationales developed for the first time during litigation do not serve as adequate substitutes"). In addition, when an Agency fails to articulate a rational connection between the facts found and the choice made, a reviewing court may not supply a reasoned

basis for the Agency's action that the Agency itself has not given. *American Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230, 251 (D.D.C. 2003).

### III. THE "BEST SCIENTIFIC AND COMMERCIAL DATA AVAILABLE" STANDARD.

Section 7 of the ESA prohibits Agencies from authorizing, funding or otherwise carrying out any action that is likely to "jeopardize" the continued existence of an Endangered or Threatened species, or result in the destruction or adverse modification of the designated critical habitat of such species. 16 U.S.C. § 1536(a)(2); *National Wildlife Federation v. Norton*, 332 F. Supp. 2d 170, 175 (D.D.C. 2004); *American Rivers*, *supra*, 271 F. Supp. 2d at 241. To discharge this duty, Agencies must consult with and obtain the assistance of, among others, the Secretary of Interior, acting through USFWS. *American Rivers*, *supra*, 271 F. Supp. 2d at 241.

In fulfilling this Consultation requirement, the ESA provides that "each agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); *Natural Resources Defense Council, Inc. v. Evans*, 364 F. Supp. 2d 1083, 1131 (N.D. Cal. 2003) (holding that the Agency must provide "all the best *available* relevant scientific data"). In addition, each Agency must support its conclusions with "ample" data and analysis, sufficient for a reasoned discussion of each issue. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992); *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988); *American Wildlands v. Norton*, 193 F. Supp. 2d 244, 256 (D.D.C. 2002).

In short, a reviewing court must consider whether an Agency "considered all the relevant Endangered Species Act factors and offered an explanation for its decision that is both 'plausible' and internally coherent." *Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946, 959 (9th Cir. 2005). Importantly, consultation cannot lawfully occur when an Agency has "selectively withheld" data

from USFWS during the required Consultation process. *Resources Limited, Inc. v. Robertson*, 35 F.3d 1300, 1304-05 (9th Cir. 1993).

## IV. APHIS WITHHELD KEY DOCUMENTS FROM USFWS, AND, IN DOING SO, VIOLATED THE ESA.

During the ESA Section 7 Consultation process, APHIS withheld highly relevant documents from USFWS concerning thrips—a "quarantine" pest associated with *Phalaenopsis* spp. orchids.[2] As discussed below, upon withholding these relevant documents, the required Consultation process was incomplete and did not use or disclose the "best science and commercial data available," this in violation of the ESA. 16 U.S.C. § 1536(a)(2).

By way of background, USFWS issued letters concurring with APHIS' determinations that importing *Phalaenopsis* spp. orchids from Taiwan in approved growing media would "not adversely affect" Federally-listed species or their designated critical habitat. AR 299, 2852. This concurrence was based on documents, correspondence and discussions between the two Agencies during the required Consultation process. Based on facts admitted by Defendants, however, the documents that APHIS provided to USFWS consisted only of the 1997 and 2003 Pest Risk Assessments (PRA), the required Biological Evaluation, and correspondence directly exchanged between the two Agencies.[3]

But the Administrative Record fails to reflect that during the ESA Section 7 Consultation process APHIS provided USFWS with the detailed Comment letters from both the Hawai`i Orchid

---

[2]   A "quarantine" pest is one where official quarantine action must be taken if the pest is intercepted by APHIS at a port of entry. AR 210.

[3]   See Defendants' Statement of Undisputed Material Facts, ¶¶8-10, 29-35, 37, 43-46, 48, 51, 53.

- 9 -

Growers and from HDOA.[4] In fact, Defendants *concede* that "it is not clear from the administrative record whether APHIS provided FWS the comments from plaintiff and the [HDOA] during the Section 7 process . . . ."[5] Defendants attempt to downplay the significance of APHIS' withholding of key documents from USFWS by asserting that even if APHIS did not share important Comment letters with USFWS, "plaintiff has failed to demonstrate the relevance in this case."[6]

The withheld Comment letters are highly relevant. They provide "the best scientific and commercial data available" concerning the threat of thrips infestation that will result by allowing importation from Taiwan finished, flowering *Phalaenopsis* spp. orchids in pots. Without such documentation, USFWS could not have made a proper determination of whether this proposed Rule would "adversely affect" Federally-listed species and their critical habitat. Because APHIS failed to provide USFWS with *all* the best available scientific and commercial data, the required Consultation was incomplete and in violation of the ESA.

### A. COMMENTS FROM THE HAWAI`I ORCHID GROWERS AND FROM HDOA PROVIDE THE BEST AVAILABLE SCIENTIFIC AND COMMERCIAL DATA REGARDING THRIPIDAE PESTS OF PHALAENOPSIS SPP. ORCHIDS, DATA NOT PROVIDED DURING THE CONSULTATION PROCESS BY APHIS TO USFWS.

Comment letters from the Hawai`i Orchid Growers (AR 162-261), and HDOA (AR 80-153), provided the best available scientific and commercial data concerning *Thripidae* pests of *Phalaenopsis* spp. orchids, and yet this data was not provided by APHIS to USFWS.

---

[4]    See Plaintiff's Statement of Material Facts, ¶29; and Defendants' Response to Plaintiffs' Statement of Material Facts ("Defendants' Response"), specifically, "Statement of Material Fact Number 29," at 56-57.
[5]    See Defendants' Memorandum in Support of Their Motions to Dismiss and/or for Summary Judgment, at 29.
[6]    See Defendants' Response, specifically, "Statement of Material Fact Number 29," at 57.

