# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAWAI'I ORCHID GROWERS ASSOCIATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 05-1182 (RCL) |
| | ) |
| | ) |
| UNITED STATES DEPARTMENT OF AGRICULTURE; | ) |
| MIKE JOHANNS, SECRETARY OF AGRICULTURE; | ) |
| W. RON DEHAVEN, ADMINISTRATOR, ANIMAL | ) |
| AND PLANT HEALTH INSPECTION SERVICE; | ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR; | ) |
| GALE NORTON, SECRETARY OF THE INTERIOR; | ) |
| MATTHEW J. HOGAN, ACTING DIRECTOR, UNITED | ) |
| STATES FISH AND WILDLIFE SERVICE, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTIONS TO DISMISS AND/OR FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Defendants hereby file this reply brief in support of their motions to dismiss and/or for

summary judgment.  As explained in defendants' opening brief, plaintiff lacks Article III

standing to pursue its case in this Court.  Even if plaintiff had standing, however, plaintiff has

failed to demonstrate that either Animal and Plant Health Inspection Service ("APHIS") or the

United States Fish and Wildlife Service ("FWS") violated the Endangered Species Act, 16

U.S.C. §§ 1531 et seq. with respect to APHIS's 2004 Final Rule.  That rule amended regulations

governing the importation of plants and plant products to add orchids of the genus Phalaenopsis

(orchids) from Taiwan to the list of plants that may be imported in an approved growing

medium, subject to specified growing, inspection, and certification requirements.  Final Rule, 69

Fed. Reg. 24,916 (May 5, 2004).  In promulgating that rule, APHIS and FWS engaged in

consultation pursuant to Section 7 of the ESA, 16 U.S.C. § 1536, to assess the potential effects of the proposed rule on endangered or threatened species.  See e.g., Administrative Record ("AR") 330.  APHIS determined that its proposed rule may effect, but would not likely adversely effect threatened or endangered species, AR 371, and FWS concurred.  AR 299; AR 2125 (September 1, 2004 Letter from Gary Frazer, FWS to Michael Lidsky, APHIS concluding programmatic consultation).  See also Defendants' Memo. In Support of their Motions to Dismiss and for Summary Judgment (hereinafter, "Defs. Opening Br.") at 14-21.  Plaintiff has failed to demonstrate that either APHIS or FWS were arbitrary or capricious here.

## II. ARGUMENT

### A. PLAINTIFF LACKS THE REQUISITE ARTICLE III STANDING.

As explained in defendants' opening brief, plaintiff lacks the requisite Article III standing to bring this case.  Defs. Opening Br. at 22-26.  In its response brief, plaintiff contends it has associational standing, based on the premise that the importation of the orchids will also allow the importation of pests that will attack the three species of native Hawaiian orchids, one of which is endangered and the other two of which are "species of concern."  Pl. Combined Opposition to Defendants' Motions to Dismiss and for Summary Judgment, and Reply Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment (hereinafter, "Pl. Resp. Memo.") at 1-2.

Plaintiff contends it will be impacted because its members have the "opportunity to observe native Hawaiian orchids each day," and because its members will be required to outfit their greenhouses with expensive shields to exclude the pests that will allegedly hitchhike into Hawaii with the imported orchids and their growing medium.  Pl. Resp. Memo. at 6 (citing Hara

Decl. at ¶ 6).[1/]

There are several problems with plaintiff's argument.  First, plaintiff has failed to provide the requisite support for its claim of associational standing.  An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests the organization seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977); Fund Democracy, LLC v. Securities and Exchange Comm'n, 278 F.3d 21, 25 (D.C. Cir. 2002).  Determination of whether any of HOGA's members would have standing to sue in his or her own right requires that at least one member demonstrate actual or imminent injury in fact that is fairly traceable to the challenged decision and likely to be redressed by a favorable decision.  National Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1435 (D.C. Cir. 1995) (internal quotation marks and citations omitted).

Moreover, to meet the standing requirements under the ESA, plaintiff must demonstrate that listed species are in fact threatened by the proposed federal action, and that plaintiff will be directly affected aside from any general interest in the subject matter.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 562-63 (1992) (the injury-in-fact test requires "more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured.")

---

[1/]Defendants have filed a separate motion to strike the Hara declaration, as it goes beyond attempting to establish standing, and seeks to improperly add purportedly "expert" testimony, which is extra-record, to challenge the merits of APHIS's decision-making.  See DEFENDANTS' MOTION TO STRIKE THE DECLARATION OF DR. ARNOLD HARA SUBMITTED WITH PLAINTIFF'S COMBINED RESPONSE/REPLY BRIEF and supporting memorandum.

(internal quotation marks and cit. omitted); accord, Defenders of Wildlife v. Norton, 257 F.

Supp. 2d 53, 62 (D.D.C. 2003); see also Mountain States Legal Foundation v. Glickman, 92 F.3d

1228, 1236-37 (D.C. Cir. 1996) (noting that a plaintiff must at least demonstrate an interest that

is "directly affected" by the government action to survive a motion to dismiss for lack of

standing) (internal quotations omitted).