For example, the Hawai`i Orchid Growers Comment letter chronicled the fact that the 1997 PRA was based on an incomplete catalogue of quarantine pests. AR 164-165. The Comment letter was supported with a Report prepared by Dr. Arnold Hara. AR 220-227. In the 1997 PRA, Tables 1 and 2 show pest lists for *Phalaenopsis* spp. orchids from Taiwan. AR 204-210. These Tables were prepared based on data provided by Taiwan, on literature reviews, and on interception records at ports of entry. AR 210. As pointed out in both the Comment letter and in Dr. Hara's Report, the pest lists identify quarantine pests associated with *Phalaenopsis* spp. orchids from Taiwan, including four thrips that infest the *Orchidaceae* plant family, of which the *Phalaenopsis spp. orchid is a member*: (1) *Frankliniella intonsa*; (2) *Thripidae, sp.*; (3) *Thrips palmi*; and (4) *Tortricidae, sp.*[7] The 1997 PRA also confirmed that "[m]ultiple interception records exist" on *Thrips palmi*. Table 3 of the 1997 PRA identified quarantine pests of *Phalaenopsis* spp. orchids from Taiwan, including the previously identified thrips. AR 211. And both Comment letters explain that "orchids belong to one of the largest, most diverse, [plant] families . . ., which are attacked by pests with wide host ranges," and that *Orchidaceae* is "the largest family of flowering plants and still one of the least known."[8]

Despite this available scientific and commercial data, the 1997 PRA arbitrarily *limited* the quarantine pests likely to be included in commercial shipments of *Phalaenopsis* spp. orchids from Taiwan, and, in doing so, dismissed numerous quarantine pests, including thrips, from any further Risk Analysis. AR 212-215. The 2003 PRA followed this same flawed approach. See AR 1070, 1074-1082.

---

[7]  See AR 164-165, 205, 207, and 221-223.
[8]  See AR 90 (HDOA Comment letter), AR 164 (Hawai`i Orchid Growers Comment letter).

In response to these flawed Risk Analyses, Dr. Hara's Report explained that several of the identified quarantine pests of *Phalaenopsis* spp. orchids from Taiwan "are not host-specific to orchids" and will feed on many host plants. AR 222. Dr. Hara pointed out that "[i]n addition to *T. palmi*, five other thrips species are listed as quarantine pest[s] of *Phalaenopsis* orchids from Taiwan. . . ." AR 224. Dr. Hara further discussed the prospect of potted orchids providing an avenue for the movement of thrips to importing countries—as did orchid flowers from Thailand. AR 224. With this, Dr. Hara provided the following "example of the worldwide crisis of a pest species causing extensive global economic damage:"

> The quarantine pest of orchids from Taiwan and Thailand, *Thrips palmi*, was first described as a new species from Sumatra by Karny in 1952 on tobacco and considered an insect without economic importance for more than 50 years (Castineira et al. 1997). The emergence of *T. palmi* as a destructive pest was first observed in 1977 in the Philippines destroying watermelon and cotton, and in 1978 in Thailand destroying cotton (Hirose 1991). Simultaneously, *T. palmi* invaded Japan in 1978 and New Caledonia in 1979. In Hawaii, *T. palmi* was first observed in 1982 and devastated numerous vegetable crops. Nakahara et al. (1984) reported that *T. palmi* was commonly intercepted on cut orchid flowers from the Orient (Thailand). Subsequently, *T. palmi* spread to several other Indian and Pacific Ocean islands, the Caribbean (1985), into India, Northern Africa and more recently to Australia (1991) and the mainland USA (Florida, 1991) (Layland et al. 1994). AR 224-225.

Dr. Hara also noted that, more recently, numerous European Union members, including Italy, France, Germany, and Spain banned the import of Thailand orchids after it was discovered they were infested with *Thrips palmi*. Dr. Hara stated that large numbers of *Thrips palmi* have been imported regularly into Europe for several years on cut *Dendrobium* orchid flowers, particularly the white varieties. AR 174. Dr. Hara relied on published literature regarding the presence of *Thrips palmi* in Japan at latitudes of less than 34º north, which suggests that *Thrips palmi* has the potential to colonize not only tropical but also temperate regions. *Id.* Dr. Hara's Report provided numerous cited "references" to support his findings regarding *Thrips palmi*. AR 225-227. Neither

- 12 -

the Comment letters, Dr. Hara's Report, nor any of his cited references regarding thrips were provided during the ESA Section 7 Consultation process by APHIS to USFWS.

In 1998, USFWS provided its own Comment, that importing *Phalaenopsis* spp. orchids from Taiwan in growing media "may affect seven species of native orchids listed as endangered or threatened . . ., as well as numerous other federally listed plant species . . . [that] occur in 26 States plus Washington, D.C. and Puerto Rico." AR 267. Specific to the native Hawai`ian orchids, USFWS noted that importation of *Phalaenopsis* spp. orchids from Taiwan may affect one Hawai`ian orchid listed as an Endangered species and two other native Hawai`ian orchids that are considered species of concern. AR 40-41, 269. USFWS recommended that APHIS enter into Section 7 Consultations, as required by the ESA. AR 267. Approximately four years later, in October 2002, APHIS provided USFWS with the 1997 and 2003 PRAs and the required Biological Evaluation. AR 307. APHIS made *no* attempt to provide the USFWS with the Comment letters, Dr. Hara's Report, nor any of the scientific articles cited in Dr. Hara's Report, all of which represent the best *available* science on the subject.

Thereafter, during the ESA Section 7 Consultation process on March 21st, 2003, USFWS identified "two areas of residual concern" regarding the proposed importation from Taiwan of *Phalaenopsis* spp. orchids in growing media. One such concern related directly to "several species of quarantine pest thrips."[9] AR 308. In its letter to APHIS, USFWS said:

> It is not clear why the several species of quarantine pest thrips were eliminated from consideration as pests that are likely to follow the importation pathway. The phytosanitary measures do not appear to adequately address the potential for infestation of thrips, resulting in a substantial risk of the organisms entering greenhouse units, openings, and

---

[9]    By then, APHIS had narrowed application of the proposed Rule to "tissue culture and greenhouse-grown *Phalaenopsis* orchids in approved growing media" from Taiwan only. AR 350, 412.

vent coverings. Specifically, the prescribed screening mesh size does not appear fine enough to exclude thrips from growing areas. Please provide an explanation why these species of thrips were dropped from the list of quarantine pests, and the rationale for the prescribed screening mesh size. AR 308.