Plaintiff fails to demonstrate a concrete and particular injury to itself.  For example, while

plaintiff relies on Dr. Hara's declaration to assert that importation of the orchids  will harm

"[g]rowers of potted epiphytic orchids," Hara Decl. at ¶ 6, Dr. Hara does not explain whether

any those growers are a member of plaintiff.  In fact, Dr. Hara's declaration does not establish

that he is a member of plaintiff.  Id.

Likewise, while plaintiff has attached the declaration of a current member of HOGA,

nothing in the declaration establishes any actual or imminent injury to plaintiff that is traceable

to the importation of the orchids from Taiwan, pursuant to APHIS's regulation.  Instead, Mr.

Zeller's declaration provides second-hand information received about the three species of native

Hawaiian orchids, and then explains that another organization that he belongs to, the Kona

Orchid Society's Conservation Committee ("Committee"), attempted to pollinate one of the two

species that is of special concern, Anoectochilus sandvicensis.  Zeller Decl. at ¶¶ 1, 4.  Mr. Zeller

explains the Committee's technique for collecting the orchid from Hawaii Volcanoes National

Park, their unsuccessful efforts at pollinating the orchids in the laboratory, and their unsuccessful

request to local hunters to find the plant in more remote areas.  Id. at ¶¶ 3-4.  Mr. Zeller

concludes that the Committee will have to seek a permit to hike back into Hawaii Volcanoes

National Park to obtain more seeds.  Id. at ¶ 3.

4

Plaintiff contends that Mr. Zeller's declaration is sufficient to establish standing because it purportedly demonstrates that it is difficult to propagate Anoectochilus sandvicensis, and therefore, plaintiff has demonstrated the requisite "aesthetic interest." Pl. Resp. Br. at 4 (citing American Soc'y for the Prevention of Cruelty to Animals v. Ringling Brothers, 317 F.3d 334, 336-37 (D.C. Cir. 2003)). On the contrary, nothing in the declaration explains any harm to plaintiff or any of its members that can be traced to the importation of the orchids from Taiwan pursuant to APHIS's Final Rule.[2] Nothing in Mr. Zeller's declaration establishes that he, or any other member of HOGA, has suffered a concrete and particular harm due to APHIS's rule allowing the imports of orchids from Taiwan in approved growing media.

Finally, while plaintiff contends that its members have the opportunity to view native orchids daily, and that their purported "commercial, educational, and aesthetic interests" provide the requisite "personal stake" in the outcome of the controversy to give plaintiff Article III standing, Pl. Resp. Br. at 2-3, plaintiff fails to provide any declaration to support these assertions. "At the summary judgment stage, plaintiff may not merely allege its standing to sue, but must support its claims with affidavits or other evidence of specific facts." Lujan, 504 U.S.

---

[2] The opinion in American Soc'y for the Prevention of Cruelty to Animals is distinguishable on two grounds. First, the D.C. Circuit reversed because it found the complaint adequately alleged harm to an aesthetic interest, and at that stage of the case, before summary judgment motions were filed, the court must assume the truth of plaintiff's claims. 317 F.3d at 337. Here, in contrast, plaintiff must support its claims with affidavits or other evidence of specific facts, Lujan, 504 U.S. at 561; Defenders of Wildlife, 257 F. Supp. 2d at 62, and plaintiff has failed to do so.

   Second, the complaint filed in American Soc'y for the Prevention of Cruelty to Animals alleged a harm to Thomas Rider, one of the named plaintiffs. Id. Here, in contrast, plaintiff has not submitted a declaration by a member of HOGA that demonstrates the requisite harm to a member, or to HOGA itself, from the importation of orchids pursuant to the Final Rule at issue here.

at 561; <u>Defenders of Wildlife</u>, 257 F. Supp. 2d at 62.  Thus, plaintiff has failed to demonstrate the first prong of the associational standing test, that at least one of HOGA's members would have standing to sue in his or her own right.[3]

As explained in defendants' opening brief and above, plaintiff fails to demonstrate the requisite standing, and Counts I and III, the remaining claims in its Amended Complaint,[4] should be dismissed.[5]

### B.     EVEN IF PLAINTIFF HAD STANDING, DEFENDANTS HAVE NOT VIOLATED THE ESA.

#### 1.     APHIS provided FWS the Relevant Information Regarding Thrips.

Defendants' opening brief explained that plaintiff's ESA arguments were without merit.

Defs. Opening Br. at 26-40.  Plaintiff contends that APHIS failed to share the "best scientific and

---

[3]Plaintiff has also not explained how it meets the "germaness requirement."  While the "germaneness requirement" is "undemanding," and requires "mere pertinence" between a litigation subject and an organization's purpose, <u>Humane Soc'y of the United States v. Hodel</u>, 840 F.2d 45, 58-59 (D.C. Cir. 1988), plaintiff's response brief does not explain how it is met. While HOGA describes itself as an organization formed in 1995 to "coordinate efforts among breeders, propagators, and growers of orchids in Hawaii," Pl. Statement of Material Facts at 2, ¶ 1, there is no explanation as to how that purpose relates to filing a lawsuit alleging a violation of the Endangered Species Act.