At a meeting held between the two Agencies on April 2nd-3rd, 2003, APHIS responded to this "residual concern" as follows:

> Thrips is a pest of Orchidaceae in Taiwan; however, there is no evidence in either the scientific literature or from the interceptions at APHIS plant inspection stations that thrips is a pest on *Phalaenopsis*. PPQ ran a search on their database for thrips interceptions on *Phalaenopsis* from Taiwan. No interceptions turned up. . . . *Phalaenopsis* has been imported bare root into the United States for at least 20 years. During that time no problems with pests on *Phalaenopsis* have arisen. The importation has amounted to a long-term uncontrolled experiment. AR 305.

On April 3rd, 2003 APHIS also responded to this "residual concern" in a letter to USFWS as follows:

> The thrips identified in the pest risk assessment (PRA) were not considered for several reasons. The extensive literature searches APHIS conducted revealed that none of the thrips identified in the PRA have ever been reported on Phalaenopsis. Furthermore, a review of pest interceptions made over the past eight years on bare-rooted Phalaenopsis plants from Taiwan show that thrips have not been intercepted. . . . AR 301.

APHIS took too narrow a view in responding to USFWS' concerns regarding thrips. As discussed below, APHIS provided circular responses to USFWS' concerns about eliminating several species of quarantine pest thrips from further consideration in the PRAs. APHIS also never adequately provided the "rationale" requested by USFWS concerning the prescribed screen mesh size for orchid greenhouses in Taiwan. Absent adequate responses to USFWS' concerns, APHIS failed to provide USFWS with all the best available scientific and commercial data. As a result, the risk of invasion by *Thripidae* pests of *Phalaenopsis* spp. orchids remains alarmingly high.

- 14 -

B.  THE ISSUE OF THRIPS INFESTATION WAS NOT ADEQUATELY ADDRESSED BY APHIS OR BY USFWS.

In response to USFWS' plainly-stated request to explain *why* several species of quarantine pest thrips were eliminated from consideration in both the 1997 and 2003 PRAs, APHIS provided circular responses that ducked altogether the thrips infestation issue. Doing so, APHIS also misdirected USFWS about the threat of thrips infestation resulting from importing from Taiwan potted *Phalaenopsis spp.* orchids by not providing *all* available and relevant scientific and commercial data. Without such data, USFWS could not, and did not, adequately fulfill its mandatory duty to use "the best scientific and commercial data available" in assessing whether this proposed Federal action would adversely affect listed species or their critical habitat. 16 U.S.C. § 1536-(a)(2); *Natural Resources Defense Council*, *supra*, 364 F. Supp. 2d at 1131-32.

At the outset, APHIS *conceded* that the thrips identified in the PRAs were *not* considered.[10] The initial justification offered by APHIS was that the literature searches it conducted did not show that the thrips identified in the PRAs were ever reported on *Phalaenopsis* spp. orchids. This defies logic.

Both the 1997 and 2003 PRAs identified numerous thrips species as quarantine pests associated with *Phalaenopsis* spp. orchids from Taiwan. AR 205, 207, 210, 1077-1078, 1080-1081. All orchids, including *Phalaenopsis* spp. orchids from Taiwan, belong to the *Orchidaceae* family, and this is one of the largest, and the most diverse, family of flowering plants. AR 90, 164. "A conservative estimate would be [that] more than 15,000 species and nearly a thousand genera" belong to the *Orchidaceae* family. AR 90. The *Phalaenopsis* spp. orchid is a genus belonging to the

---

[10]  See AR 301 ("The thrips identified in the pest risk assessment . . . were not considered. . . .").

*Orchidaceae* family.[11] AR 90. Neither the records provided by Taiwan, nor APHIS' interception records, would necessarily call out the specific genus, *Phalaenopsis* spp. orchids, as opposed to the broader *Orchidaceae* family of orchid plants. The 1997 PRA supports this. The PRA identifies several quarantine pest thrips on *Orchidaceae*. AR 205, 207. According to the PRA, "[t]he host, '*Orchidaceae*' is used for orchids which were not identified to genus at time of pest interception." AR 210. This, of course, is understandable. It is not documented in the Administrative Record that enforcement officials conducting inspections at ports of entry and making interception records are trained biologists that could necessarily classify a particular orchid plant as to its genus.

Second, as pointed out by Dr. Hara, several quarantine pests of *Phalaenopsis* spp. orchids from Taiwan are not host-specific to orchids. AR 222. Such pests will feed on many different host plants, including the broader *Orchidaceae* family of flowering orchid plants. AR 205, 207, 210, 1077-1078.

Third, APHIS asserts that *Phalaenopsis* spp. orchids have been imported bare-root from Taiwan for at least twenty years, and, during this time, "no problems with pests on *Phalaenopsis* have arisen." AR 305. But the interception records likely would not have keyed thrips-infested *Orchidaceae* in such records to the genus *Phalaenopsis*. And the 1997 PRA makes it clear that several thrips species have infested *Orchidaceae*, and that the term "*Orchidaceae*" is used for orchids that are not identified to genus at the time of pest interceptions at ports of entry. AR 399. As such, there is a reasonable link between thrips-infested *Orchidaceae* and the genus *Phalaenopsis* that has been ignored.

---

[11]    The term "genus" means the usual major subdivision of a biological family or subfamily in the classification of organisms, usually consisting of more than one species. Random House WEBSTER'S COLLEGE DICTIONARY, 2d Ed. 1997, at 542.

Finally, HDOA's Comment letter explained to APHIS that the plant family *Orchidaceae* is considered a high pest-risk, requiring State-mandated sixty-day quarantine. AR 117-118. The Comment letter further explained that since 1953, HDOA has routinely intercepted pests in shipments of high-risk bare-rooted orchid seedlings (AR 37), pests that were detected while the bare-rooted orchid seedlings were held in State-mandated sixty-day quarantine. AR 86-87. These same shipments had been examined and passed by inspectors of the exporting country, as well as by APHIS, before moving into State-mandated quarantine. AR 87. HDOA's pest interceptions on these orchid plants showed that while they were held under HDOA's sixty-day quarantine, they developed larger, observable pest populations not detected, or detectable, in previous inspections. AR 87-88.