[4]The parties stipulated to dismissal of Counts II and IV of the Amended Complaint soon after defendants moved to dismiss those counts, and the Court granted the stipulation.  Docket Nos. 19 and 20 (order granting stipulation).

[5]Plaintiff's contention that any injury it has suffered is "exacerbated" by APHIS's allegedly unlawful "pre-emption" of the State inspection system fails.  First, plaintiff fails to demonstrate how federal preemption of a State legal system injures plaintiff.  Moreover, there is no real dispute that the United States Department of Agriculture has the authority to take the necessary steps to prevent the introduction of pests, and to pre-empt State laws.  <u>See e.g.</u>, 7 U.S.C. § 7756.

commercial data available" when APHIS failed to provide FWS the text of comments submitted

by plaintiff and the State of Hawaii, Department of Agriculture, on the proposed rule and the

issue of thrips. Pl. Resp. Br. at 9-10. While plaintiff contends that the Section 7 process is

flawed by APHIS's failure to share the textual comments regarding thrips, Pl. Resp. Br. at 9-10,

plaintiff provides no legal support for its argument. While the Endangered Species Act and

implementing regulations require both the action agency and FWS to use the "best scientific and

commercial data available" in the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §

402.14(d), neither the Act nor the regulations specify what qualifies as the best scientific and

commercial data, or how relevant information is to be shared between the agencies.

Here, while it is not clear from the administrative record whether APHIS provided FWS a

copy of the comments from plaintiff and the State of Hawaii, Department of Agriculture during

the Section 7 process, the record is clear that APHIS and FWS discussed the issue of thrips

infestations, including the issue of the appropriate screen mesh size for excluding thrips. See

Defs. Opening Br. at 28-34 and cites therein. Plaintiff contends that the failure of APHIS to

provide the comments to the FWS resulted in APHIS "arbitrarily limit[ing]" the list of

quarantine pests likely to be included in orchids imported from Taiwan when APHIS prepared

and issued both its 1997 Pest Risk Analysis ("PRA") and its 2003 Risk Analysis. Pl. Resp. Br. at

11.

In particular, plaintiff focuses heavily on a report prepared by Dr. Hara, which plaintiff

had attached to its comments submitted on the proposed rule. Pl. Resp. Br. at 11. Dr. Hara's

report identifies reports of alleged import of certain thrips species, which are listed as quarantine

pests, with the import of orchids from Taiwan, and plaintiff's discussion of Dr. Hara's report

focuses heavily on the alleged risk associated with <u>Thrips palmi</u>.  Pl. Resp. Br. at 11-12.

According to plaintiff, the failure of APHIS to provide the text of plaintiff's comments to FWS

means the best scientific and commercially available data was not used in the Section 7 process.

Plaintiff's argument fails.

First, APHIS's 1997 PRA and the 2003 Risk Analysis did not arbitrarily limit the pests

identified.  Pursuant to both current and past APHIS guidelines (both of which are based on

international guidelines), APHIS assembled a list of potential plants pests that <u>might</u> be

associated with <u>Phalaenopsis</u> after consulting literature reviews of published and peer reviewed

scientific documents and electronic databases, such as the University of California computer

information system on pests, the United States catalogue of intercepted pests and interception

records, the CM.I Distribution Maps and Descriptions of Plant Pests, various texts and indices of

plant pathogens and diseases, APHIS's files on pests not known to occur in the United States,

and other national and international plant pest databases.  AR 1319; AR 1371; AR 1352.[g]  This

initial list included all pests that "<u>may</u>" be associated with the plant "<u>in any way</u>," AR 1352-58

(emphasis added); AR 1371, not just quarantine pests that were likely to follow <u>Phalaenopsis</u>

into the United States.

After assembling this preliminary list, APHIS identified the quarantine plant pests likely

to follow <u>Phalaenopsis</u> spp. orchids from Taiwan into the United States.  AR 1082 (2003 Risk

Assessment), 1532 (text of Final Rule stating that "APHIS is confident that the 2003 risk

---

[g]As to <u>Thrips palmi</u>, APHIS's Final Rule explains that <u>Thrips palmi</u> had not been documented as
being specifically associated with <u>Phalaenopsis</u> species.  AR 1534.  APHIS's 1997 PRA and
2003 Risk Analysis identified <u>Thrips palmi</u> as a pest, but not one that is associated specifically
with <u>Phalaenopsis</u>.  AR 1078 (2003 Risk Analysis), 1355 (1997 PRA).

analysis considers all pests known to be associated with <u>Phalaenopsis</u> spp. orchids.").  Pursuant

to past and current APHIS guidelines for conducting these risk assessments, this analysis itself

required three sub-steps.  First, a quarantine pest is one that is "of potential economic

importance." AR 1319 (current APHIS guidelines); AR 1372 (past APHIS guidelines); <u>see also</u>

AR 1629 (international standards).  An organism is considered to be of potential economic

importance both because of the threat it poses to the area it could endanger and because scientific

evidence, as indicated in the literature, demonstrates that an organism has an association with the

plant species being assessed.  AR 1319; AR 1372.