In addition, in 1993 HDOA's pest interceptions on 50,000 bare-rooted *Phalaenopsis* spp. orchids imported from Taiwan into Hawai`i illustrated obvious flaws in APHIS' port-of-entry inspections. See AR 89. Here, even after APHIS' port-of-entry inspections, HDOA's inspectors intercepted additional pests on *Phalaenopsis* spp. orchids imported from Taiwan, while these plants were held in State-mandated sixty-day quarantine. *Id*. Now, however, under the Final Rule, no State-mandated quarantine procedures are permitted, because APHIS has announced that the Final Rule *preempts* State regulations. AR 1539.

In short, in logical terms, when records show that several species of thrips have been documented on the larger *Orchidaceae* plant family, then the *Phalaenopsis* orchid genus, or subfamily, is necessarily a part of the same orchid family that is at high risk of thrips infestation, especially since thrips are not host-specific. APHIS cannot get around USFWS' concerns by proclaiming that it need not conduct a risk analysis where such pests have not been "specifically linked" only

- 17 -

to the genus *Phalaenopsis*. The "link" has been made to the larger *Orchidaceae* family—where numerous records exist of thrips infestation. AR 205, 207, 210.

C.    **THE ISSUE OF APPROPRIATE SCREEN MESH SIZE FOR THE PROGRAM GREENHOUSES WAS SWEPT UNDER THE RUG.**

In its Section 7 Consultation correspondence, USFWS pointed out that the "phytosanitary measures do not appear to adequately address the potential for infestation of thrips, resulting in a substantial risk of the organisms entering greenhouse units, openings, and vent coverings." AR 308. USFWS opined that "the prescribed screening mesh size does not appear fine enough to exclude thrips from growing areas." *Id*. USFWS' request was simple enough. It only asked that APHIS "provide . . . the rationale for the prescribed screening mesh size," as it relates to thrips. *Id*. But as explained below, APHIS, again, misdirected USFWS on the issue of the appropriate screen mesh size for the program greenhouses adequate to preclude thrips infestation. In doing so, APHIS failed to provide all available scientific and commercial data, likely because there was no adequate response to USFWS' concerns other than a reduction in screen mesh size. Instead, APHIS simply swept the issue under the rug.

First, in April 2003, in response to USFWS' inquiry regarding the appropriate screen mesh size to preclude thrips from infesting greenhouses in Taiwan where *Phalaenopsis* spp. orchids were to be grown over a period of some twelve months, APHIS said that proposed greenhouse exclusionary measures, including screening, *is* sufficient to prevent thrips and other pests from entering the program greenhouses:

> In addition, required greenhouse pest exclusionary measures such as the use of air-curtains, double doors, and *screening prevent the introduction of various pests, including thrips*, from entering the greenhouse. AR 301 (Emphasis added).

- 18 -

Despite such representations, APHIS had said in earlier Consultation meetings with USFWS that "0.6 mm mesh size is *not* sufficient to exclude thrips." AR 305 (Emphasis added). Again, USFWS was not provided with the Hawai`i Orchid Growers and HDOA Comment letters. As a result, USFWS could not answer its own inquiry about a screen mesh size that would be sufficient to preclude thrips from infesting greenhouses in Taiwan where *Phalaenopsis* spp. orchids are grown-out as finished, flowering plants.

The conditions required by 7 C.F.R. § 319.37-8(e) for program greenhouses in which plants are cultivated in an approved growing medium include requirements that the greenhouse "must have screening with openings of not more than 0.6 mm . . . on all vents and openings. . . ." 7 C.F.R. § 319.37-8(e)(2)(ii). However, the Hawai`i Orchid Growers Comment letter and Dr. Hara's Report *confirm* that this required 0.6 mm opening will *not* exclude quarantine pests of *Phalaenopsis* spp. orchids, including, among others, *Thrips palmi*. AR 166, 223. Dr. Hara's opinions are based on published scientific research referenced in his Report.[12] The HDOA Comments also noted that greenhouses with screens and automatic doors are not impermeable to all insects, and a screen of 0.6 mm mesh is "certainly insufficient" to exclude several pests that can easily penetrate this screen mesh. AR 83. The HDOA pointed out that thrips and other pests are of "minute size" and they can hide in the potted plant material and in unopened buds. AR 81-82. Nonetheless, without support, APHIS asserted repeatedly that "the risk" of *Phalaenopsis* spp. orchids grown in pots of sphagnum moss "under modern conditions in [an] approved media is no greater than that posed by . . . orchid material currently allowed entry as bareroot plants or in other approved . . . growing media. . . ." AR 215. There can be no support for this statement—

---

[12]    See AR 223, 225 (specifically, Bethke, *et al.* 1994).

after having conceded that this mesh size is insufficient to preclude thrips and other pests from these program greenhouses.

The Final Rule itself is perhaps the best evidence showing how APHIS avoided altogether Comments confirming that screens of 0.6 mm mesh are inadequate to keep out *Thrips palmi* and other pests. AR 1535-1536. After summarizing Comments that *Thrips palmi* and other pests will not be excluded using 0.6 mm screens, APHIS took the position that the screen size required under the regulations in 7 C.F.R. § 319.37-8(e) "is sufficient to exclude all life stages of all quarantine pests of *Phalaenopsis* . . . orchids identified in our risk analysis. . . ." AR 1536. The problem, of course, with this statement is that APHIS *excluded* several species of thrips from further consideration in these Risk Analyses. See AR 210-212, 1070, 1074-1082. The Risk Analyses, in fact, were limited to only a handful of quarantine pests. AR 210 (Table 2); AR 1082 (Table 3). By necessarily limiting its discussion in the Final Rule only to those quarantine pests identified in these Risk Analyses, APHIS avoided completely the issue of the adequacy of the screen mesh to preclude thrips and other pests from invading the program greenhouses in Taiwan where *Phalaenopsis* spp. orchids are grown-out as finished, flowering, orchid plants.

D.    THE RE-INITIATION OF ESA CONSULTATIONS AGAIN RAISED QUESTIONS ABOUT THE ADEQUACY OF THE SCREEN MESH SIZE FOR THE PROGRAM GREENHOUSES, AND, AGAIN, APHIS OBFUSCATED THE ISSUE.