Second, a quarantine pest must be "not yet present [in the United States], or present but

not widely distributed and being officially controlled."  AR 1319; AR 1372; AR 1629.  Finally, a

quarantine plant pest that is "likely to follow the import pathway," is one that, it is reasonable to

assume, is present in the exporting country, associated with the plants at the time of harvest, and

remains with the plants during harvesting, packing and shipping.  AR 1320; AR 1373.

APHIS performed each of these inquires in both its initial and final scientific assessments

for the <u>Phaleanopsis</u> species orchids, initially identifying seven, and finally six quarantine plant

pests as likely to follow these plants into the United States.  AR 1082; AR 1362.  Analyzing

factors such as the climate-host interaction, the host range, the potential for dispersal, economic

impact, environmental impact, the likelihood of introduction, APHIS then determined the risk

that would be posed by the <u>unmitigated</u> introduction of these six pests into the United States.

AR 1082-1090 (2003 Risk Analysis); AR 1360-63 (1997 PRA).  In the 2003 Risk Analysis,

APHIS assigned a risk rating of high to the <u>Spodoptera litura</u> moth and a risk rating of medium

to the other five quarantine pests.  AR 1089-90.  Thrips was eliminated because APHIS

determined that they could not survive the importation process. AR 1080-1081 (""[O]nly the quarantine pests that can reasonably be expected to follow the pathway, i.e. be included in commercial shipments of Phalaenopsis are further analyzed.") (emphasis in original). Thus, plaintiff's contention that APHIS arbitrarily limited the pests it identified is contradicted by the administrative record.

Moreover, contrary to plaintiff's suggestions, FWS was aware that APHIS did not include several species of quarantine pest thrips, as the FWS identified the issue as an area of concern that remained after its review of APHIS's Biological Evaluation ("BE"). AR 308.[7] FWS's concern was resolved at a meeting held between APHIS and FWS on April 2-3, 2003 AR 304-05, and documented in an April 3, 2003 letter to FWS, as well as in minutes from the meetings. AR 301-303, 304-306. In response to FWS's request to clarify why several species of quarantine significant thrips were eliminated from consideration, APHIS advised FWS that the thrips were originally considered in the quarantine pest list in the 1997 PRA, but were not considered a pest that would follow the importation pathway. AR 304. APHIS explained that it conducted extensive literature searches which revealed that none of the thrips identified in the PRA had ever been reported on Phalaenopsis. AR 301, AR 304-305. APHIS also advised that there was no evidence in its interception database that linked quarantine pest thrips to Phalaenopsis, and in a run of the interception database on the morning of the April 3, 2003 meeting, there were no records of thrips on Phalaenopsis orchids. AR 304-305.

APHIS further explained that Phalaenopsis has been imported bare root into the United

---

[7] The second concern FWS raised, why the BE referred to aqueous zone solution in relation to the sphagnum moss, AR 308, is not relevant here.

States for at least 20 years, and no problems with pests on <u>Phalaenopsis</u> have arisen.  AR 305.

Finally, APHIS noted that if a propagation facility has recurring interceptions or their shipments

are consistently found to be in non-compliance with APHIS phytosanitary measures, the facility

will not be able to import into the United States.  AR 305.

Plaintiff contends that APHIS was incorrect in telling FWS that its literature searches did

not show that the thrips identified in the risk analyses were ever reported on <u>Phalaenopsis</u>

orchids, when, according to plaintiff, both the 1997 PRA and the 2003 Risk Analysis identified

"numerous" thrips species as quarantine pests associated with <u>Phalaenopsis</u> orchids from

Taiwan.  Pl. Resp. Br. at 15.  On the contrary, only one species of thrips, <u>Thrips hawaiiensis</u>, is

identified as associated with <u>Phalaenopsis</u> species from Taiwan.  AR 207 (1997 PRA); 1078

(2003 Risk Analysis).  While other species of thrips are identified as associated with

<u>Orchidaceae</u>, the family <u>Orchidaceae</u> includes genera other than <u>Phalaenopsis</u>, a fact which

plaintiff acknowledges.  Pl. Resp. Br. at 15.

Moreover, simply because PPQ interception records noted interception of thrips on

Orchidaceae does not mean that the orchids were <u>Phalaenopsis</u>.  As plaintiff also acknowledges,

the 1997 PRA explains that <u>Orchidaceae</u> was the term used for orchids which were not identified

to genus at the time of pest interception.  Pl. Resp. Br. at 16 (citing AR 210).  Based on this,

plaintiff jumps to the conclusion that there is a "reasonable link" between thrips and

<u>Phalaenopsis</u>.  Plaintiff essentially argues that because APHIS's interception records do not

specify the genus on which certain thrips were intercepted, they must have been intercepted on

<u>Phalaenopsis</u>.  Pl. Resp. Br. at 16.  The administrative record does not support plaintiff's leap in

logic.

Finally, plaintiff's reference to the experience of the State of Hawaii, Department of Agriculture, and its comment letter, fails to advance its case. As defendants earlier explained, plaintiff has not demonstrated that thrips were intercepted during Hawaii's 1993 import, and plaintiff fails to explain whether the 1993 imports were grown and imported under the same requirements and mitigation measures that APHIS has imposed in its Final Rule at issue here. Defs. Opening Br. at 33, n.12. In fact, in response to a comment submitted on the Final Rule which referred to the experience of the State of Hawaii, APHIS explained that inspection is the last safeguard in a series of safeguards required by the rule, and that the various measures other than inspection at the port of entry are intended to ensure that the Phalaenopsis orchids are free of pests prior to arrival at a port of entry into the United States. AR 1535, Final Rule, 69 Fed. Reg. 24, 916, 24, 927 (May 5, 2004).