In October 2003, APHIS re-initiated ESA Consultations with USFWS. AR 2733-35. As part of this re-opening of Consultations, USFWS again raised questions about the adequacy of the screening for the program greenhouses in Taiwan. Specifically, USFWS stated:

We had understood during the interagency discussions and subsequent agreement that *0.6 mm mesh size for greenhouse, opening, and vent screening was inadequate to prevent the introductions of thrips infestations into APHIS-approved greenhouses*, and that 0.4 mm mesh size or less would be used. Using the smaller mesh screen size would provide

- 20 -

an additional degree of insurance against an infestation of thrips and reduce the potential for importing thrips into the United States. Please explain *how* requiring use of 0.6 mm mesh will prevent thrips introductions. AR 2738 (Emphasis added).

On June 2nd, 2004, APHIS responded to USFWS' inquiry regarding screening by claiming there was a "misunderstanding" between the Agencies, and conceding, again, that thrips could get through the required 0.6 mm screen mesh for the program greenhouses. AR 2743-2744. Nonetheless, APHIS maintained its position that a 0.6 mm mesh size "is the most practical," and promised to incorporate mitigation measures, "including routine or repeated pesticide sprays, when warranted, to reduce the risk of infestation and possible introduction of thrips into the United States." *Id*. Specifically, APHIS responded as follows:

> Regarding the comment that FWS understood from our discussions that [APHIS] would require a mesh size smaller than 0.6 mm for the greenhouse, opening, and vent screenings to prevent the introductions of thrips infestations into APHIS-approved greenhouses, [APHIS] assumes that this was a *misunderstanding*. [APHIS] recognizes that thrips are very small insects, approximately 0.2 mm, and could get in through even the 0.4 mm mesh size suggested by FWS. Mesh size of 0.6 mm *is the most practical* for many situations; smaller mesh sizes would require adapting greenhouse construction to accommodate the need for air circulation and cooling fans, especially in more humid climates. However, [APHIS] incorporates specific *equivalent mitigation measures, including* routine or repeated *pesticide sprays*, when warranted, to reduce the risk of infestation and possible introduction of *thrips* into the United States. *Id*. (Emphasis added).

In other words, as stated above, requiring greenhouse screens smaller than 0.6 mm would require changes in greenhouse construction, and, therefore, APHIS decided to maintain a mesh size of 0.6 mm, but to require specific mitigation, including "routine or repeated pesticide sprays." The problem with this response is two-fold.

First, APHIS in essence admits that its selection of mesh size for the screening in the program greenhouses is based on economic concerns, not on any concern for the prevention of pest-infes-

- 21 -

tation in such greenhouses. Second, APHIS' promise of mitigation—pesticide sprays—to reduce the risk of infestation, including thrips, is a promise that was not kept, and cannot be kept.

Given that the Final Rule was published in the FEDERAL REGISTER on May 5th, 2004 (AR 1524), and given that APHIS' promise of mitigation was made about a month later, on June 2nd, 2004, it is no surprise that the Final Rule contains *no* mitigation requirement for "pesticide sprays." In fact, in the Final Rule, APHIS *admits* that its regulations "do not require any specific pest-control measures such as pesticide applications to be applied in the greenhouse." AR 1538. This is clearly arbitrary and capricious: APHIS made no effort to ensure that adequate mitigation actions would indeed be taken. *American Rivers*, *supra*, 271 F. Supp. 2d at 253 ("A no jeopardy finding under the ESA must have a reasonable *certainty* of occurring, not just a reasonable chance").

In spite of APHIS' inherent inconsistencies and unenforceable promises, USFWS concurred, again, with APHIS' determination that the Final Rule allowing the importation from Taiwan of finished, flowering *Phalaenopsis* spp. orchid plants in pots is "not likely to adversely affect" Federally-listed species or designated critical habitat. AR 2852. USFWS provided this concurrence despite APHIS never having adequately explained to USFWS "*how* requiring use of 0.6 mm mesh will prevent thrips introductions." AAR 2738 (Emphasis added). As shown above, in fact, the best available scientific and commercial data confirms that the required mesh size is insufficient to preclude entry of thrips and other pests into the program greenhouses. Ignoring such data plainly violates the substantive provisions of the ESA. 16 U.S.C. § 1536(a)(2).

### E.    APHIS NEVER EVALUATED THE ACTION'S EFFECT ON CRITICAL HABITAT OF FEDERALLY-LISTED SPECIES.

APHIS wholly disregarded its mandatory duty to "insure" that its proposed Final Rule would not "result in the destruction or adverse modification of habitat" of any Endangered or Threaten-

ed species. 16 U.S.C. § 1536(a)(2). Section 7 of the ESA requires that an action Agency consider *not only* potential risks to listed species, *but also* potential risks to the critical habitat of such species. *Greenpeace v. National Marine Fisheries Service*, 80 F. Supp. 2d 1137, 1149 (W.D. Wash. 2000) ("The requirement that an agency evaluate the effects of its actions on critical habitat is mandatory under the ESA."); *see also Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173 (1978) ("One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act," quoting 16 U.S.C. § 1536(a)(2)).

APHIS' Biological Evaluation provided to USFWS was required to consider potential risks to the designated critical habitat of Federally-listed species posed by the importation from Taiwan of *Phalaenopsis* spp. orchids in approved growing media. 50 C.F.R. § 402.12(a). Such a Biological Assessment "*shall* evaluate the potential effects of the action on listed and proposed species *and designated and proposed critical habitat* and determine whether any such species *or habitat* are likely to be adversely affected . . ." *Id.* (Emphasis added). Consequently, this action by APHIS was arbitrary and capricious, and contrary to procedures required by law. 5 U.S.C. § 706. In addition, this action did not consider the relevant factors in its analysis and "entirely failed to consider an important aspect of the problem." *Motor Vehicle Manufacturer's Association*, *supra*, 463 U.S. at 43; *Marsh*, *supra*, 490 U.S. at 378.