### 2. Screen Mesh Size was Adequately Considered by both APHIS and FWS.

Plaintiff next contends that APHIS mis-led the FWS regarding the efficacy of screen mesh to exclude pests from the orchids while they are in the Taiwanese greenhouses, and that APHIS "avoided altogether" comments stating that a screen mesh size of .6 mm was insufficient to exclude thrips. Pl. Resp. Br. at 18-22. On the contrary, as defendants explained in their opening brief, APHIS and FWS discussed the issue of screen mesh size during both the initial consultation in 2003, and the programmatic consultation in 2004. See Defs. Opening Br. at 30-33 and administrative record citations therein. During the initial consultation, APHIS explained that while the proposed 0.6 mm mesh screening would not exclude thrips, thrips are not expected to follow the importation pathway of Phalaenopsis into the United States. AR 304.

The issue of thrips was again raised during the programmatic consultation in 2004. In a

March 18, 2004 letter, FWS recommended that APHIS require a .4 mm screen mesh in APHIS-approved greenhouses, in order to prevent <u>thrips</u> infestations, as prior inter-agency discussions led FWS to believe that the .6 mm screen mesh size would be inadequate.  March 18, 2004 Letter from Richard Sayers, Chief, Branch of Consultation and Habitat Conservation Planning, FWS to Michael R. Lidsky, Plant Health Programs, PPQ, APHIS at AR 2239.

APHIS responded with a June 2, 2004 letter, which advised that FWS's impression that greenhouses would have a screen mesh size of smaller than .6 mm was incorrect, and notes that at .2 mm, thrips could get in through screen sizes of even .4 mm, which FWS had recommended.  June 2, 2004 Letter from Michael R. Lidsky, APHIS to Richard Sayers, FWS at 3, AR 2235.  APHIS further advised that requiring screen size of smaller than .6 mm would require adapting greenhouse construction to accommodate the need for air circulation and cooling fans, particularly in humid climates, and that mitigation measures, such as routine or repeated pesticide sprays, when warranted, will reduce the risk of infestation and possible introduction of thrips into the United States.  <u>Id</u>. [9]

This explanation from APHIS addressed FWS's concerns, and FWS concluded the

_____

[9]APHIS also advised FWS that requiring screen size of smaller than .6 mm would require adapting greenhouse construction to accommodate the need for air circulation and cooling fans, particularly in humid climates.  AR 2235.  While plaintiff complains that APHIS improperly elevated economic concerns over concern for excluding pests, plaintiff has failed to demonstrate that APHIS has violated the ESA by choosing less expensive mitigation measures that still achieve the goal of excluding pests.

Moreover, the ESA does not mandate that an agency choose the most protective measure, as long as the record supports the agency's determination that the chosen measure is sufficiently protective.  <u>Southwest Center for Biological Diversity v. Bureau of Reclamation</u>, 143 F.3d 515, 523 (9th Cir. 1998).  In reaching this holding, the court also cited the deference owed to the expert agency.  <u>Id</u>. at 523.

section 7 consultation on the proposed program to import plants established in APHIS-approved

growing media and produced in accordance with requirements set forth at 7 C.F.R. § 319.37 to

prevent the introduction of quarantine pests into the United States.  September 1, 2004 Letter

from Gary Frazer, FWS to Michael Lidsky, APHIS at 2, AR 2125.

The letter also noted that FWS's initial determination was "may affect, but not likely to

adversely affect," and that the determination after re-initiation was the same.  Id. at 2; AR 2125.

Thus, plaintiff's assertion, and purported quote from the record, that APHIS never adequately

explained how the .6 mm screen mesh size would prevent thrips introductions, Pl. Resp. Br. at

22, is belied by the administrative record documents demonstrating that the agencies discussed

the issue during both the initial and programmatic consultation.

Plaintiff further contends that the mitigation measures are an unkept promise because the

Final Rule does not impose the specific measure of pesticide spray.  Pl. Resp. Br. at 22.  On the

contrary, APHIS's June 2, 2004 letter to FWS stated that mitigation measures, including routine

or repeated pesticide sprays, would be incorporated "when warranted," and thus, APHIS did not

state that the spray was required.  AR 2235.  Moreover, plaintiff overlooks the mitigation

measures imposed by APHIS's plants in growing media rule.  See Defs. Opening Br. at 7-9; 7

C.F.R § 319.37-8; see also AR 1091 (2003 Risk Analysis discussing the regulatory mitigation

measures).  The three categories of mitigation measures required by this rule are pest-free

propagative materials, pest-exclusionary greenhouses, and inspection.  7 C.F.R. § 319.37-8(e).[9]

_____

[9]The 2003 Risk Analysis also discussed APHIS's experience with import of other plants in
growing media from Europe, pursuant to APHIS's plants in growing media rule, and the Risk
Analysis noted that no plant pest detections were made during inspections of greenhouses, and
that only one port of entry detection was reported.  AR 1092-1093.