The Biological Evaluation confirms that APHIS failed to conduct the required analysis. See AR 348, 364-366.[13] The Biological Evaluation focused on 1,259 Threatened, Endangered or proposed species. AR 350, 364-367. It considered all such species "potentially at-risk" as a result of

---

[13]    Also *compare* the Table of Contents of the Biological Evaluation, indicating an evaluation of "associated critical habitats," AR 349, with the actual text in Section IV, which deletes any reference to the evaluation of "associated critical habitats." AR 364.

the proposed importation of *Phalaenopsis* orchids from Taiwan. *Id.* It assumed that *Phalaenopsis* spp. orchid importation from Taiwan would occur in "the States, District of Columbia, Guam, Northern Mariana Islands, Puerto Rico and the Virgin Islands of the United States." AR 366. However, it failed to evaluate and determine whether the proposed importation of *Phalaenopsis* spp. orchids from Taiwan would result in destruction or adverse modification of the designated critical habitat of Federally-listed species. AR 367.

HDOA told APHIS about its concerns whether the proposed Rule would result in the destruction or adverse modification of a designated critical habitat of several Federally-listed species in Hawai`i:

> As a result of a federal court ruling, USFWS was ordered to propose critical habitat designations throughout Hawaii for 245 endangered plant species. . . . Once areas are designated as critical habitats, USFWS has federal regulatory oversight in order to ensure that actions will not likely result in the destruction and [adverse] modification of the critical habitat. . . . If USDA fails to identify pests in their pest risk assessments that would be detrimental to listed plants and animals as is the case in this risk assessment, and in doing so, allow importations that would increase the likelihood that invasive species will be introduced, establish, and harm listed species or cause more endemic species to be listed, or prevent listed plants to recover, Hawaii, as a state, will systematically lose more rights over its lands under this broad federal authority. AR 1049-1050.

But the Administrative Record is devoid of any evaluation of the potential risks of destroying or adversely modifying critical habitat of numerous Federally-listed species. That there was no such evaluation is perhaps explained by APHIS' failure to submit any Comments received during the Section 7 Consultation process. The lack of *any such* analysis on this critical issue in and of itself is a substantive violation. *Greenpeace*, *supra*, 80 F. Supp. 2d at 1149; 16 U.S.C. § 1536(a)(2).

**V.  USFWS VIOLATED THE ESA IN CONCURRING WITH APHIS THAT THE PROPOSED RULE WOULD "NOT ADVERSELY AFFECT" LISTED SPECIES AND THEIR HABITATS, WITHOUT CONDUCTING THE REQUIRED EVALUATION OF KNOWN PEST RISKS ASSOCIATED WITH THE GROWING MEDIA**

USFWS had a mandatory duty under the ESA to "insure" that actions carried out by another Federal Agency—here, APHIS—are not likely to "jeopardize" the continued existence of Federally-listed species or their critical habitat. 16 U.S.C. §1536(a)(2); *National Wildlife Federation*, *supra*, 332 F. Supp. 2d at 175. To fulfill this mandatory duty, Federal Agencies engage in the ESA Section 7 Consultation process in order to evaluate the effects of the proposed Federal action, and to determine whether or not the Agency action will have an "adverse affect." *Greenpeace*, *supra*, 80 F. Supp. 2d at 1149-1150 (remand where Agency failed to "meaningfully analyze" the risks to the species and the key issues); *American Wildlands v. Norton*, 193 F. Supp. 2d 244, 251-252, 256 (D.D.C. 2002) (Service acted arbitrarily and failed to "consider an important part of the problem" when it identified hybridization of trout as a threat to the species, but nonetheless included hybrid trout in population assessments for listing purposes).

In this case, USFWS acted arbitrarily in disregarding that duty and the record evidence of adverse affects on listed species and their habitats posed by high-risk pests in the sphagnum moss used in Taiwan to grow potted orchid plants prior to importation. In response, however, the USFWS asserts that it "considered" such affects and that is all that is required by law. (Def. Mot., p. 37-40.) On the contrary, when faced with such record evidence, the USFWS was required to extract from APHIS a biological assessment of the pest risks posed by importing not only the orchid plants, but also the moss used in Taiwan to grow them. There was no such evaluation. As such, there could be no valid USFWS "concurrence" under the ESA.

**A.  THE PROBLEM WAS IDENTIFIED, BUT NOT EVALUATED**

The undisputed Administrative Record confirms there are pest risks associated with growing media—even approved growing media like sphagnum moss. E.g., AR 1349. The Administrative Record established that sphagnum moss "is a living organism" that can host fungal pathogens. AR 785. The Administrative Record confirms that, with or without the APHIS general regulation

for certain plants in growing media (7 C.F.R. § 319.37-8(e)), potted orchids grown in sphagnum moss *do* pose greater pest risks than bare-rooted orchids. AR 220-221. For example, Comment letters from HDOA and Hawai`i Orchid Growers provided the following scientific data relevant to sphagnum moss concerns:

(a) Snails are known to occur subterranean on roots of potted orchids. Scientific literature has noted that *Sublina octona* and the bush snail *B. similaris*, occurring on orchids in Hawai`i, stunt potted orchid plants. "Snails have been intercepted on bare-rooted *Phalaenopsis* orchids from Taiwan." AR 221.

(b) "*Phalaenopsis* orchids potted in sphagnum moss provide an excellent habitat for the pupal or resting stage of certain quarantined pests. Cluster caterpillar, *S. litura* and larvae of other noctuid species primarily feed on leaves and pupate in soil or media (Schreiner 1998). Potted orchids in sphagnum moss provide a pupation medium for *S. litura* and other noctuid species." AR 221.

(c) "Six species of thrips that are listed as quarantine pests of *Phalaenopsis* orchids pupate in soil or media below the host plant (Lewis 1997), and these thrips species will not be excluded by modern growing conditions under 7 C.F.R. § 319.37-8." AR 221, 223.

(d) Mealybugs will occur and feed on roots of potted orchids and "[c]rawlers of *P. minor* will not be excluded by modern growing conditions under 7 C.F.R. § 319.37-8." AR 221, 223.

(e) Numerous plant diseases "may be overlooked in early stages of development in potted *Phalaenopsis* orchids." AR 221.

(f) Higher pest risks will occur when potted orchids are exported from Taiwan with flower spikes. Flower spikes increase pest risk "because they provide a habitat for thrips, blossom mites, blossom midges, and other blossom-infesting organisms." AR 168, 221.