The use of pest-free propagative materials requires monitoring and testing of mother stock and descendant plants.  Id. § 319.37-8(e)(2)(iv); AR 1090-91.  The use of pest-exclusionary greenhouses employs treatments, good sanitation, e.g., surface disinfection of tools and plant materials, clean water sources, and use of approved growing media.  7 C.F.R. §§ 319.37-8(e)(2)(v) & (vi); AR 1090-91.[10]  Furthermore, pursuant to the permit conditions, these plants are subject to inspection by APHIS officials at the U.S. port of entry, subject to treatments contained in the Plant Protection and Quarantine Treatment Manual, and may be denied entry if untreatable.  7 C.F.R. § 319.37-4(b).[11]  Pursuant to this inspection system, APHIS interception records show that since 1988, there have been fewer than 50 interceptions of quarantine-significant pests on Phalaenopsis from Taiwan imported pursuant to this rule.  Final Rule, 69 Fed. Reg. 24, 916, 24, 929; AR 1537.

Likewise, APHIS's Biological Evaluation, prepared as part of its Section 7 consultation obligations, identified the mitigation measures to be imposed on the importation of the orchids, which include a four month quarantine period in Taiwan, AR 362, a port of entry inspection at specially staffed and equipped Plant Inspection Stations, AR 362, and inspection of greenhouses and the plants within them to ensure that the greenhouses meet standards, and the plants are free of pests.  AR 359, 362.  During the Section 7 consultation process, APHIS informed the FWS

---

[10] Independent studies of APHIS-approved growing media have found that pathogens are not present.  AR 1091.

[11] Moreover, the June, 2004 Work Plan for Plants in Growing Media from Taiwan, entered into by APHIS and the Taiwanese Bureau of Animal and Plant Health Inspection and Quarantine ("BAPHIQ") also imposes certain inspection requirements.  The work plan provides for inspection of the facilities and plants (AR 1548-49), and of bare-rooted plants and mother stock (AR 1550-51), and provides that BAPHIQ is responsible for inspection during the growing season and during packing, and is responsible for inspecting and approving greenhouses for exports to the United States.  AR 1552, 1553.

that the mitigation measures described in the documents submitted had "proven effective in similar programs, [and] will effectively mitigate potential pest risks and will protect threatened and endangered species and their habitats." October, 2003 Letter from Lee Ann Thomas, Acting Director, APHIS to Gary Frazer, Assistant Director, Endangered Species, Fish and Wildlife Service, AR 2244. Thus, plaintiff has failed to demonstrate that APHIS has acted in an arbitrary or capricious manner in failing to require a pesticide spray, given the mitigation measures detailed in the administrative record here.

Plaintiff's citation to American Rivers v. United States Army Corps of Engineers, 271 F.Supp.2d 230, 253 (D.D.C. 2003), Pl. Resp. Br. at 22, fails to advance plaintiff's case in anyway. In American Rivers, the court held that a "no jeopardy" opinion issued by the FWS pursuant to Section 9 of the ESA violated both the ESA and the Administrative Procedure Act because it was premised on actions to be taken by the U.S. Army Corps of Engineers that the Corps did not ensure it would take. 271 F.Supp.2d at 253. Here, in contrast, the mitigation measures set forth in 7 C.F.R. § 319.37-8 are mandatory, and are in effect as to orchids imported pursuant to the Final Rule.

### 3. Plaintiff's Argument that APHIS Failed to Analyze Critical habitat Should be Deemed Waived, and, At Any Rate, is Without Merit.

Plaintiff next raises an argument that was not raised in Counts I and III of its Amended Complaint, nor in its opening brief - - the argument that APHIS purportedly failed to consider critical habitat in its Biological Evaluation. Pl. Resp. Br. at 22-24. Given that plaintiff did not raise this argument until its combined response and reply brief, it should be considered waived. See generally, Plotner v. AT & T Corp., 224 F.3d 1161, 1175 (10th Cir. 2000) (citing its general rule, and declining to consider new arguments raised for first time in reply brief).

At any rate, plaintiff's argument overlooks certain analysis in the administrative record. First, the summary section of APHIS's Biological Evaluation explained that the proposed import of <u>Phalaenopsis</u> species from Taiwan may effect, but is not likely to adversely effect federally proposed or listed species or "designated critical habitat." AR 348. The rationale for this determination was, in part, because the proposed action included many mitigation measures and safeguarding opportunities that are "highly effective in preventing the entry of pests into the United States." AR 372.

The administrative record also reflect the comments of the United States Fish and Wildlife Service as to critical habitat. For example, the Regional Director of the Southeast Region informed the Director of the FWS that all Ecological Services Field Offices in the region reviewed the BE, and the region identified no specific instances where it would not concur with APHIS's determination that the proposed importation is not likely to adversely affect listed species or adversely modify critical habitat. AR 344.[12] Finally, in concluding the Section 7 consultation in April, 2003, the FWS stated that it concurred with APHIS's determination that the proposed import would not adversely affect federally listed or proposed endangered or threatened species, "or their habitats." AR 299.