As previously noted, the conditions required by 7 C.F.R. § 319.37-8(e) will not provide a pest-free production environment in greenhouses because the specified screening will not exclude quarantine pests of orchids, including, among others, *Thrips palmi*. AR 169, 221, 223. Importantly, APHIS concedes this undisputed fact. See, AR 2743-2744 (in response to USFWS' request to explain how use of 0.6 mm mesh will prevent thrips introduction, APHIS states that they

"recognize that thrips are very small insects, approximately 0.2 mm, and could get in through even the 0.4 mm mesh size suggested by FWS").

Further, as indicated in APHIS' change in policy for ants intercepted at United States ports of entry destined to Hawai`i (Am. Comp., Att. 5), APHIS has recognized the unique risk of importing exotic ants into Hawai`i because Hawai`i is particularly susceptible to herbivory predation and competition from ants. "This susceptibility is evidenced by a number of publications that document serious impacts caused by introduced ant species in Hawaii." *Id.* Notably, APHIS recognized in this policy change the risk of ants and the harm that imported ants have caused to Hawai`i, but then acknowledged the reality that "[a]nts are rarely intercepted with cargo imported into Hawaii." *Id.* Thus, as with other pests, importation of orchids with sphagnum moss will make it more difficult to detect the presence of ants than on bare root orchids. But, the Risk Assessments inappropriately fail to consider the risk of ants imported in potted flowering orchid plants in sphagnum moss.

In addition, the Record confirms that "[e]ach orchid-growing area of the world has a unique pest species complex." AR 224. Thus, the required pest risk evaluation for plants established in growing media (7 C.F.R. § 319.37-8(g)) should have evaluated not only the imported plant itself, but also the growing media used to establish the potted plants in each exporting country—in this case, Taiwan. *Id.* The PRA also should have accounted for, and developed, that country's unique mitigation measures to minimize and manage pest risks. *Id.*

For example, even the use of "sterilized or pasteurized sphagnum moss as a growing medium is not without risk. Use of treated sphagnum moss as a growing medium in Taiwan can also vector a 'hitch-hiker,' [the] blood-sucking midge, *Forcipomyia taiwana*." AR 786. "Damp absorbent material (such as sphagnum, other mosses, and wood chips) used to transport cut flowers and other fresh plant and animal material can harbor [immature midges] as well as many other pests." Am. Comp., Att. 1, at 9.

- 27 -

Just as the required 0.6 mm screens in greenhouses for purported "pest exclusionary" measures will not exclude thrips, quarantine pests of *Phalaenopsis* orchids in Taiwan, or the mealybug, *Planococcus minor*; the required screening will not exclude adult or immature midges. AR 786-787. Biting midges are "members of the *Ceratopogonidae* family," and a member of the *Culicoides* genus, and they "live in moist substrates, such as sphagnum." AR 1043. "Taiwan has many species of *ceratopogonids*. At least 30 *Culicoides* species are found in Taiwan. . . . Dr. Howarth of Bishop Museum predicts that there are over 50 *Culicoides* species in Taiwan of which ten to fifteen would become serious environmental or veterinary pests and two or three could become serious nuisances for humans in Hawaii. (Howarth, 2003.) **There are no *Culicoides* in Hawaii** (Nishida, 2002)." (Emphasis in original.) AR 1043-1044, 1045. Some "*Culicoides* aestivate as dry immatures and can rehydrate and emerge when moistened. This . . . allows for efficient long-distance dispersal in untreated material." Am. Comp., Att. 1, at 9. "High risk material also may include cut flowers and other living plant material, particularly from high risk areas." *Id*. "Given the tiny size, cryptic behavior and high mobility," *Culicoides* are difficult to control or eradicate once established; therefore, "greater reliance must be placed on prevention." *Id*.

With all this available scientific data, the risks specific to Taiwan that are posed by not only the importing of *Phalaenopsis* orchids, but also the sphagnum moss used in the potted orchids were required to be evaluated. The APHIS-prepared PRAs identified the problem, but did not evaluate these known pest risks. More importantly, neither USFWS nor APHIS evaluated pest risks in this growing media to determine if there would be "adverse affects" on Federally-listed species and their critical habitat, as required by the ESA. This omission constitutes a violation of the ESA.

## B.  THE PRAS ALSO IDENTIFIED THE PROBLEM

The APHIS-prepared 1997 PRA is at the heart of this issue. See, AR 1349, 1350. The Assessment concedes that the importation of live potted *Phalaenopsis* orchid plants from Taiwan in sphagnum moss is a "potential pathway for introduction of plant pests." AR 1349.

In response to that identified concern, in 1998, USFWS focused on the pest risks associated not only with the *Phalaenopsis* orchids themselves, but also the sphagnum moss as a breeding habitat for high risk pests that could adversely affect listed species and their designated habitat. For example, USFWS expressed "concern" to APHIS that the importation of potted orchids in growing media (*e.g.*, sphagnum moss) "may affect three species of native Hawaiian orchids; one is listed as endangered, and two are considered to be species of concern." AR 40. USFWS also advised APHIS that "[t]he importation of sphagnum moss could be detrimental" to the three native Hawai`ian orchids "by altering the critical conditions required by Hawaiian orchid for successful germination, growth, and reproduction." *Id.* USFWS explained further that "[t]his could come about through the introduction of . . . alien arthropods, snails, and fungi that have been identified in the risk assessment conducted by APHIS . . . ." *Id.* USFWS advised APHIS that "the employment of sphagnum or any other moss as growth or rooting medium could significantly increase the transmission of alien species into Hawaii." AR 41. "These alien species may represent a direct threat to Hawaii's endangered orchid species and could contribute to the endangerment of the [Hawaiian] orchids that are species of concern." *Id.*

Thereafter, in 1998, USFWS alerted APHIS that "[f]ederally listed endangered or threatened orchids and their habitats may be attractive to alien species that could accompany the importation of orchids in moss or [other] growing media." AR 267. USFWS advised APHIS that impacts to Hawai`i's native orchids (including species of concern), and approximately 319 additional unlisted orchid species throughout the mainland United States and Puerto Rico, "may be affected by the alien species or diseases that could be imported in moss orchid medium." *Id.*

### C.  APHIS Relied On The Existing Regulatory Program As The Exclusive Method To Resolve Legitimate Concerns

Despite legitimate concerns expressed by USFWS and others, the APHIS-prepared 1997 and 2003 PRAs did not evaluate the risks posed by growing media. See, AR 1537 ("The risk posed by

growing media in and of itself was not considered in the risk assessment . . . ."). Instead, APHIS

relied on an exception in its general regulation that authorizes the importing of "nursery stock"

established in approved growing media, including sphagnum moss. AR 1349; 7 C.F.R. § 319.37-

8(e)(1). In addition, APHIS did not adopt in the Final Rule any specific phytosanitary measures

beyond the general program requirements contained in 7 C.F.R. §319.37-8(e). See AR 1525.