Thus, plaintiff is mistaken to argue that APHIS did not consider the effects of the proposed import on critical habitat. The administrative record reflects consideration by both APHIS and FWS of the issue, and plaintiff has not demonstrated that either APHIS or FWS

_____

[12]Contrary to plaintiff's suggestion, the July 9, 2003 comment submitted by the Hawaii Department of Agriculture did not raise a criticism regarding APHIS's analysis of critical habitat in its Biological Evaluation. Instead, the portion of the comment that plaintiff cites contends that with the designation of critical habitat in Hawaii, the State would lose rights over its lands if APHIS allowed the import of potentially invasive species. AR 1050.

17

acted in an arbitrary or capricious manner.

> **4.    Both Agencies Adequately Considered the Risks Associated with the Approved Growing Medium.**

Plaintiff spends the rest of its combined response and reply brief arguing that both APHIS and FWS failed to consider the risks of importation of pests associated with the approved growing medium, the sphagnum moss.  Pl. Resp. Br. at 25 - 32.  This argument differs from Count III of the Amended Complaint, where plaintiff faulted only FWS for purportedly failing to consider the risks associated with the growing medium.

Defendants' opening brief explained, however, that FWS did consider those risks.  Defs. Opening Br. at 37-40.  The explanation provided in defendants' opening brief also demonstrates that APHIS considered the risks associated with approved growing media.  For example, the BE that APHIS provided FWS contained a section identifying "Specific Mitigation Measures for Propagative Materials," AR at 355, and the 2003 Risk Analysis explains that it is examining the "phytosanitary risks associated with the potential importation, from Taiwan into the United States, of moth orchid plants rooted in APHIS-approved growing media."  2003 Risk Analysis at 1, AR 2295.  The 2003 Risk Analysis also noted that use of approved growing media is one mitigation measure required by APHIS regulations to "effectively remove [] pests from the pathway, thus precluding them from establishment in the United States."  2003 Risk Analysis at 18, AR at 2313.  For example, use of approved growing media is one mitigative measure expected to ensure that the <u>Phalaenopsis</u> plants are free of mollusk eggs.  2003 Risk Analysis at 22, AR 2317.[13]

---

[13]Plaintiff's assertion that APHIS's Risk Assessments fail because they did not consider the risk that ants would be imported in the growing media, Pl. Resp. Br. at 27, is unsupported by any record citation.  Instead, plaintiff points this Court to an extra-record document, an APHIS notice

While plaintiff contends that the regulatory measure requiring that the sphagnum moss not have been previously used is insufficient to protect against pest infestation, Pl. Resp. Br. at 30, plaintiff fails to support its assertion with any citation to the record. As the expert agency, APHIS is entitled to deference, <u>Baltimore Gas & Electric v. NRDC</u>, 462 U.S. 87, 103 (1983) , and plaintiff has failed to demonstrate that APHIS is arbitrary and capricious in determining that the regulatory requirements of 7 C.F.R. § 319.37-8 are sufficiently protective.[14]

Defendants' opening brief explained APHIS's analysis of the risks posed by growing media. Defs. Opening Br. at 38-39. Sphagnum moss is an approved growing medium, 7 C.F.R. § 319.37-8(e)(1), and has been successfully imported into the United States for years. AR 1537. Additionally, studies on APHIS-approved growing media, which includes sphagnum moss, found that pathogens are not present. AR 1091. Moreover, in addition to ensuring that the growing media has not previously been used, APHIS requires that the greenhouses ensure that pests are excluded from the greenhouses, and that growing media are subject to inspection. 7 C.F.R. § 319.37-8(e)(2)(i), (ii),(vi), (viii); <u>see also</u> 7 C.F.R. § 319.37-3 (Permits); § 319.37-4

---

regarding a quarantine on ants intercepted from commodities destined to Hawaii (Att. 5 to Amended Complaint) which makes no reference to the import of orchids pursuant to the Final Rule at issue here. Pl. Resp. Br. at 27. Plaintiff then asks this Court to find that, based on this unrelated, extra-record document, APHIS failed to adequately consider the risk that ants would be imported with sphagnum moss. Plaintiff fails to support its argument. <u>See also</u> Defs. Opening Br. at 35-36 (responding to other arguments raised by plaintiff with respect to APHIS's "ant policy.").

[14]Contrary to plaintiff's assertion, Pl. Resp. Br. at 30, FWS did not state that the regulatory requirements of 7 C.F.R. § 319.37 were insufficient to protect against pest infestation via the sphagnum moss. The letter that plaintiff cites is a November 30, 1998 from FWS to APHIS in response to the proposed rule, and recommending that APHIS enter into formal Section 7 consultation with FWS. AR 267. One issue that FWS raises is the potential that pests will be transported with the growing medium. AR 268. The cited letter does not, however, address the phytosanitary requirements of 7 C.F.R. § 319.37. AR 267-268.

(Inspection, treatment, and phytosanitary certificates of inspection).  See also AR 1092, 1538;
see also Defs. Opening Br. at 4-9 (describing measures imposed by statute and regulation).