If sphagnum moss is used as a growing medium, the only general program requirement, and

the only requirement applicable here, is that this moss "must not have been previously used." 7

C.F.R. § 319.37-8(e)(1). However, the Administrative Record, including Comments from US-

FWS and others, establishes that these general program requirements are not sufficient, and there

is a need to evaluate the growing medium itself as a breeding habitat for a variety of high-risk

pests. E.g., AR 168-169, 267-268, 785-788, 1043-1047.

### D. NO BIOLOGICAL EVALUATION WAS CONDUCTED TO ADDRESS THE PROBLEM; NONETHELESS, USFWS CONCURRED IN APHIS' "NO ADVERSE AFFECT" DETERMINATION

In response to the concerns expressed by USFWS, APHIS initiated an ESA Section 7 Consul-

tation in 2002. AR 330. At that time, USFWS required APHIS to prepare a biological assessment

evaluating the proposed rule and its potential effects on Federally-listed and proposed species

and designated and proposed critical habitat. *Id.*; 50 C.F.R. § 402.12(a).

The APHIS-prepared Biological Evaluation, along with the 1997 PRA, were sent to USFWS

for consideration. AR 347, 387. The Biological Evaluation considered potential risks to listed and

other species posed by the proposed Rule. AR 348. However, neither the Biological Evaluation,

nor the attached 1997 PRA considered or evaluated pest risks posed by the growing media (*e.g.*,

sphagnum moss) in and of itself. AR 364-371; 1537. To justify this gaping hole in the analysis,

APHIS relied only on the fact that sphagnum moss is an approved growing medium under

current plant program regulations. 7 C.F.R. § 319.37-8(e). AR 1537. This rationale, however, is

not a substitute for the mandate to prepare a biological assessment evaluating potential effects on

- 30 -

listed and proposed species and designated and proposed critical habitat, including potential pest risks posed by the growing medium itself. See 50 C.F.R. § 02.12; *Pacific Coast Federation of Fishermen's Associations v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d 1228, 1240-1247 (N.D. Cal. 2001).

Despite no analysis of the risks posed by the entry of pests in growing media, USFWS, nonetheless, concurred in APHIS' "no adverse affect" determination. AR 299, 2852. The USFWS' concurrence failed to "consider an important part of the problem" associated with the proposed rule. The problem is the significant risks to listed species and their critical habitats posed by pests known to exist in the sphagnum moss used in the potted orchid plants. *American Wildlands*, *supra*, 193 F. Supp. 2d at 256. This problem cannot be swept under the rug by either USFWS or APHIS, relying solely on the following to justify a significant omission in the required biological analysis:

> At present, we have no reason to believe that unused sphagnum moss that is produced according to standard industry practice presents any risk of pest introduction in and of itself, nor does it behave as a weed.[14] AR 1538.

All the relevant and available scientific data presented by USFWS itself and in Comment letters by others raised a "reason to believe" that even unused sphagnum moss presented a high risk of introducing pests to the U.S., including Hawai`i. That data also raised a "reason to believe" that the specific growing practices in Taiwan greenhouses should be evaluated and mitigated to preclude pest infestation from not only the orchid plants, but also from the live sphagnum moss used to establish the flowering orchid plants. In light of the available scientific data presented, USFWS had no legitimate basis for concurring with APHIS' "no adverse affect" determination, particularly where, as here, the biological evaluation did not assess all known pest risks from both the plant and the growing media.

---

[14]    On the contrary, the Record established the fact that "in Taiwan, as in Hawaii, the quality of unused sphagnum moss is not uniform. Some sphagnum moss has viable weed seeds mixed within it, and these weed seeds sprout and grow after the orchids are potted." AR 167-168.

In opposing Hawai`i Orchid Growers' motion, USFWS responds that it "considered" such risks and cites to a list of documents that have *identified* the risk of the sphagnum moss. (Def. Mot., p. 37-40.) However, merely identifying the risk does not relieve USFWS of its duty to evaluate the effects of the proposed Federal action. And, USFWS has not, nor can it, point to any analysis that it considered regarding the pest risks associated with the sphagnum moss. Despite being faced with substantial record evidence identifying the risks associated with sphagnum moss, USFWS still concurred with APHIS' "no adverse affect" determination. Such concurrence ignored an "important part of the problem" and consequently, was arbitrary and capricious.

With aloha,

/s/ Cyrus E. Phillips, IV

_____
Cyrus E. Phillips, IV
D.C. Bar Number 456500
May 3rd, 2006

1828 L Street, N.W., Suite 660
Washington, D.C. 20036-5112
Telephone:      (202) 466-7008
Facsimile:      (202) 466-7009

Electronic Mail:    *lawyer@procurement-lawyer.com*

Attorney of record for Plaintiffs,
Hawai`i Orchid Growers Association.

- 32 -

CERTIFICATE OF SERVICE

I hereby certify that on Wednesday, May 3rd, 2006 a true and complete copy of this Opposition to Defendants' Motion to Dismiss and Reply Memorandum of Points and Authorities was filed electronically via the Court's Electronic Case Filing System, through which notice of the filing will be sent to:

Donna S. Fitzgerald, Esq.

Electronic Mail:     donna.fitzgerald@usdoj.gov

Attorney of record for Defendants,
United States Department of Agriculture, *et al.*,
and United States Department of the Interior, *et al.*

/s/ Cyrus E. Phillips, IV

_____
Cyrus E. Phillips, IV

- 33 -