Furthermore, plaintiff's contention that APHIS's risk assessments failed to address the
risks posed by growing media, Pl. Resp. Br. at 29, is without merit.  For example, the 1997 PRA
acknowledged that "the importation of live Phalaenopsis plants from Taiwan in sphagnum
growing medium is a potential pathway for introduction of plants pests."  AR 201.  The 1997
PRA further noted Phalaenopsis species are successfully grown in sphagnum from New Zealand,
and that APHIS contracted a study to be done which evaluated peat and other materials as
growing media.  AR 201.  The PRA also noted that "[c]ommercial sphagnum is allowed entry as
it is an approved growing medium under [7] C.F.R. § 319.37-8(e)(1)."  AR 201.

Likewise, the 2003 Risk Analysis noted that the plants in growing media rule requires
plants to be grown in approved growing media, and that studies on APHIS-approved growing
media found that pathogens are not present.  AR 1091.  The 2003 Risk Analysis also noted that
use of approved growing media is one mitigation measure required by APHIS regulations to
"effectively remove [] pests from the pathway, thus precluding them from establishment in the
United States."  2003 Risk Analysis at 18, AR at 2313.  For example, use of approved growing
media is one mitigative measure expected to ensure that the Phalaenopsis plants are free of
mollusk eggs.  2003 Risk Analysis at 22, AR 2317.

Finally, plaintiff's argument that the FWS failed to analyze the risks that pests would
arrive in the growing medium, Pl. Resp. Br. at 31-32, is also belied by the administrative record,
which contains numerous documents reflecting FWS's identification and consideration of the
risk from the growing media.  See Defs. Opening Br. at 38-40.  For example, FWS's November
30, 1998 comment letter on the proposed rule noted and discussed the possible risk of

introduction of alien species or diseases through the import of the growing medium, and the possible resulting harm to Hawaii's native orchids and other native flora. AR 267-268. See also AR 345 (memo from Regional Director of FWS's Southeast Region to FWS Director commenting that "[p]hytosanitary or protective measures might be effective, but non-native pests could still gain access to the U.S. during importation if approved growing media (especially natural plant products such as sawdust, buckwheat hulls or sphagnum moss) were infested or contaminated.").

Likewise, during the initial consultation, FWS sent APHIS a letter, dated March 21, 2003, stating that FWS recognized that APHIS would use a "systems approach in pest risk management for the importation of Phalaenopsis in approved growing media," consisting of three phases: harvesting plant material from mother stock, cultivation and packaging of descendant plants, and importation of these plants to the United States." March 21, 2003 Letter from FWS to APHIS, AR 307. Finally, during the April 2-3, 2003 meeting, APHIS and FWS discussed the use of ozonated water in Taiwanese greenhouses, and APHIS noted that using unused sphagnum moss as an approved growing medium does not require disinfection treatment. AR 305.[15]

As the discussion and record citations above demonstrate, FWS considered the risks posed by the importation of plants in approved growing media, and discussed those risks with APHIS during the Section 7 consultation. Plaintiff has failed to demonstrate that APHIS or FWS

---

[15]Furthermore, APHIS noted that ozonated water is not prescribed or required by APHIS, but on a site visit to Taiwanese propagation facilities, ozonated water was seen being used as a disinfectant. AR 301; AR 305. APHIS further advised FWS that there was no reason to believe using ozonated water has adverse consequences to listed and proposed species, and APHIS did not expect it to adversely affect the mitigation measures that are required. AR 310; AR 305.

21

acted in an arbitrary or capricious manner in considering the risks posed by the approved growing media.

## III. CONCLUSION

For the reasons expressed above and in defendants' opening brief, plaintiff has failed to demonstrate that it has the requisite standing to pursue this case. Even if this Court finds plaintiff has standing, however, plaintiff has failed to demonstrate that either APHIS or FWS violated the ESA.

Accordingly, this Court should grant defendants' motion to dismiss, or, in the alternative, defendants' motion for summary judgment, deny plaintiff's motion for summary judgment, and dismiss the remaining counts (Counts I and III) of plaintiff's Amended Complaint.

Dated: June 21, 2006                    Respectfully submitted,

                                        Sue Ellen Woolridge
                                        Assistant Attorney General
                                        Environment & Natural Resources Division
                                        United States Department of Justice


                                        _____/s/_____
                                        DONNA S. FITZGERALD
                                        Connecticut Bar #411810
                                        Trial Attorney
                                        Natural Resources Section
                                        Environment & Natural Resources Division
                                        United States Department of Justice
                                        P.O. Box 663
                                        Washington D.C. 20044-0663
                                        Phone: (202) 305-0476
                                        Fax: (202) 305-0506
                                        E-mail: Donna.Fitzgerald@usdoj.gov

OF COUNSEL:

Darlene Bolinger
Attorney Advisor General
Regulatory Division

Office of the General Counsel
United States Department of Agriculture
Rm 2319 South Building
1400 Independence Ave., SW
Washington, DC 20250-1400

Peg Romanik, Attorney
Office of the Solicitor
Division of Parks & Wildlife
United States Department of the Interior
1849 C. St., N.W., MS 6557
Washington D.C. 20240